1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jaba Tsitsuashvili (CA SBN 309012)
jaba.tsitsuashvili@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

*Attorney for Plaintiff*
*Kaji Dousa*

[Additional counsel listed on following pages]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAJI DOUSA,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS"); U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT ("ICE"); U.S. CUSTOMS AND BORDER PROTECTION ("CBP"); KEVIN K. MCALEENAN, Acting Secretary of DHS; MATTHEW T. ALBENCE, Acting Director of ICE; MARK A. MORGAN, Acting Commissioner of CBP; and PETER FLORES, Director of Field Operations for CBP, San Diego,<br><br>Defendants. | Case No. '19CV1255 LAB KSC<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

R. Stanton Jones* (DC SBN 987088)
stanton.jones@arnoldporter.com
William C. Perdue* (DC SBN 995365)
william.perdue@arnoldporter.com
Christian Sheehan* (DC SBN 1045233)
christian.sheehan@arnoldporter.com
Jean Chang* (DC SBN 1035614)
jean.chang@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

Ada Añon* (NY SBN 5030697)
ada.anon@arnoldporter.com
Leah Harrell* (NY SBN 5623335)
leah.harrell@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th St.
New York, NY 10019
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

Stephanie Llanes* (NY SBN 5580014)
stephanie.llanes@protectdemocracy.org
PROTECT DEMOCRACY
222 Broadway, 19th Floor
New York, NY 10038
Telephone: (202) 579-4582

Anne Tindall* (DC SBN 494607)
anne.tindall@protectdemocracy.org
PROTECT DEMOCRACY
2020 Pennsylvania Avenue NW, Suite # 163
Washington, DC 20006
Telephone: (202) 579-4582

Genevieve Nadeau* (MA SBN 677566)
genevieve.nadeau@protectdemocracy.org
Ben Berwick* (MA SBN 679207)
ben.berwick@protectdemocracy.org
PROTECT DEMOCRACY
15 Main Street, Suite 312
Watertown, MA 02472
Telephone: (202) 579-4582

*Attorneys for Plaintiff*
*Kaji Dousa*

*pro hac vice applications forthcoming

## **INTRODUCTION**

1. "For I was hungry and you gave me food, I was thirsty and you gave me something to drink, I was a stranger and you welcomed me, I was naked and you gave me clothing, I was sick and you took care of me, I was in prison and you visited me. Truly I tell you, just as you did it to one of the least of these who are members of my family, you did it to me." *Matthew* 25:35–36, 40. As a Christian minister, Plaintiff Pastor Kaji Dousa believes that serving the needs of migrants, refugees, and asylum-seekers—the most vulnerable among us—is a requirement of her Christian faith. The First Amendment safeguards Pastor Dousa's right to follow Christ's commandment to serve "the least of these," and to lead them in prayer, for "religious activity occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits." *Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*, 536 U.S. 150, 161 (2002). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Nor may our government punish expression of a person's beliefs, no matter how at odds they may be with the government's policy. *See Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969).

2. Punishing Pastor Dousa's protected ministry and expression, however, is exactly what Defendants—agencies and officials of our federal government— have done and will continue to do without intervention from this Court.

3. Pastor Dousa serves as Senior Pastor at the Park Avenue Christian Church in New York, New York. She is also Co-Chair of the New Sanctuary Coalition, a faith-based organization dedicated to serving and advocating for immigrant communities.

4.     Pastor Dousa is called by God to follow Jesus Christ, who spent most of his life in the company of people cast aside by ruling authorities.  In the Gospel of Matthew, the Bible records that the Holy Family—Mary, Joseph, and Jesus—fled for Egypt with government authorities in hot pursuit, narrowly escaping the King's massacre of all children under the age of two.  In Egypt, Jesus and his parents were received as refugees.  *See Matthew* 2:13–15.  The Bible explains that after his return, Jesus began a rapidly growing ministry that soon threatened unjust ruling authorities.  For his conscientious preaching about justice and his compassionate ministry to outsiders, those same authorities executed him, nailing him to a cross to silence him.

5.     Because Jesus crossed a foreign border as a refugee and an immigrant, Pastor Dousa has preached to her congregation and other audiences of faith that "to oppose an immigrant is to oppose Jesus."  She has warned that "if we do not stand on the side of immigrants right now, history will find us as the ones who were complicit in their persecution."

6.     Pastor Dousa offers pastoral care to longtime U.S. residents facing deportation and separation from their U.S. citizen families.  She meets with them.  She leads them in prayer.  She organizes prayer vigils for and with these vulnerable individuals and families.  Pastor Dousa has done all the same for newly arrived refugees who fled violence and extreme poverty in their home countries.

7.     Pastor Dousa's ministry also takes her to the United States' Southern Border with Mexico.  Since serving several years ago as pastor to a church in La Mesa, California—20 miles from the Southern Border—she has provided pastoral care to migrants, as well as to people giving them aid and counsel.

8.     Most recently, Pastor Dousa was a lead organizer of the "Sanctuary Caravan," a mobile faith clinic deployed to Tijuana, Mexico to minister to Central American refugees fleeing persecution, violence, crushing poverty, and even death.

2

Many of these migrants are devout Christians, and they often turn to their faith to guide and sustain them.

9. Late last fall and again in January of this year, Pastor Dousa traveled to Tijuana where she prayed with scores of migrants and their advocates. She preached to them. She heard their confession. She offered them absolution. She anointed the sick. She consoled the mourning. She laid hands on the injured. She offered grace to the anguished. She dedicated the children of migrants born on their journey in search of safe refuge. She officiated Christian marriage ceremonies for migrants who had never before been able to have a church-blessed wedding. In Tijuana, Pastor Dousa exercised all the duties of the Christian pastoral office.

10. For these acts of devotion commanded by the core tenets of her Christian faith, Defendants targeted Pastor Dousa with surveillance, detention, interrogation, and harassment.

11. In New York, regional ICE officials tracked rallies and prayer vigils led by Pastor Dousa on a list that the officials compiled of so-called "Anti-Trump Protests." These officials marked Pastor Dousa for surveillance because she prayed with and for immigrants, and because she generated publicity about the devastation that ICE's enforcement activities rain on immigrants and their families.

12. Then, in January, Defendants detained Pastor Dousa as she attempted to re-enter this nation, her nation, after a day in Tijuana ministering to migrants and their advocates. Border agents interrogated Pastor Dousa about her pastoral work. They interrogated her about her motives. They interrogated her about her associations. They revealed to Pastor Dousa that they had collected detailed information about her and her pastoral work. And they revoked the access she had previously been granted to expedited border crossing.

13. Pastor Dousa's name is included in a secret government database of journalists, attorneys, immigrant-rights activists, and others targeted for their work

with and for migrants.  Compiled as part of a wide-ranging investigatory effort known as "Operation Secure Line," this database contains a picture of Pastor Dousa with a yellow "X" over her face.

14.   Defendants' targeting of Pastor Dousa impedes her ministry, through and through.  It burdens her ability to continue answering God's call to minister to migrants and refugees, which cannot happen without confidence in confidentiality. It deprives Pastor Dousa of her ability to offer pastoral guidance without credible fear of intrusion and retaliation by the government.  Defendants' targeting of Pastor Dousa has further forced her to take steps contrary to her faith and to forgo activities that her faith requires, including all but ending her ministry of pastoral care at the Southern Border.  And Defendants' surveillance of Pastor Dousa has diminished attendance of migrants at church services she leads, depriving her of the ability to minister to her congregation and the community at large.

15.   Pastor Dousa is not alone.  Defendants' targeting of her in retaliation for her religious exercise and protected expression is part of a nationwide effort by the United States government to silence the voices of anyone, even a prominent Christian minister, who dissents from the administration's immigration policies, and to punish anyone who offers comfort, aid, or care to migrants and refugees.

16.   The First Amendment's Free Exercise and Free Speech Clauses prohibit our government from discriminating or retaliating on the basis of a person's religious exercise or protected expression.  The Religious Freedom Restoration Act ("RFRA") prohibits our government from significantly burdening a person's exercise of her chosen religion.  By targeting Pastor Dousa for surveillance, detention, interrogation, and other adverse actions on the basis of her Christian ministry to migrants, refugees, and those who provide them aid and sanctuary, Defendants' actions violate the First Amendment and RFRA.

17.     Defendants' actions are not only unlawful, but fundamentally at odds with a democratic society in which people are free to follow their faith and government policy is subject to robust debate and criticism.  Authoritarian regimes spy on, detain, and punish their critics; democracies thrive on the competition of ideas and freedom of belief.

18.     In this country, the government cannot dictate the people with whom a pastor may pray, to whom she may preach, or for whom she may seek God's pardon and absolution.  Pastor Dousa asks that the Court remind Defendants of these fundamental tenets of our democracy.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331. Pastor Dousa's causes of action arise under the laws and Constitution of the United States, including the First Amendment and RFRA, 42 U.S.C. § 2000bb *et seq*.

20.     Venue is proper in this district under 28 U.S.C. § 1391.  A substantial part of the events giving rise to this action occurred in this judicial district.

21.     An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief, *id.* §§ 2201, 2202; 42 U.S.C. § 2000bb-1.

## PARTIES

22.     Plaintiff Kaji Dousa is a U.S. citizen and the Senior Pastor at Park Avenue Christian Church ("The Park").  Located on the Upper East Side of Manhattan in New York City, The Park is a well-known, prominent feature of the Manhattan community.  Pastor Dousa was elected to her position at The Park on June 19, 2016, by a unanimous vote—the first in the congregation's 206-year history.  Pastor Dousa is also the Co-Chair of the New Sanctuary Coalition ("New Sanctuary"), work she began a decade ago while serving at Saint Peter's Memorial Church in New York City.  Housed in Judson Memorial Church, also in New York

City, New Sanctuary is a faith-based network of congregations, organizations, and individuals devoted to immigrant rights.  Pastor Dousa is also President of the Yale Divinity School Alumni Board and serves as a Trustee for Andover Newton Seminary at Yale.  She has served on United Church of Christ ("UCC") Board of Directors' Executive Council.

23.    Defendant U.S. Department of Homeland Security ("DHS") is an executive department of the United States Government.  DHS is headquartered in Washington, DC.

24.    Defendant U.S. Immigration and Customs Enforcement ("ICE") is an agency within DHS, that includes the Homeland Security Investigations ("HSI") directorate.  ICE is headquartered in Washington, DC.

25.    Defendant U.S. Customs and Border Protection ("CBP") is an agency within DHS headquartered in Washington, DC.

26.    Defendant Kevin K. McAleenan is the Acting Secretary of DHS.  He is named in his official capacity.  He is responsible for the administration and enforcement of federal immigration laws, regulations, and policies, including against Pastor Dousa.  His address is 2707 Martin Luther King Jr Ave., SE, Washington, DC, 20528.

27.    Defendant Matthew T. Albence is the Acting Director of ICE.  He is named in his official capacity.  In this capacity, he is charged with administering the enforcement of immigration laws.  His address is 500 12th St., SW, Washington, DC, 20536.

28.    Defendant Mark A. Morgan is the Acting Commissioner of CBP.  He is named in his official capacity.  He is responsible for executing CBP's missions, including the mission for border security.  His address is 1300 Pennsylvania Ave., NW, Washington, DC, 20229.

29.     Defendant Peter Flores is the Director of Field Operations for CBP in San Diego, California and oversees the San Ysidro Land Port of Entry.  He is named in his official capacity.  San Ysidro Land Port of Entry is the border crossing between San Diego and Tijuana, and is located at 720 East San Ysidro Blvd., San Ysidro, CA, 92173.

## FACTUAL ALLEGATIONS

**I.     Pastor Dousa's Religion Commands Her to Engage in Direct, Confidential Ministry to Migrants and Their Advocates**

### A.     Pastor Dousa is called by God to provide pastoral care to immigrants and refugees and those who aid and care for them

30.     As a Christian and UCC leader, Pastor Dousa must follow Jesus Christ by mirroring his ministry to the vulnerable and dispossessed.  Her faith teaches her to see Jesus Christ in those who suffer as he did, and to view actions that cause further harm to the suffering as actions causing harm to Jesus Christ, who himself was a refugee.  Pastor Dousa is thus called to pray with and protect refugees, asylum seekers, and other migrants.  This calling is a command from God and answering it is a requirement of her faith.

31.     As part of her work with New Sanctuary, Pastor Dousa serves as a spiritual advisor to its leaders and members, including Ravi Ragbir, its Executive Director.  Through New Sanctuary, Pastor Dousa has, for the better part of a decade, organized and led weekly prayer vigils, or "Jericho Walks," near federal immigration buildings.  These interfaith gatherings borrow the symbolism of the Battle of Jericho from the Book of Joshua, in which the Israelites marched around the city of Jericho seven times, causing the city walls to fall.  New Sanctuary prays every week that "the wall of immigration injustice will come tumbling down."

32.     Pastor Dousa's ministry with New Sanctuary includes the organization's Accompaniment Program, which ensures that immigrants who have immigration court dates and ICE check-in appointments do not face them alone.

7

Pastor Dousa regularly accompanies and prays with immigrants through this program.

33.     Pastor Dousa's current work builds on a career of ministry.  Before joining The Park, Pastor Dousa was Senior Minister at The Table: La Mesa United Church of Christ in California, just miles from the Southern Border, where she led the congregation in various forms of support for newly arrived immigrants. Members of the congregation offered housing and helped connect immigrants with their family members throughout the United States.  During this time, Pastor Dousa frequently provided pastoral care at Casa Hogar, an orphanage in Baja California in Mexico.  With the League of Women Voters, she met with the Consulate General of Mexico to help connect migrants with family members in the United States.  She also brought her congregation to a yearly Christmas service at "Friendship Park," which is located at a space where a barricade between Mexico and the United States can be opened so that U.S. citizens and family members deported to Mexico may gather and pray together.  The *La Mesa Today* newspaper named Pastor Dousa La Mesan of the Year in 2015 for her ministry to immigrant children.

34.     Pastor Dousa continued her work on the Southern Border after being called to The Park in 2016.  In 2018, through New Sanctuary, she helped organize a "Sanctuary Caravan," a mobile clinic of faith leaders, congregants, and humanitarian workers who provided pastoral services, including prayer and church-blessed marriage ceremonies, to migrants seeking asylum in the United States. Lasting 40 days and 40 nights (a period of Biblical significance), the Sanctuary Caravan included dozens of volunteers ministering to several hundred asylum seekers south of the Southern Border.

35.     The majority of these asylum seekers hail from Guatemala, Honduras, and El Salvador, a geographical area called Central America's "Northern Triangle."

This region is beset with widespread corruption[1] that is reinforced by police forces with extensive ties to organized crime and transnational drug cartels.[2]  A confluence of factors, including absorption of U.S.-funded paramilitary forces into law enforcement and other parts of government in the 1980s and 1990s, a deportation pipeline from gang-dominated U.S. prisons, and a collapse of rural economies, has created a crisis in governance that makes traditional law enforcement such as investigation and prosecution for serious crimes like extortion, burglary, rape and murder the exception rather than the rule for most citizens of these countries.  The impunity rates—the percentages of crimes that go unpunished—in the Northern Triangle range from the mid-80s to near 100%.[3]  In other words, a Northern Triangle family targeted for these crimes has only one reliable recourse: to leave.

36.  Women and children facing long-term physical, sexual, and emotional violence in the Northern Triangle can expect little to no meaningful help from their governments.[4]  Impunity for domestic violence exceeds that for other serious crimes.  People fleeing the Northern Triangle seek refuge from this unchecked

---

[1] *See* Christina Eguizábal *et al*., *Crime and Violence in Central America's Northern Triangle*, THE WILSON CTR. 1–2 (2015), https://www.wilsoncenter.org/sites/default/files/FINAL%20PDF_CARSI%20REPORT_0.pdf.

[2] Mimi Yagoub, *480 Gang Members Infiltrated El Salvador Security Forces: Report*, INSIGHT CRIME (Feb. 22, 2016), http://www.insightcrime.org/news-briefs/did-480-gang-members-infiltrate-el-salvador-security-forces.

[3] *What's Really Happening in Central America*, VOX (June 21, 2019), https://megaphone.link/VMP1974115829

[4] UNHCR, *Women on the Run: First-Hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico*, THE UN REFUGEE AGENCY, at 25 (2015), http://www.unhcr.org/en-us/publications/operations/5630f24c6/women-run.html [hereinafter *Women on the Run*].  The women interviewed described repeated rapes and sexual assaults as well as violent physical abuse that included: "beatings with hands, a baseball bat and other weapons; kicking; threats to do bodily harm with knives; and repeatedly being thrown against walls and the ground." *Id*.

domestic violence, from crushing poverty, and from "criminal armed groups" that terrorize them through "assaults, extortion, and disappearances or murder of family members."[5]

37.    Migrants do not escape this violence when they cross Mexico's border with Central America.  Mexico also has seen a staggering rise in corruption and violence since the early 2000s.[6]  As in the Northern Triangle, corrupt elements of the police and armed forces operate with unchecked lawlessness in parts of Mexico, leaving victims of crime unable to turn to the Mexican government for protection. Many migrants experience beatings or other forms of assault.  Nearly one in three women (31.4%) and one in five men (17.2%) traveling this route are sexually abused during their journeys.[7]

38.    The dangers that lead migrants to flee the Northern Triangle, and the traumatic experiences they endure along the way, make offering them pastoral care an urgent command of Pastor Dousa's Christian faith.

**B.     The covenant of confidentiality is central to Pastor Dousa's ministry**

39.    Pastoral care requires confidentiality.  Worshippers come to Pastor Dousa for ministry and religious guidance in overcoming, among other things, sexual assault, family violence, and fear of political persecution.  Like clergy across the globe, Pastor Dousa has a religious and moral obligation to receive this

---

[5] *Id.* at 15.

[6] Dominic Joseph Pera, *Drugs Violence and Public [In]Security: Mexico's Federal Police and Human Rights Abuse*, 2–4, 7 (Justice in Mex. Working Paper Series Vol. 14,No. 1, May 2015), https://justiceinmexico.org/wp-content/uploads/2015/12/151204_PERA_DOMINIC_DrugViolenceandPublicInsecurity_FINAL.pdf; *see* U.S. Dep't of State, Bureau of Democracy, Human Rights & Labor, *Country Reports on Human Rights Practices for 2014*, https://2009-2017.state.gov/j/drl/rls/hrrpt/2014humanrightsreport/#wrapper.

[7] *Id*. at 12.

testimony in a setting sealed from the outside world except in the most extraordinary circumstances.  Without a commitment to confidentiality, Pastor Dousa's ministry is severely diminished.

40.    Confidentiality is also essential to the pastoral rites of confession and absolution, through which the faithful share their truth without judgment and receive complete forgiveness.  The ability to offer this path to redemption is a faith leader's greatest power.  Pastor Dousa's ministry hinges upon this core theological principle.

41.    Confidence in the ability to minister without fear of intrusion is acutely important when ministering to refugees.  By definition, refugees are fleeing hardships.  These hardships often come at the hands of dangerous and powerful people, including violent criminals and corrupt governments.

42.    Confidentiality is also particularly essential to the pastoral duty to hear confession and offer Christ's absolution, whereby penitents share privately what burdens their consciences and receive complete forgiveness from the minister—as if from Christ himself.  The ability to minister to Christians in this way is at the heart of a pastor's calling and lies at the foundation of Pastor Dousa's ministry.

43.    Many refugees arrive in the United States knowing no English and without access to counsel or advocates who can help them navigate the asylum process.  These people often first seek sanctuary in a church, a recognized place of safety, comfort, counseling, and religious guidance across countries and cultures.

**II.    Defendants Target Pastor Dousa for Ministering to Migrants and Refugees and for Preaching the Tenets of Her Christian Faith**

**A.    CBP detains Pastor Dousa for interrogation at the San Ysidro port of entry because of her ministry to migrants**

44.    Pastor Dousa made her first trip to San Diego in connection with the Sanctuary Caravan on November 26, 2018.  She traveled with a group of clergy and Mr. Ragbir to learn what on-the-ground organizing was already in place to receive a

large group of migrants traveling to the United States through Central and South America (dubbed by the President and some in the media as a "migrant caravan").

45.     On November 27, 2018, the Sanctuary Caravan officially began its advance work, and the faith group crossed the border to Tijuana to meet with leaders of Sanctuary Caravan partner Al Otro Lado, an organization that provides legal services to migrants on both sides of the border.  Al Otro Lado announced at a press conference and via Facebook that day that members of the clergy would be available to minister to migrants and were able to officiate weddings.  Over the course of the next two days, the clergy, including Pastor Dousa, officiated 17 weddings for families too poor or isolated to have received church blessing of their unions in the past.  She crossed the border twice without incident during this time and returned to New York City on November 29, 2018.

46.     On December 30, 2018, Pastor Dousa returned to San Diego to meet with Sanctuary Caravan leaders and assist with internal logistics.  On January 1, 2019, while Pastor Dousa was in meetings at First United Methodist Church of Chula Vista, San Diego, confrontations between migrants and CBP erupted at the border.  These confrontations made national headlines, as photographs of children fleeing tear gas fired by CBP appeared in newspapers and widely online.[8]  Neither

---

[8] *See, e.g.*, Chris Boyette and Steve Almasy, *Border Patrol: Tear Gas, Pepper Spray Used Against Rock-Throwing Migrants at Border*, CNN (Jan. 2, 2019), https://www.cnn.com/2019/01/01/us/california-border-patrol-gas-migrants/index.html; Daniella Cheslow, *U.S. Agents Fire Tear Gas at Migrants Trying to Cross Mexico Border*, NPR MORNING EDITION (Jan. 2, 2019), https://www.npr.org/2019/01/02/681513362/us-agents-fire-tear-gas-at-migrants-trying-to-cross-mexico-border; Daniel Ochoa de Olza, *US Fires Tear Gas Across Mexico Border to Stop Migrants*, AP NEWS (Jan. 2, 2019), https://apnews.com/3f2a5aba2a8844dcb05816a24402739e; Mohammed Salem, et al., *U.S. Agents Fire Tear Gas Into Mexico at 'Violent Mob' Near Border*, REUTERS (Jan. 1, 2019), https://www.reuters.com/article/us-usa-immigration-border-us-agents-fire-tear-gas-at-violent-mob-near-mexico-border-idUSKCN1OV1TG.

Pastor Dousa nor other clergy in the Sanctuary Caravan were present for or otherwise part of those confrontations.

47.     On January 2, 2019, Pastor Dousa returned to Tijuana and posted a video to her Facebook page stating that she would be meeting with Sanctuary Caravan partners and hoped to learn about the previous day's confrontations. Pastor Dousa "tagged" the San Ysidro point of entry on her Facebook post.  On Facebook, "tagging" allows people to see where the person who made the post is located.  Pastor Dousa spent the day in Tijuana, beginning her return to San Diego around 4:30 p.m.

48.     When Pastor Dousa reached the San Ysidro port of entry, she presented her TSA-issued Global Entry card to a CBP official.  The CBP official looked at Pastor Dousa's card and asked her to follow him to a waiting room for secondary screening, where immigration officials conduct enhanced questioning of border-crossers with alerts on their passports or those who otherwise present cause for additional investigation prior to admission to the U.S.  Pastor Dousa had crossed the border several times before on her Global Entry card; she had never before been subject to secondary screening.

**B.      CBP reveals the government's surveillance of Pastor Dousa and interrogates her about her ministry and faith**

49.     CBP officers in the waiting area refused to answer Pastor Dousa's questions about why she was being subjected to secondary screening or how long they intended to hold her.  During Pastor Dousa's detention, several other border-crossers appeared in the waiting area, answered a handful of questions from the officers present, and promptly departed.

50.     Pastor Dousa, however, remained in the waiting area for several hours without explanation.  At one point, Pastor Dousa put on her collar identifying herself as a member of the clergy and tried again to speak with the CBP officers.

1    She told an officer that she needed to use a phone to contact her family.  Pastor
2    Dousa used the officers' desk phone to call her husband but he did not answer.
3    More time passed.  In response to another question about the duration of her
4    detention, an officer told Pastor Dousa that she would not be allowed to go
5    anywhere until unspecified officials were ready to question her.

6        51.    Finally, an officer differently uniformed from the CBP officers
7    directed Pastor Dousa to a cubicle for interrogation.  The officer asked Pastor
8    Dousa personal identification questions, such as her address and date of birth, how
9    many times she had crossed the border, and what she was doing in Tijuana.  He
10   asked about her work with the "migrant caravan" and why she worked with "the
11   aliens."  Pastor Dousa explained that her faith compelled her to provide pastoral
12   services to migrants.  She explained that she is a Christian and that Jesus Christ was
13   a refugee, thus ministering to refugees is an essential Christian service.

14       52.    The officer asked Pastor Dousa about her involvement with the
15   Sanctuary Caravan.  The officer asked other questions about her work with New
16   Sanctuary that Pastor Dousa believed revealed prior knowledge of her ministry to
17   immigrants.  He asked about Pastor Dousa's assistance to asylum seekers and
18   whether she encouraged them to lie in asylum applications.  Pastor Dousa
19   responded that lying would be a violation of her faith; she explained that sometimes
20   during her ministry she assisted asylum seekers, many of whom speak no English,
21   in explaining what caused them to flee their homes.

22       53.    The officer asked Pastor Dousa if she was involved in illegal activity,
23   and she reiterated that she was in Tijuana to provide pastoral services.  The officer
24   did not ask Pastor Dousa any questions regarding confrontations between migrants
25   and immigration officials at the Southern Border or about any human smuggling
26   operation.

27
28

14

54.     At the end of the interrogation, Pastor Dousa shared her business card with the officers.  The officers did not share their contact information with Pastor Dousa, but they did share their names, and they returned her Global Entry card.

55.     On Saturday, January 5, 2018, Pastor Dousa returned to New York City.

**C.     Pastor Dousa learns she is on a list of U.S. citizens subject to government surveillance because they have written about, photographed, or aided migrants along the Southern Border**

56.     On March 6, 2019, NBC 7 San Diego published internal DHS documents (provided by a whistleblower within DHS) showing that DHS was targeting journalists, attorneys, immigrant rights advocates, and Pastor Dousa for enhanced government surveillance as part of the department's "Operation Secure Line."  These documents, titled "San Diego Sector Foreign Operations Branch: Migrant Caravan FY-2019, Suspected Organizers, Coordinators, Instigators and Media," are dated January 9, 2019 and detail a coordinated intelligence-gathering effort by U.S. and Mexican authorities, targeting 59 people allegedly affiliated with the "migrant caravan."[9]

57.     On information and belief, these documents were a component of a program named "Operation Secure Line."  The data contained therein were the result of a massive, coordinated investigatory effort by DHS, the Federal Bureau of Investigations, and CBP's International Liaison Unit, which is responsible for coordinating intelligence between Mexico and the United States.[10]

[9] Tom Jones, et al., *Source: Leaked Documents Show the U.S. Government Tracking Journalists and Immigration Advocates Through a Secret Database*, NBC 7 SAN DIEGO (Mar. 6, 2019), https://www.nbcsandiego.com/news/local/Source-Leaked-Documents-Show-the-US-Government-Tracking-Journalists-and-Advocates-Through-a-Secret-Database-506783231.html.

[10] The Times Editorial Board, *The Government Has Secret Dossiers on Border Journalists, Lawyers and Activists*, LOS ANGELES TIMES (Mar. 8, 2019),

58.     This federal investigation resulted in the formation of a secret database containing information on individuals whom federal officials then targeted for enhanced screening and interrogation at the border.  Fifty-nine individuals appear in the database, including ten journalists, one attorney, and 48 others labeled as organizers, instigators, associates, or as "unknown" roles.  The vast majority of these individuals are U.S. citizens.[11]

59.     For each listed individual, the document contains a photograph—usually from a passport but, in some cases, pulled from a social media account—as well as other personal information, including date of birth, country of commencement, and any suspected connection to migrants.  In addition, the documents note whether an alert has been placed on the individual's passport.[12]

60.     For some individuals, a color-coded "X" appears over their photograph.  On information and belief, the color of the X indicates whether the individual was arrested, interviewed, or subjected to an adverse immigration action, such as having their visa or SENTRI pass revoked by officials.[13]

61.     On information and belief, in addition to creating this database and flagging certain individuals for enhanced secondary screenings, the investigative authorities also created dossiers on each person included in the list.  These dossiers contain even more personal information on each individual.

62.     Friends alerted Pastor Dousa to news reporting about the Operation Secure Line documents.  In reviewing the documents online, which included blurred photographs of those subject to surveillance, Pastor Dousa identified what

---

https://www.latimes.com/opinion/editorials/la-ed-trump-border-mexico-journalists-migrants-20190308-story.html.

[11] Jones, et al., *supra* note 9.

[12] Jones, et al., *supra* note 9.

[13] Jones, et al., *supra* note 9.

she believed to be a photograph of herself with a yellow "X" over her face and an accompanying note reading: "Disposition: SENTRI Revoked."

63.     Pastor Dousa contacted NBC 7 San Diego reporter Tom Jones, who confirmed that she indeed appeared in the Operation Secure Line documents.

64.     "SENTRI"—the annotation next to Pastor Dousa's picture—refers to the Secure Electronic Network of Travelers Rapid Inspection.  This CBP program allows for expedited clearance of pre-approved travelers, including access to designated primary car lanes at the Southern Border's land border ports.  To be eligible for this program, immigration officials must deem a traveler to be "low risk."

65.     Pastor Dousa received her SENTRI membership in June 2016.  Before January 2019, she crossed U.S. borders, including the Southern Border, on several occasions using her SENTRI status without incident.

66.     Pastor Dousa's appearance on the Operation Secure Line list with the notation "SENTRI Revoked," on information and belief, reflects Defendants' revocation of her SENTRI status.  Defendants have not restored that status, and it remains revoked today.

67.     Upon learning that her government had targeted her as a risky traveler subject to greater scrutiny and surveillance, Pastor Dousa immediately became distraught.  She experienced feelings of intense fear, vulnerability, and invasion of privacy.

68.     Also on March 6, 2019—the same day as the NBC 7 San Diego report on Operation Secure Line—Pastor Dousa read an investigative report in *The Nation* detailing ICE surveillance of peaceful protests in New York City.[14]  According to

---

[14] Jimmy Tobias, *Exclusive: ICE Has Kept Tabs on 'Anti-Trump' Protesters in New York City*, THE NATION (Mar. 6, 2019), https://www.thenation.com/article/ice-immigration-protest-spreadsheet-tracking/.

that report, among the organizations listed on an ICE spreadsheet labeled "Anti-Trump Protests" was New Sanctuary.  U.S. government records highlighted by the article included email exchanges between ICE officers talking about events organized by New Sanctuary.

69.     One such event surveilled was the annual Ash Wednesday prayer vigil, frequently led by Pastor Dousa, where clergy applied ashes to the foreheads of anyone who presented themselves to receive them, even including ICE officials.  In the same email exchanges, an assistant field office director stated that the demonstration "saves us the trip of going over to the church," which Pastor Dousa believed reflected ICE surveillance of Judson Memorial Church.  Pastor Dousa often works out of Judson Memorial Church with her New Sanctuary partners.

70.     Another surveilled event listed on the spreadsheet was a "Suitcase Rally," which invited participants to consider the question, "what would you pack if you were deported?"  Pastor Dousa served as emcee of this event, during which her four-year-old daughter appeared alongside her in the pulpit.

71.     Pastor Dousa's Christian faith instills in her a deep commitment to justice and mercy.  The reporting on Operation Secure Line and ICE's Anti-Trump Protests list revealed that Defendants have identified this commitment as suspicious and expended essential security resources to track Pastor Dousa's ministry over thousands of miles.

**D.     The government offers pretextual justifications for surveilling Pastor Dousa**

72.     Minutes after NBC 7 San Diego broke its story about Operation Secure Line on March 6, 2019, CBP officials told the station "that the names in the database are all people who were present during violence that broke out at the border in November."  But Pastor Dousa was not present for any violence near the border in November or at any other time.  The agency also told NBC 7 San Diego

that "journalists are being tracked so that the agency can learn more about what started that violence."  Like Pastor Dousa, the journalists who appeared on the list and who were detained for interrogation at San Ysidro reported that immigration officials asked them no questions about the November confrontations between immigration officials and migrants at the border.

73.    On May 17, 2019, *The Intercept* published a detailed letter from the head of the Office of Field Operations of CBP responding to "the media's reporting of [CBP]'s targeting of reporters, attorneys, and advocates at the Southern Border." The letter stated that CBP was collaborating with Mexican law enforcement to surveil certain individuals suspected of "facilitating illegal migrant crossings and violence against the authorities" and potentially involved in human smuggling across the border.[15]

74.    Yet on March 7, 2019, in response to the NBC 7 San Diego reporting, the Mexican government had stated it disapproved "of all acts of illegal espionage against any person, domestic or foreign" and that "[t]he Mexican government does not conduct illegal surveillance on anyone, for any type or category of activity."[16]

---

[15] Letter from Randy J. Howe, Exec. Dir., Office of Field Operations, U.S. Customs & Border Prot., to Mana Azarmi, Ctr. for Democracy & Tech. (May 9, 2019), *available at* https://www.documentcloud.org/documents/6009352-CBP-Response-to-DHS-Coalition-Letter.html; *see also* Ryan Devereaux, *Border Official Admits Targeting Journalists and Human Rights Advocates with Smuggling Investigations*, THE INTERCEPT (May 17, 2019), https://theintercept.com/2019/05/17/border-smuggling-journalists-activists/.

[16] Joint Statement SRE-SSPC, "Mexico Disapproves of Illegal Espionage," Secretary of Foreign Relations (Mar. 7, 2019), https://www.gob.mx/sre/prensa/mexico-desaprueba-espionaje-ilegal (translated to English from the original Spanish).

### III. Defendants' Actions Significantly Burden Pastor Dousa's Practice of Her Religion

75.    Defendants' targeting of Pastor Dousa has burdened and will continue to burden her ministry and cause her irreparable harm.

76.    The surveillance, detention, and retaliation against herself and those to whom she ministers significantly interferes with Pastor Dousa's practice of her religion.  Defendants' surveillance creates fear and reticence in The Park's members and those it serves, deterring participation in worship services by refugees and asylum seekers whose pastoral care is a central Christian obligation.

77.    Because of Defendants' surveillance of Pastor Dousa and retaliation against her and others who serve migrants, the Park reversed initial plans to house a pro se clinic for asylum seekers and provide sanctuary to individual refugees.  The church determined that Defendants' surveillance of and retaliation against Pastor Dousa could lead to arrest, detention, or even deportation for those whom the church sought to serve.

78.    Defendants' surveillance of Pastor Dousa interferes with her ability to provide her most essential pastoral service: the hope of the consolation and peace of absolution.  People seeking pastoral care often are navigating life's greatest challenges, including the burden of past mistakes.  Pastors help to guide people back to the promises of their faith through forgiveness.  To receive Christ's forgiveness, a penitent must be free to confess absolutely everything weighing on their consciences.  This vital Christian practice, through which a person shares the deepest hurt, pain, guilt, and shame in their lives, demands the strictest confidence. As the common-law priest-penitent privilege recognizes, this practice depends on the guarantee of privacy, apart from which penitents cannot feel free to unburden their consciences or truly receive the assurance of forgiveness and consolation.

79.     Because of Defendants' targeting of Pastor Dousa, she has advised penitents who seek her counsel that any confidential ministry not conducted in person should be communicated via secure and encrypted technology.  Even in person, some of her parishioners have shared their concern that surveillance of Pastor Dousa means that there is a "microphone in the confessional."

80.     The steps Pastor Dousa takes to preserve the covenant of confidentiality particularly burden the pastoral care she is called to offer to migrants and their advocates at the Southern Border.  One such advocate relies *exclusively* on Pastor Dousa for pastoral care, but because of this person's distance from New York City and the burdens on Pastor Dousa's travel, this person now must receive pastoral care through comparatively impersonal electronic communications.

81.     For the first time in her life, Pastor Dousa now fears traveling across the border to Mexico.  As a consequence of her surveillance as a part of Operation Secure Line, she has curtailed her ministry at the Southern Border.  Pastor Dousa had planned a return to Tijuana for further ministry on January 3, 2019 but cancelled the trip out of fear of another hours-long detention and interrogation of her ministry by federal authorities.  Since her January 2, 2019 detention, Pastor Dousa has visited Tijuana only once, and only did so because she was accompanied by her lawyer.

82.     Pastor Dousa no longer has access to the expedited screening she enjoyed as a SENTRI holder, which makes it more difficult for her to cross the border to access migrants in need of ministry if and when she does travel to Tijuana again.

83.     Pastor Dousa does not know the full extent of the government's adverse actions against her, including what surveillance it has conducted, what information it has collected, or for what purposes it may use that information.

84.     Both at The Park and with New Sanctuary, a substantial component of Pastor Dousa's ministry is providing pastoral services to migrants.  Pastor Dousa has deep connections and relationships with immigrants' rights advocates in New York and in Mexico, and she has offered pastoral care to those advocates and to the migrants with whom they work for nearly a decade.  She no longer feels able to fulfill this core tenet of her faith because she may be detained and interrogated when crossing the border without the accompaniment of her attorney, and because of her fear that migrants' association with her will damage their chance of receiving asylum.

85.     Asylum seekers fear not only their persecutors at home but also can fear U.S. officials.  Since announcing their "zero tolerance" policy in June of 2018, Defendants have separated thousands of refugee children from their parents, losing track of hundreds of them in a byzantine detention system, and deporting their parents to the treacherous homes they initially fled, leading migrants in this country to exercise great care in where they go and with whom they share concerns about their status in the country.

86.     Having to note the possibility of surveillance to the penitents seeking her pastoral care interferes with Pastor Dousa's assurance of privacy, the trust between pastor and parishioner, and the ability to freely seek her pastoral care. Rather than offering the consolation and assurance of Christ's love and forgiveness, Pastor Dousa's practice of confession is burdened by an uneasiness in the pastoral relationship that fundamentally undermines confidence in her ministerial function. Seeking ministry from Pastor Dousa or any other faith leader under government surveillance means risking identification, detention, family separation, and deportation by Defendants.

87.     At least one migrant whose marriage was blessed by clergy in the Sanctuary Caravan was interrogated by immigration officials regarding her

association with Pastor Dousa when she submitted an application for asylum. Since learning of this migrant's interrogation, Pastor Dousa has abstained from blessing further marriages of vulnerable migrants even though such blessings are a fundamental component of pastoral care.

## IV. Defendants' Targeting of Pastor Dousa Is Part of a Nationwide Effort to Target Those Who Serve, Counsel, Advocate for, Write About, or Minister to Migrants

88.    Since January 2017, Defendants have engaged in a pattern and practice of targeting for investigation, surveillance, harassment, arrest, detention, and deportation those who offer aid, counsel, or ministry to refugees and journalists who document the plight of migrants to this country, including the individuals who were specifically targeted as part of Operation Secure Line.

89.    Defendants have arrested immigrants who speak out about their experiences with federal authorities immediately following press appearances and news conferences; detained spokespeople and directors of immigration advocacy organizations; surveilled the organizations' headquarters and their members; identified immigrants who advocate for themselves and others as enforcement priorities even before a final order of removal is in place; instructed non-citizens that associating with organizations that advocate for or otherwise serve the migrant community may negatively impact their immigration status; and detained journalists covering migrants traveling to the Southern Border.[17]

---

[17] *See, e.g.*, *Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917, 933 (W.D. Tex. 2018); Phil Helsel et al., *'Dreamer' Applicant Arrested After Calling for Immigrant Protection*, NBC NEWS (Mar. 2, 2017), https://www.nbcnews.com/us-news/dreamer-applicant-arrested-after-calling-immigrant-protections-n727961; *ICE Intimidates Latino Community With Arrest of DACA Recipient Practicing Free Speech*, HUFFPOST (Mar. 3, 2017), https://www.huffingtonpost.com/entry/ice-intimidates-latino-community-with-arrest-of-daca_us_58b9dd6de4b02b8b584dfb6d; Nina Shapiro, *ICE Tracks Down Immigrants Who Spoke to Media in SW Washington: "You Are the One from the*

90.     Importantly, Defendants have been targeting these individuals based on activity that is not only lawful, but constitutionally protected.  In this country, it is lawful—indeed laudable—to provide services and comfort to the most vulnerable, including women, children, and the poor who flee to the United States for asylum because of gang violence, domestic abuse, and persecution in their native countries.  And it is legal to document and tell their stories in the media.  Defendants have no ground to target Pastor Dousa and these other individuals on the basis of these actions.

91.     Defendants have taken action against Pastor Dousa and others who serve, advocate for, and write about refugees in order to silence them, to punish them for their association with and aid to a group of people—immigrants to this country—whom Defendants disfavor and even demonize, and to deter others from taking similar actions in support of immigrants and their rights.

**A.     The Government has targeted Pastor Dousa's New Sanctuary colleagues**

92.     Defendants have engaged in a pattern and practice of targeting individuals who serve, counsel, advocate for, or minister to migrant and refugee communities in association with New Sanctuary, including Jean Montrevil and Ravi Ragbir—two individuals to whom Pastor Dousa has ministered for over a decade.

93.     On January 3, 2018, ICE agents arrested Mr. Montrevil at his New York home.  A co-founder of New Sanctuary, Mr. Montrevil is a Haitian national, immigrant-rights activist, and lawful permanent resident who had lived in this country for over 20 years.  In 2017, Defendants placed Mr. Montrevil in removal

_____

*Newspaper,"* SEATTLE TIMES (Dec. 3, 2017), https://www.seattletimes.com/seattle-news/ice-tracks-down-immigrant-who-spoke-to-media-in-sw-washington-you-are-the-one-from-the-newspaper.

proceedings, citing a decades-old drug charge he incurred as a teenager. At the time of his 2018 arrest, he was in the midst of a motion to reopen his order of removal. Following the arrest, ICE transferred Mr. Montrevil to its Krome Detention Center in Miami, Florida and deported him to Haiti just days later.[18]

94.    Just prior to Mr. Montrevil's deportation, on January 5, 2018, Pastor Dousa led a group of three other clergy to meet with ICE's New York Field Office Deputy Director, Scott Mechkowski, to discuss the sudden change in Mr. Montrevil's status. During this meeting, Mr. Mechkowski stated, "Nobody gets beat up in the news more than we do, every single day. It's all over the place . . . how we're the Nazi squad, we have no compassion . . . . The other day Jean [Montrevil] made some very harsh statements. . . . I'm like, 'Jean, from me to you . . . you don't want to make matters worse by saying things.'"[19]

95.    During this January 5, 2018 meeting, Mr. Mechkowski also told Pastor Dousa, "I know exactly how to find you. You're on the web. You're all over the documents that I have." Mr. Mechkowski further said: "We all know the network of people that you have at your disposal. You have City Hall in your pocket. Like, we get it." He also stated: "Trust me, I know your network just as good as you do."

96.    Defendants' treatment of Mr. Ragbir mirrored that of Mr. Montrevil. On January 8, 2018, Mr. Ragbir's counsel, Alina Das, spoke with Mr. Mechkowski, who stated that he felt "resentment" about prayer vigils, often organized and led by Pastor Dousa, outside the federal building where Mr. Ragbir had his March 9, 2017 ICE check-in, that he had heard Mr. Ragbir's statements to the press, and that he

---

[18] Lydia McMullen-Laird, *Life After Deportation: Their Father Was Returned to Haiti. Now What?*, THE INDYPENDENT (Feb. 2, 2018), https://indypendent.org/2018/02/life-after-deportation/.

[19] *See Ragbir v. Homan*, 923 F.3d 53, 60, 70 (2d Cir. 2019).

continued to see Mr. Ragbir at New Sanctuary prayer vigils outside ICE's New York City office.

97.     During his next ICE check-in on January 11, 2018, which Pastor Dousa attended, ICE detained Mr. Ragbir.  The next day, the agency transferred him, like Mr. Montrevil days earlier, to Krome Detention Center to be held until his deportation.

98.     Mr. Ragbir filed a petition for a writ of habeas corpus with the U.S. District Court for the Southern District of New York, seeking to bar his abrupt removal without allowing him time for an orderly departure.  The court granted the petition, cautioning:

> The Court also notes with grave concern the argument that petitioner has been targeted as a result of his speech and political advocacy on behalf of immigrants' rights and social justice.[20]

99.     Mr. Ragbir later filed a separate action to block his deportation on the ground that the decision to execute his final removal order reflected impermissible, unconstitutional retaliation against his protected speech, in violation of the First Amendment.  On April 25, 2019, the U.S. Court of Appeals for the Second Circuit reversed the district court's denial of a preliminary injunction, concluding that Mr. Ragbir had stated a valid claim and provided strong evidence to support it.  The Second Circuit stated:

> To allow this retaliatory conduct to proceed would broadly chill protected speech, among not only activists subject to final orders of deportation but also those citizens and other residents who would fear retaliation against others.[21]

100.    Defendants have unlawfully targeted and retaliated against Pastor Dousa's fellow New Sanctuary leaders for speaking out against their immigration

---

[20] *Ragbir v. Sessions*, No. 18-cv-236 (KBF), 2018 WL 623557, at *1 n.1 (S.D.N.Y. Jan. 29, 2018) (quoting *United States v. Alvarez*, 579 U.S. 709, 716 (2012)).

[21] *Ragbir v. Homan*, 923 F.3d 53, 71 (2nd Cir. 2019).

policies and practices.  She reasonably fears they will continue to retaliate against her as well.

### B. The Government has targeted many other people who write about, serve, counsel, or advocate for refugees in "migrant caravans"

101.   Since October 2018, federal immigration and law enforcement authorities have engaged in a pattern and practice of targeting journalists, immigration attorneys, and advocates because of their work related to so-called "migrant caravans"—individuals traveling from Central America to the Southern Border to claim asylum and seek refuge.

102.   On information and belief, those whom Defendants specifically targeted for intense inspections and scrutiny by federal officers at the Southern Border include journalists who documented migrant caravan activities and experiences, lawyers who provided legal services to caravan members, and humanitarians who offered aid to migrant communities on both sides of the Southern Border.

103.   In particular, journalists, immigration attorneys, and advocates have described a pattern of targeted, heightened scrutiny at the San Ysidro port of entry in San Diego beginning in late 2018 and continuing into 2019.[22]  According to an investigation published by *The Intercept*, 19 sources provided consistent accounts of increased interrogations, which included being asked to identify immigration activists from photo lineups.  In many of these cases, immigration officials seized, searched, and copied the contents of electronic devices, such as phones and cameras, belonging to those being interrogated, including electronic devices

---

[22] Ryan Devereaux, *Journalists, Lawyers, and Activists Working on the Border Face Coordinated Harassment from U.S. and Mexican Authorities*, THE INTERCEPT (Feb. 8, 2019), https://theintercept.com/2019/02/08/us-mexico-border-journalists-harassment/.

belonging to journalists and lawyers, which contained sensitive and confidential information such as names of sources, draft legal documents, and attorney-client communications.

104.   Journalists' suspicions of heightened scrutiny by federal law enforcement officers were confirmed in March 2019, when an NBC affiliate in San Diego published the documents related to Operation Secure Line.

105.   The individuals included in the Operation Secure Line database have done nothing more than write about, photograph, provide legal services to, offer humanitarian aid to, or minister to migrants fleeing violence, persecution, and extreme poverty.  This database reflects retaliation against journalists, lawyers, human rights advocates, and people of faith who work with asylum seekers and are critical of the Administration's approach to immigration policy and immigration enforcement.  It represents a concerted, coordinated effort by federal law enforcement agencies to target dissenters on the basis of protected speech, association, and exercise of religious belief.

106.   In addition to Pastor Dousa, dozens of other U.S. citizens are harmed by Defendants' pattern and practice of surveillance, harassment, and retaliation.

### 1.    Nicole Ramos (Al Otro Lado)

107.   On information and belief, Nicole Ramos, Refugee Program Director and an attorney for Al Otro Lado, was targeted as part of Operation Secure Line because she aids and advocates for migrants at the Southern Border.[23]  Ms. Ramos's dossier included personal information, such as specific details about her work and travel history, a description of the car she drives, and information about her mother. Ms. Ramos is a U.S. citizen.  Pastor Dousa is Ms. Ramos's pastor.

---

[23] Jones, et al., *supra* note 9.

108.   Ms. Ramos's ability to do her job as an attorney is significantly impacted by the revocation of her SENTRI pass as a part of Operation Secure Line, particularly given the Administration's new "Migrant Protection Protocols," which were implemented in the same time period.  Under this DHS policy, some non-Mexican asylum seekers were returned to Mexico where they must remain for the duration of their asylum application process.[24]  This policy requires asylum seekers to rely on immigration lawyers crossing the border to assist with their cases.

## 2.   Alex Mensing and Jeff Valenzuela (PSF)

109.   Pueblo Sin Fronteras ("PSF") is an immigration rights advocacy group that has accompanied groups of Central American refugees to the Southern Border and provided them with humanitarian assistance.  On information and belief, 10 members of PSF have been targeted as part of Operation Secure Line because they advocate for migrants at the Southern Border.[25]

110.   Alex Mensing, a U.S. citizen, is one of the PSF members named in the Operation Secure Line database.  Between May 2018 and February 2019, Defendants targeted him for heightened screening and interrogations approximately 15 to 20 times while crossing the border.[26]  On one of these occasions, he was taken

---

[24] Maya Averbuch & Kevin Sieff, *Asylum Seeker is Sent Back to Mexico as Trump Administration Rolls Out New Policy*, WASHINGTON POST (Jan. 29, 2019), https://www.washingtonpost.com/world/the_americas/asylum-seekers-are-being-sent-back-to-mexico-as-trump-administration-rolls-out-new-policy/2019/01/29/a0a89e9c-233b-11e9-b5b4-1d18dfb7b084_story.html?utm_term=.62fdbce42d6e.

[25] Lauren Carasik, *The Government is Targeting Immigration Lawyers, Activists, and Reporters*, BOSTON REVIEW (Apr. 24, 2019), http://bostonreview.net/global-justice/lauren-carasik-government-targeting-immigration-lawyers-activists-journalists.

[26] Devereaux, *supra* note 22.

29

into a concrete cell for interrogation, where federal officials took his phone and scanned all of his notebooks and papers.[27]

111.   On information and belief, another PSF volunteer and U.S. citizen, Jeff Valenzuela, has been targeted multiple times while crossing at the El Chapparal port of entry.[28]

112.   On December 27, 2018, Mr. Valenzuela attempted to cross the border by car from Tijuana to visit family in Los Angeles.  Two officers approached his vehicle and instructed him to place his hands behind his back.  The officers handcuffed Mr. Valenzuela and took him to a booking room while simultaneously assuring him that he was not under arrest.  The officers confiscated his belongings and shackled his ankle to a steel bench.  Mr. Valenzuela spent more than four hours shackled to the bench before two plainclothes officers arrived and transferred him to another interview room.  There, the officers asked Mr. Valenzuela to unlock his cell phone.  When he asked if he could be compelled to do so, the officers presented Mr. Valenzuela with a document indicating that his phone had been "detained for further examination, which may include copying."[29]

113.   In the weeks following the December 27, 2018 incident, Mr. Valenzuela was sent to secondary screening four more times.  On January 25, 2019, he again found himself shackled to the steel bench in the booking room.[30]

---

[27] National Lawyers Guild, *NLG Condemns Secret US-Mexican List of Journalists and Advocates Documenting and Providing Humanitarian Aid at the Border*, (Mar. 8, 2019), https://www.nlg.org/nlg-condemns-secret-us-mexican-list-of-journalists-and-advocates-documenting-and-providing-humanitarian-aid-at-the-border/.
[28] Devereaux, *supra* note 22.
[29] Devereaux, *supra* note 22.
[30] Devereaux, *supra* note 22.

### 3. Ariana Drehsler

114. On information and belief, Ariana Drehsler, a U.S. citizen, has been targeted as part of Operation Secure Line because she documents the experiences of migrants at the Southern Border.[31] Ms. Drehsler is a freelance photojournalist who covered the "migrant caravan" in Tijuana for Buzzfeed News and United Press International.

115. On December 30, 2018, Ms. Drehsler attempted to cross the Southern Border when CBP officers detained her for interrogation. The officers asked about individuals who were aiding asylum-seekers. After an hour of questioning, the officers released Ms. Drehsler but also warned her that an alert had been placed on her passport and that, should she attempt to cross the border again, she would be subjected to heightened screening. The agents did not tell Ms. Drehsler why this alert was placed on her passport, but it did indeed lead to additional detentions at the Southern Border.

### 4. Kitra Cahana

116. On information and belief, Kitra Cahana has been targeted as part of Operation Secure Line because she documented the experiences of migrants at the Southern Border.[32] Ms. Cahana is a freelance photojournalist whose work has been featured by *National Geographic*, the *New York Times*, and the Canadian Broadcasting Company. Ms. Cahana is a dual citizen of the United States and Canada.

117. In late December 2018, Mexican authorities stopped Ms. Cahana and photographed her passport while she and other journalists were working near the border. A few weeks later, on January 17, 2019, Ms. Cahana attempted to travel

---

[31] Jones, et al., *supra* note 9.

[32] Jones, et al., *supra* note 9.

from Canada to Mexico City, with a connecting flight in Detroit, Michigan.[33]  At U.S. Customs pre-clearance in Montreal, officials reported that her passport was flagged and she was sent to secondary screening.  Ms. Cahana was interrogated about her photojournalism, who funded her projects, and what she was assigned to cover.  Eventually, she was allowed to travel to Detroit.  While connecting in Detroit, Ms. Cahana was again flagged for secondary inspection, but eventually allowed to board her flight to Mexico City.

118.   On her arrival in Mexico, Ms. Cahana was again detained, and this time officials also confiscated her cell phone.  Ms. Cahana asked the Mexican officials whether she was being targeted because of her journalism.  They responded that her detention was "because of the Americans."  Ms. Cahana remained in custody for 13 hours before being denied entry into Mexico.  Upon returning to Detroit, CBP detained her for questioning.

119.   Because of Operation Secure Line, Ms. Cahana says she is "effectively no longer able to cover the story of the migrant caravan."[34]

## CLAIMS FOR RELIEF

## COUNT 1

### (Retaliation in Violation of the First Amendment)

120.   Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

121.   To establish a First Amendment retaliation claim, a plaintiff must show that (1) she engaged in constitutionally protected conduct; and (2) the conduct

---

[33] Devereaux, *supra* note 22.

[34] Max Rivlin-Nadler, *Journalists, Lawyers, Volunteers Face Increased Scrutiny by Border Agents*, NPR (Feb. 15, 2019) https://www.npr.org/2019/02/15/695164916/journalists-lawyers-volunteers-face-increased-scrutiny-by-border-agents.

was a substantial or motivating factor in Defendants' adverse action.  *See, e.g.*, *Williams v. California*, 764 F.3d 1002, 1016 (9th Cir. 2014).

122.   Like others targeted by Defendants, Pastor Dousa has engaged in speech and association protected by the First Amendment.  She is compelled by her faith to provide pastoral services to migrants and others.  Pastor Dousa has used her ministry to advocate for and associate with migrants and refugees both within the United States and across the border in Tijuana, Mexico.  Her advocacy and association involves, among other things, ministering to migrants, officiating weddings for migrant communities, and organizing prayerful vigils critical of U.S. immigration law and policy.

123.   Defendants have taken adverse actions against Pastor Dousa.  They have targeted her for heightened surveillance, held her in hours-long secondary screening at the border, subjected her to extensive interrogation, and revoked her SENTRI pass.  The adverse actions taken against Pastor Dousa are part of Defendants' intentional targeting of immigrant-rights activists and individuals who interact with migrant communities near the Southern Border based on their protected First Amendment activity.

124.   There is a causal connection between Pastor Dousa's protected speech and association and Defendants' adverse actions.  Defendants have targeted Pastor Dousa and others who are similarly situated for increased surveillance and heightened interrogation at the border on the basis of their protected speech regarding U.S. immigration law and policy.  In Pastor Dousa's case, this speech is compelled by her faith.

125.   As a result, this Court should declare that Defendants' retaliatory actions against those who lawfully aid, advocate for, or associate with migrants at the Southern Border violate the First Amendment.  The Court should enter a preliminary and permanent injunction (1) ordering Defendants to cease surveilling,

detaining, or otherwise taking adverse actions against Pastor Dousa, (2) restraining Defendants from taking future adverse actions against her based on her protected speech and association, and (3) generally restoring her to the status quo ante.

## COUNT 2

### (Violation of the First Amendment's Free Exercise Clause)

126.   Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

127.   Under the Free Exercise Clause, a governmental policy, custom, or practice that is not neutral and/or not of general applicability is subject to strict scrutiny and must be justified by a compelling governmental interest and narrowly tailored to advance that interest. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993).

128.   Defendants' practice of targeting those who lawfully aid, advocate for, or associate with migrants at the Southern Border is neither neutral nor generally applicable. Pastor Dousa's Christian faith requires her to minister to vulnerable people, including migrants, refugees, and asylum seekers. Because of her proximity to and relationship with these communities—which is based solely on her provision of pastoral services—Ms. Dousa has been targeted by Defendants for heightened surveillance and interrogation. Defendants' actions do not serve a compelling state interest and are not narrowly tailored to achieve that interest.

129.   As a result, this Court should declare that Defendants' actions against those who lawfully aid, advocate for, or associate with migrants at the Southern Border as part of the exercise of their religious faith violate the Free Exercise Clause of the First Amendment. The Court should enter a preliminary and permanent injunction (1) ordering Defendants to cease surveilling, detaining, or otherwise taking adverse actions against Pastor Dousa, (2) restraining Defendants

from taking future adverse actions against her based on her exercise of her religion, and (3) generally restoring her to the status quo ante.

## COUNT 3

### (Hybrid First Amendment Rights Claim)

130.   Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

131.   Where a free exercise claim is brought in conjunction with a claim alleging a separate constitutional violation for the same communicative activity, strict scrutiny is triggered and the governmental policy, custom, or practice in question must be justified by a compelling governmental interest and narrowly tailored to advance that interest. *See, e.g.*, *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir. 2004).

132.   As alleged above, Pastor Dousa's free exercise claim is brought in conjunction with her First Amendment retaliation claim.  Defendants' conduct is therefore subject to strict scrutiny review.

133.   Defendants fail to survive scrutiny because their practice of subjecting those who lawfully aid, advocate for, or associate with migrants at the Southern Border to, among other things, heightened surveillance and extensive interrogation is not justified by a compelling governmental interest and is not narrowly tailored to achieve that interest.

134.   As a result, this Court should declare that Defendants' targeting of those who lawfully aid, advocate for, or associate with migrants at the Southern Border violates the First Amendment.  The Court should enter a preliminary and permanent injunction (1) ordering Defendants to cease surveilling, detaining, or otherwise taking adverse actions against Pastor Dousa, (2) restraining Defendants from taking future adverse actions against her based on her protected speech or her exercise of religion, and (3) generally restoring her to the status quo ante.

## **COUNT 4**

### **(Violation of the Religious Freedom Restoration Act)**

135.   Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

136.   Defendants' practices interfering with Pastor Dousa's and others' religious exercise violate the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq.

137.   To establish a *prima facie* claim under RFRA, a plaintiff must provide "evidence sufficient to allow a trier of fact rationally to find the existence of two elements.  First, the activities the plaintiff claims are burdened by the government action must be an 'exercise of religion.' . . . Second, the government action must 'substantially burden' the plaintiff's exercise of religion. . . . [S]hould the plaintiff establish a substantial burden on h[er] exercise of religion, the burden of persuasion shifts to the government to prove that the challenged government action is in furtherance of a 'compelling government interest' and is implemented by 'the least restrictive means.'"  *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008) (internal citations omitted).

138.   The activities of Pastor Dousa and others that are burdened by government action are an exercise of religion.  Pastor Dousa travels to Tijuana to minister and provide other pastoral care to asylum seekers.

139.   The government's actions targeting Pastor Dousa substantially burden her exercise of her religion.  Because of Defendants' conduct, Pastor Dousa has been severely impeded from accessing and ministering to asylum seekers in Mexico, engaging in scheduled worship activities with fellow clergy and religious leaders in Mexico, and performing marriage ceremonies and signing marriage licenses for refugee individuals in Mexico.  Pastor Dousa has significantly decreased her travels to Mexico because she fears the uncertainty of a timely return

to the United States to care for her daughter if she is again detained by Defendants. She is also unable to travel to Mexico without the accompaniment of an attorney, who is needed to ensure that her rights are not violated at the U.S.-Mexico border. Unless the Court intervenes, Pastor Dousa will be forced to continue to significantly limit her religious practices and beliefs of praying with and providing other pastoral care to asylum seekers at the U.S.-Mexico border seeking refuge. She can only minister to these asylum seekers through face-to-face encounters.

140.   Defendants' actions also burden her exercise of her religion at home in New York City.  The church Pastor Dousa leads reversed plans to house an asylum seekers clinic and to offer sanctuary to individual migrants because Defendants' surveillance of Pastor Dousa would put migrants receiving this pastoral care at risk of detention, separation from their families, and even deportation.  Defendants' actions also have interfered with Pastor Dousa's ministry to her own congregation because surveillance of Pastor Dousa at her church and at religious events deters immigrant parishioners from attendance and participation.

141.   Defendants have no compelling interest in surveilling, targeting, and detaining Pastor Dousa in this manner.  While Defendants have a general interest in border security, the surveillance and detainment of Pastor Dousa for the simple act of providing pastoral services to asylum seekers does not advance that interest.

142.   Defendants' actions therefore violate the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq*.  This Court should declare that Defendants' actions against those who lawfully aid, advocate for, or associate with migrants at the Southern Border as part of the exercise of their religious faith violate RFRA.  The Court should enter a preliminary and permanent injunction (1) ordering Defendants to cease surveilling, detaining, or otherwise taking adverse actions against Pastor Dousa, (2) restraining Defendants from taking future adverse

actions against her based on her exercise of her religion, and (3) generally restoring her to the status quo ante.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter judgment in her favor and:

a)      Declare that Defendants' targeting of individuals, including Plaintiff, for surveillance, detention, or other adverse treatment because they lawfully aid, advocate for, or associate with migrants to the United States, violates the Free Speech Clause of the First Amendment;

b)      Declare that Defendants' surveillance, detention, and other adverse treatment of individuals, including Plaintiff, who lawfully aid, advocate for, or associate with migrants to the United States as part of the exercise of their religious faith, violates the Free Exercise Clause of the First Amendment;

c)      Declare that Defendants' surveillance, detention, and other adverse treatment of individuals, including Plaintiff, who lawfully aid, advocate for, or associate with migrants to the United States as part of the exercise of their religious faith, violates the Religious Freedom Restoration Act;

d)      Enter a preliminary and permanent injunction ordering Defendants to cease surveilling, detaining, and otherwise targeting Plaintiff; restraining Defendants from taking any future adverse action against her based on her protected expression, association, or religious exercise; and generally restoring Plaintiff to the status quo ante;

e)      Award Plaintiff costs and reasonable attorneys' fees; and

Order such other relief as this Court may deem just and proper.

Dated:  July 8, 2019

By:  /s/ Jaba Tsitsuashvili
Jaba Tsitsuashvili
R. Stanton Jones*
William C. Perdue*
Christian Sheehan*
Ada Añon*
Jean Chang*
Leah Harrell*

ARNOLD & PORTER
  KAYE SCHOLER LLP

Stephanie Llanes*
Anne Tindall*
Genevieve Nadeau*
Ben Berwick*
PROTECT DEMOCRACY

*Attorneys for Plaintiff*
  *Kaji Dousa*

*pro hac vice applications forthcoming

39

1
2

## <u>CERTIFICATE OF ELECTRONIC FILING</u>

3

 I hereby certify that on July 8, 2019, I electronically filed the foregoing

4

document with the Clerk of the Court using CM/ECF.

5

<u>/s/ Jaba Tsitsuashvili</u>

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28