Oscar Ramallo (Bar No. 241487)
oscar.ramallo@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
Telephone: (213) 243-4000
Facsimile: (213) 243-4199

*Attorney for Plaintiff*
*Kaji Dousa*

[Additional counsel listed on following page.]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAJI DOUSA,<br><br>    Plaintiff,<br><br>    v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS"); U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT ("ICE"); U.S. CUSTOMS AND BORDER PROTECTION ("CBP") KEVIN K. MCALEENAN, Acting Secretary of DHS; MATTHEW T. ALBENCE, Acting Director of ICE; MARK A. MORGAN, Acting Commissioner of CBP; AND PETER FLORES,  Director of Field Operations for CBP, San Diego,<br><br>    Defendants. | Case No. 19-cv-01255 (LAB)<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:      September 23, 2019<br>Time:      11:30 a.m.<br>Place: Courtroom 14A<br>Judge: Hon. Larry Alan Burns |

R. Stanton Jones (*pro hac vice*) (DC SBN 987 987088)
stanton.jones@arnoldporter.com
William C. Perdue (*pro hac vice*) (DC SBN 995365)
William.Perdue@arnoldporter.com
Christian D. Sheehan (*pro hac vice*) (DC 1045233)
christian.sheehan@arnoldporter.com
Jaba Tsitsuashvili (Bar No. 309012)
jaba.tsitsuashvili@arnoldporter.com
Jean Chang* (DC SBN 1035614)
jean.chang@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

Ada Añon (*pro hac vice*) (NY 5030697)
ada.anon@arnoldporter.com
Leah J. Harrell (*pro hac vice*) (NY 5623335)
leah.harrell@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th St.
New York, NY 10019
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

Stephanie Llanes (*pro hac vice*) (NY SBN 5580014)
stephanie.llanes@protectdemocracy.org
PROTECT DEMOCRACY
222 Broadway, 19th Floor
New York, NY 10038
Telephone: (202) 579-4582

Anne Tindall (*pro hac vice*) (DC SBN 494607)
anne.tindall@protectdemocracy.org
PROTECT DEMOCRACY
2020 Pennsylvania Avenue NW, Suite # 163
Washington, DC 20006
Telephone: (202) 579-4582

1   Genevieve Nadeau (*pro hac vice*) (MA SBN 677566)
2   genevieve.nadeau@protectdemocracy.org
    Ben Berwick (*pro hac vice*) (MA SBN 679207)
3   PROTECT DEMOCRACY
4   15 Main Street, Suite 312
    Watertown, MA 02472
5
6   *Attorneys for Plaintiff*
    *Kaji Dousa*
7
8   *\*Amended pro hac vice application forthcoming*
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 3

I.      PASTOR DOUSA AND HER MINISTRY ................................................. 3

II.     DEFENDANTS' RETALIATION AGAINST PASTOR DOUSA ............... 5

III.    DEFENDANTS' PATTERN AND PRACTICE OF TARGETING
        IMMIGRANT RIGHTS ACTIVISTS AND THOSE WHO REPORT
        ON MIGRATION TO THE SOUTHERN BORDER .................................... 7

ARGUMENT ........................................................................................................... 9

I.      PASTOR DOUSA IS LIKELY TO SUCCEED ON THE MERITS ........... 10

        A.      Pastor Dousa Has Standing to Assert Her Claims ........................... 10

        B.      Pastor Dousa is Likely to Prevail on Her First Amendment
                Retaliation Claim ............................................................................. 12

                i.      Pastor Dousa's Conduct Is Constitutionally Protected ............ 13

                ii.     Defendants Took Adverse Action Against Pastor Dousa ......... 14

                iii.    Pastor Dousa's Protected Conduct Was a Substantial or
                        Motivating Factor in Defendants' Adverse Actions Against
                        Her ....................................................................................... 15

        C.      Pastor Dousa is Likely to Prevail on Her Free Exercise Claim ......... 16

        D.      Pastor Dousa is Likely to Prevail on Her Hybrid First
                Amendment Rights Claim .................................................................. 19

        E.      Pastor Dousa is Likely to Prevail on Her RFRA Claim .................... 19

II.     PASTOR DOUSA WILL SUFFER IRREPARABLE HARM ABSENT
        A PRELIMINARY INJUNCTION ............................................................. 22

III.    THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST
        SUPPORT A PRELIMINARY INJUNCTION ........................................... 23

CONCLUSION ...................................................................................................... 24

i

EXHIBIT 1 .................................................................................................................26

ARNOLD & PORTER
KAYE SCHOLER

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*American-Arab Anti-Discrimination Comm. v. Thornburgh*,
  970 F.2d 501 (9th Cir. 1991) ................................................................. 11

*Ariz. Right to Life Political Action Comm. v. Bayless*,
  320 F.3d 1002 (9th Cir. 2003) ............................................................... 10

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
  824 F.3d 858 (9th Cir. 2016) .......................................................... 10, 14

*Arjmand v. DHS*,
  No. 14-cv-7960, ECF No. 74 (N.D. Cal. 2015) ................................... 11

*Askins v. DHS*,
  899 F.3d 1035 (9th Cir. 2018) ............................................................ 3, 18

*Askins v. DHS*,
  No. 12-CV-2600 W (BLM), 2013 WL 5462296 (S.D. Cal. Sept. 30,
  2013) ....................................................................................................... 17

*Babbitt v. United Farm Workers Nat'l Union*,
  442 U.S. 289 (1979)................................................................................ 10

*Buckley v. Am. Constitutional Law Found., Inc.*,
  525 U.S. 182 (1999)................................................................................ 13

*Cherri v. Mueller*,
  951 F. Supp. 2d 918 (E.D. Mich. 2013) ................................................ 11

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993)................................................................................ 18

*City of Boerne v. Flores*,
  521 U.S. 507 (1997)................................................................................ 12

*Coszalter v. City of Salem*,
  320 F.3d 968 (9th Cir. 2003) .......................................................... 15, 16

*Crawford-El v. Britton*,
  523 U.S. 574 (1998)................................................................................ 12

i

ARNOLD & PORTER
KAYE SCHOLER

*Doe v. Harris*,
   772 F.3d 563 (9th Cir. 2014) ................................................................23

*Elrod v. Burns*,
   427 U.S. 347 (1976)............................................................................22

*Fifth Ave. Presbyterian Church v. City of New York*,
   No. 01 Civ. 11493 (LMM), 2004 WL 2471406 (S.D.N.Y. Oct. 29,
   2004) .................................................................................................20

*Garcia v. Lawn*,
   805 F.2d 1400 (9th Cir. 1986) .............................................................23

*Hamilton v. Hernandez*,
   500 F. App'x 592 (9th Cir. 2012) .................................................12, 18

*Hartman v. Moore*,
   547 U.S. 250 (2006)............................................................................12

*Healy v. James*,
   408 U.S. 169 (1972)............................................................................13

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010)................................................................................24

*Holt v. Cont'l Grp., Inc.*,
   708 F.2d 87 (2d Cir. 1983) ..................................................................23

*Human Life of Washington Inc. v. Brumsickle*,
   624 F.3d 990 (9th Cir. 2010) ...............................................................11

*Jaffe v. Alexis*,
   659 F.2d 1018 (9th Cir. 1981) .............................................................13

*Leigh v. Salazar*,
   677 F.3d 892 (9th Cir. 2012) .................................................................9

*Lopez v. Candaele*,
   630 F.3d 775 (9th Cir. 2010) .........................................................10, 11

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)............................................................................10

*Malik v. Brown*,
   16 F.3d 330 (9th Cir. 1994) .................................................................16

ARNOLD & PORTER
KAYE SCHOLER

ARNOLD&PORTER
| KAYE SCHOLER

*Manning v. Powers*,
  281 F. Supp. 3d 953 (C.D. Cal. 2017) ........................................................ 17, 22, 23

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ................................................................................................ 22

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ................................................................................. 22

*Mockaitis v. Harcleroad*,
  104 F.3d 1522 (9th Cir. 1997) .................................................................... 12, 13, 21

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ................................................................................................ 13

*N.Y. Times Co. v. United States*,
  403 U.S. 713 (1971) ................................................................................................ 24

*Navajo Nation v. U.S. Forest Serv.*,
  535 F.3d 1058 (9th Cir. 2008) .......................................................................... 19, 20

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................................ 23

*Perry v. Sindermann*,
  408 U.S. 593 (1972) .......................................................................................... 12, 18

*Posey v. Lake Pend Oreille Sch. Dist. No. 84*,
  546 F.3d 1121 (9th Cir. 2008) ............................................................................... 13

*Presbyterian Church (U.S.A.) v. United States*,
  870 F.2d 518 (9th Cir. 1989) ........................................................................... 12, 15

*Ragbir v. Homan*,
  923 F.3d 53 (2d Cir. 2019) ....................................................................................... 9

*Ragbir v. Sessions*,
  No. 18-cv-236 (KBF), 2018 WL 623557 (S.D.N.Y. Jan. 29, 2018) ................... 2, 9

*Rutan v. Republican Party of Ill.*,
  497 U.S. 62 (1990) .................................................................................................. 12

*Sammartano v. First Judicial Dist. Court*,
  303 F.3d 959 (9th Cir. 2002) ..................................................................... 10, 14, 24

iii

*San Jose Christian Coll. v. City of Morgan Hill*,
  360 F.3d 1024 (9th Cir. 2004) ................................................................. 19

*Smith v. Brady*,
  972 F.2d 1095 (9th Cir. 2002) ................................................................. 11

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ................................................................................ 13

*Sorrell v. IMS Health Inc.*,
  564 U.S. 522 (2011) ................................................................................ 22

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ................................................................................ 11

*Trammel v. United States*,
  445 U.S. 40 (1980) .................................................................................. 21

*United States v. Adeyemo*,
  624 F. Supp. 2d 1081 (N.D. Cal. 2008) ................................................. 10

*United States v. Christie*,
  825 F.3d 1048 (9th Cir. 2016) ................................................................ 21

*United States v. Cotterman*,
  709 F.3d 952 (9th Cir. 2013) .................................................................. 18

*United States v. Lee*,
  455 U.S. 252 (1982) ................................................................................ 16

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*,
  536 U.S. 150 (2002) ............................................................................ 1, 13

*Western Presbyterian Church v. Board of Zoning Adjustment*,
  862 F. Supp. 538 (D.D.C. 1994) ............................................................ 19

*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000) ................................................................ 14

*Widmar v. Vincent*,
  454 U.S. 263 (1981) ................................................................................ 14

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .................................................................................... 24

ARNOLD & PORTER
KAYE SCHOLER

iv

**Statutes**

42 U.S.C. §§ 2000bb *et seq.* ..........................................................................................3

**Other Authorities**

Park Avenue Christian Church, *Social Justice*, available at:
    https://parkavenuechristian.com/social-justice/....................................................20

ARNOLD&PORTER
| KAYE SCHOLER

# INTRODUCTION

In March 2019, a Department of Homeland Security ("DHS") whistleblower released secret government documents that depict Plaintiff Kaji Dousa, a prominent Christian minister, immigrant rights advocate, and U.S. citizen, with a yellow "X" over her face. The whistleblower collected these documents, which also include identifying personal information, from a database compiled as part of a sweeping multi-agency investigation called "Operation Secure Line." The documents purport to list "Suspected Organizers, Coordinators, Instigators, and Media" associated with the so-called "migrant caravan." Pastor Dousa did nothing unlawful to land herself in the government's crosshairs. Instead, DHS, U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), and the individuals in charge of those agencies (collectively, "Defendants") have targeted Pastor Dousa, as they have many others, simply because she exercised her First Amendment rights.

Pastor Dousa believes that responding to the needs of refugees, asylum-seekers, and other migrants is a requirement of her Christian faith. She acts on that belief by providing pastoral care to migrants, both in the United States and across the Southern Border in Mexico, officiating migrants' weddings, and leading prayerful vigils in opposition to U.S. immigration policy. The First Amendment safeguards her right to engage in this activity, as it "occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits." *Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*, 536 U.S. 150, 161 (2002).

Yet, in response to Pastor Dousa's exercise of her First Amendment rights, Defendants have illegally revoked border-crossing privileges they once provided her, and subjected her to unwarranted surveillance, detention, interrogation, and harassment. Defendants' actions already have severely harmed Pastor Dousa's ministry and will continue to inflict further irreparable harm if not enjoined. Quite simply, Pastor Dousa is not able to freely exercise her religion because of the government's actions. She has significantly decreased her ministry in Mexico because

ARNOLD & PORTER
KAYE SCHOLER

she fears prolonged detention at the border.  Her ability to cross the border to minister to migrants is impeded by revocation of her status as a "trusted traveler" as part of the Secure Electronic Network for Travelers Rapid Inspection ("SENTRI") program.  She has refrained from blessing additional marriages, even though such blessings are a fundamental part of pastoral care, because the migrants whom she has married have been subject to questioning based on their association with her.

The harm to Pastor Dousa is not limited to her work at the Southern Border.  The church Pastor Dousa leads in New York City reversed plans to house an asylum-seekers clinic, and to restrict the provision of sanctuary to individual refugees because Defendants' unwarranted targeting of Pastor Dousa would put migrants receiving this pastoral care at risk of detention, separation from their families, and even deportation.  Defendants also have interfered with Pastor Dousa's existing congregation by deterring immigrant parishioners from attending and participating in church and other religious events.  Defendants' actions particularly interfere with Pastor Dousa's ability to provide the sacred pastoral rites of confession and absolution, which depend on confidentiality.

To be clear, Pastor Dousa is not alone.  Defendants' targeting of Pastor Dousa is part of a disturbing pattern and practice of surveillance, harassment, and other adverse treatment, described in detail in Pastor Dousa's Complaint, designed to stifle opposition to U.S. immigration policy, and to punish those who offer comfort, aid, or ministry to migrants.  Several of Pastor Dousa's associates, along with scores of other advocates and journalists, have been singled out for adverse treatment based on their exercise of First Amendment rights.  Indeed, other courts already have expressed "grave concern" that Defendants have targeted these individuals "as a result of [their] speech and political advocacy on behalf of immigrants' rights and social justice."  *See Ragbir v. Sessions*, No. 18-cv-236 (KBF), 2018 WL 623557, at *1 n.1 (S.D.N.Y. Jan. 29, 2018).

Pastor Dousa now seeks this Court's intervention in vindicating her rights.  The

2

ARNOLD&PORTER
| KAYE SCHOLER

First Amendment's Free Exercise and Free Speech Clauses prohibit Defendants from discriminating or retaliating against a person based on religious exercise or protected expression. The Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.*, prohibits Defendants from substantially burdening a person's exercise of her chosen religion. To be sure, the government has an interest in securing our borders, and may detain individuals at the border, subject them to secondary screening, and conduct appropriate surveillance to advance that interest. But "[e]ven at the border, [courts] have rejected an 'anything goes' approach." *Askins v. DHS*, 899 F.3d 1035, 1045 (9th Cir. 2018). The First Amendment draws a clear line: The government's powers may not be used to target and punish individuals for exercising their First Amendment rights at the border or anywhere else. This is the hallmark of a free and democratic society.

This Court should order Defendants to comply with the United States Constitution and federal law, to cease their adverse treatment of Pastor Dousa and restore her SENTRI pass, and to restrain Defendants from taking any future adverse action against her based on her protected expression, association, or religious exercise.

## BACKGROUND

## I.  PASTOR DOUSA AND HER MINISTRY

Pastor Dousa is a U.S. citizen who serves as the Senior Pastor at Park Avenue Christian Church ("The Park") in New York City. Ex. 1, Decl. of Kaji Dousa ¶¶ 1–2 (July 24, 2019) ("Dousa Decl."). She is also the co-chair of the New Sanctuary Coalition ("New Sanctuary"), a faith-based network of congregations, organizations, and individuals dedicated to immigrant rights. *Id.* ¶ 3. She is chair of the Yale Divinity School Alumni Board, a trustee of the Yale Theological Seminary, and a member of the United Church of Christ ("UCC") Board of Directors and Executive Council. *Id.* ¶ 4.

As a Christian and UCC leader, Pastor Dousa must follow Jesus Christ, who

3

himself was a refugee, by mirroring his ministry to the vulnerable and the dispossessed. *Id.* ¶ 9.  Her faith teaches her to see Jesus Christ in those who suffer as he did, and to view actions that cause further harm to the suffering as acts causing harm to Christ himself. *Id.*  Pastor Dousa is thus required by her faith to pray with, protect, and serve refugees, asylum-seekers, and other migrants. *Id.*

Through her leadership in New Sanctuary, which is housed in Judson Memorial Church in New York City, Pastor Dousa has organized and led weekly interfaith prayer vigils, or "Jericho Walks," near federal immigration buildings. *Id.* ¶¶ 3, 5.  Pastor Dousa also regularly accompanies and prays with immigrants who have court dates and ICE check-ins, as part of New Sanctuary's Accompaniment Program. *Id.* ¶ 6.

For several years, Pastor Dousa also has ministered to migrants at the U.S. Southern Border with Mexico. *Id.* ¶¶ 7–8.  In 2018, through New Sanctuary, Pastor Dousa helped organize a "Sanctuary Caravan," a mobile clinic of faith leaders, congregants, and humanitarian workers who provided pastoral services, including prayer and church-blessed marriage ceremonies, to migrants seeking asylum in the United States. *Id.* ¶ 8.  Lasting 40 days and 40 nights, a period of Biblical significance, the Sanctuary Caravan included dozens of volunteers ministering to several hundred asylum-seekers. *Id.*  Late last fall and again in January of this year, Pastor Dousa traveled to Tijuana, Mexico, to pray with, preach to, marry, and provide confession and absolution to scores of migrants and their advocates. *Id.* ¶¶ 13–15.

The pastoral covenant of confidentiality is central to Pastor Dousa's ministry. Worshippers come to her for religious guidance related to intensely personal matters like sexual assault, family violence, and fear of political persecution. *Id.* ¶ 12.  Pastor Dousa has a religious and moral obligation to keep the information she receives confidential, except in the most extraordinary circumstances. *Id.*  Without the ability to ensure confidentiality, Pastor Dousa cannot minister freely as her faith commands. *Id.*

## II.    DEFENDANTS' RETALIATION AGAINST PASTOR DOUSA

In response to Pastor Dousa's ministry to migrants and advocacy in opposition to U.S. immigration policy, Defendants have subjected Pastor Dousa to surveillance, detention, and harassment.  Defendants have tracked Pastor Dousa's ministry across thousands of miles, subjected her to extended interrogation, and revoked expedited border-crossing privileges afforded to "low risk" travelers.  Compl. ¶¶ 44–74 (July 8, 2019) [Dkt. 1].

In January 2019, when Pastor Dousa attempted to cross into the United States from Mexico, Defendants detained her for "secondary screening," an enhanced questioning of travelers with alerts on their passports or who otherwise present cause for additional investigation. Ex. 1, Dousa Decl. ¶ 19.  Pastor Dousa had previously crossed the border several times using her TSA-issued Global Entry card without incident.  *Id.*  After Pastor Dousa was confined to the waiting area for several hours, an officer directed Pastor Dousa to a cubicle for interrogation.  *Id.* ¶¶ 21–22.  The officer wore a different uniform than the CBP officers Pastor Dousa typically encountered at the border, which she understood to mean he worked in a different unit or held a different rank.  *Id.* ¶ 22.  He asked Pastor Dousa intrusive questions about her pastoral care for refugees traveling from the Central American countries of Guatemala, Honduras, and El Salvador ("the Northern Triangle") in what media dubbed a "migrant caravan," and why she ministered to "the aliens."  *Id.*  He also asked questions about Pastor Dousa's work with New Sanctuary that revealed that he had access to detailed information about her ministry to migrants and their advocates in New York City. *Id.* ¶ 23.  The officer asked Pastor Dousa if she was involved in illegal activity; she reiterated that she was not doing anything illegal and was in Tijuana to provide pastoral services.  *Id.* ¶ 24.  Pastor Dousa ultimately crossed the border and returned to New York City.  *Id.* ¶ 28.

On March 6, 2019, NBC 7 San Diego published internal DHS documents provided by a whistleblower showing that the government was targeting Pastor Dousa,

ARNOLD & PORTER
| KAYE SCHOLER

5

along with numerous journalists, attorneys, and immigrant rights advocates, as part of a program called "Operation Secure Line." Compl. ¶ 56. The documents, titled "San Diego Sector Foreign Operations Branch: Migrant Caravan FY-2019, Suspected Organizers, Coordinators, Instigators and Media," are dated January 9, 2019 (just days after Defendants interrogated Pastor Dousa regarding her lawful activities) and detail a coordinated intelligence-gathering effort by U.S. and Mexican authorities, targeting at least 59 people allegedly associated with the "migrant caravan." *Id.* Defendants also created a secret database containing information on these individuals, whom Defendants targeted for enhanced screening and interrogation at the border. *Id.* ¶ 58.

The released documents contain photographs of each target—usually from a passport but in some cases from a social media account, indicating surveillance of those accounts—and other personal information, including date of birth, and any suspected connection to migrants. *Id.* ¶ 59. The documents also noted whether Defendants had placed an alert on the individual's passport, and in some cases whether the individual was arrested, interviewed, or subjected to an adverse immigration action, such as having a visa or SENTRI pass revoked. *Id.* ¶ 60.[1] According to a source within DHS, investigative authorities also created dossiers for each person on the list that contain even more detailed personal information. *Id.* ¶ 61. Pastor Dousa appears on the Operation Secure Line list with a yellow "X" over her face and an accompanying note stating "Disposition: SENTRI Revoked." *Id.* ¶ 62; Ex. 1, Dousa Decl. ¶¶ 29–30. Defendants have not restored Pastor Dousa's SENTRI status. Ex. 1, Dousa Decl. ¶ 32.

Meanwhile, in New York, regional ICE officials tracked prayer vigils and other religious events led by Pastor Dousa on a list of so-called "Anti-Trump Protests." Compl. ¶ 68. These officials targeted Pastor Dousa for surveillance because she prayed with migrants and called attention to the effects of U.S. immigration policy on

[1] SENTRI is a CBP program that allows for expedited clearance of pre-approved travelers who are deemed to be "low risk." *Id.* ¶ 64.

ARNOLD & PORTER | KAYE SCHOLER

migrants and their families. *Id.* ¶ 11.  Among the events Defendants surveilled was an annual Ash Wednesday prayer vigil, which Pastor Dousa frequently leads.  Ex. 1, Dousa Decl. ¶¶ 33–34.  According to emails obtained by *The Nation* and published in a March 6, 2019, report, a regional ICE official remarked that the Ash Wednesday event "saves us the trip of going over to the church," indicating that ICE was surveilling the Judson Memorial Church where Pastor Dousa often works with New Sanctuary.  *Id.*  Another surveilled event was a "Suitcase Rally," led by Pastor Dousa, which invited participants to consider what they would pack if they were deported.  *Id.* ¶ 34; Compl. ¶ 70.

The government's purported justifications for surveilling Pastor Dousa are pretextual.  Shortly after NBC 7 San Diego published the Operation Secure Line story, CBP officials told reporters "that the names in the database are all people who were present during violence that broke out at the border in November [2018]."  Compl. ¶ 72.  But Pastor Dousa was not present for any violence near the border, and when she was detained, she was not even asked about confrontations between migrants and immigration authorities.  Ex. 1, Dousa Decl. ¶¶ 17, 25.

## III.  DEFENDANTS' PATTERN AND PRACTICE OF TARGETING IMMIGRANT RIGHTS ACTIVISTS AND THOSE WHO REPORT ON MIGRATION TO THE SOUTHERN BORDER

Defendants have engaged in a pattern and practice of surveillance, harassment, and other adverse treatment designed to stifle opposition to U.S. immigration policy and punish those who offer comfort, aid, or ministry to migrants.  Defendants also have targeted journalists who cover the migrant journey from Central America's Northern Triangle to the U.S.  Compl. ¶ 88.  Among other things, Defendants have arrested immigrants who speak out about their experiences with federal authorities; detained spokespeople and directors of immigrant advocacy organizations; surveilled the organizations' headquarters and members; identified immigrants who advocate for themselves and others as enforcement priorities even before a final order of removal is in place; instructed non-citizens that associating with organizations that advocate

7

for or serve the migrant community may negatively impact their immigration status; and detained journalists covering migration to the Southern Border. *Id.* ¶ 89. The activities that led Defendants to target these individuals are not only lawful, but constitutionally protected. *Id.* ¶ 90.

For example, Defendants have targeted Pastor Dousa's New Sanctuary colleagues, including Executive Director Ravi Ragbir and co-founder Jean Montrevil, specifically because of their work with migrants and opposition to U.S. immigration policy. *Id.* ¶ 92. On January 3, 2018, ICE agents arrested Mr. Montrevil at his New York home, seeking to deport him based on a decades-old drug charge incurred as a teenager. Ex. 1, Dousa Decl. ¶ 46. Mr. Montrevil is a Haitian national, immigrant rights-activist, and lawful permanent resident who had lived in this country for over 20 years. *Id.* ¶ 47. In a January 5, 2018 meeting to discuss Mr. Montrevil's sudden change of status, ICE New York Field Office Deputy Director Scott Mechkowski told Pastor Dousa directly that "[n]obody gets beat up in the news more than we do, every single day. It's all over the place, . . . how we're the Nazi squad, we have no compassion. . . . The other day Jean [Montrevil] made some very harsh statements. . . I'm like, 'Jean, from me to you . . . you don't want to make matters worse by saying things.'" *Id.* ¶ 48.

During this meeting, Mr. Mechkowski also told Pastor Dousa, "I know exactly how to find you. You're on the web. You're all over the documents that I have." *Id.* ¶ 49. He further stated, "We all know the network of people that you have at your disposal. You have City Hall in your pocket. Like, we get it. Trust me, I know your network just as good as you do." *Id.* ICE deported Mr. Montrevil days later. *Id.* ¶ 47. Mr. Mechkowski also complained about Mr. Ragbir's statements to the press and stated that he felt "resentment" about prayer vigils led by Pastor Dousa outside a federal building where Mr. Ragbir's ICE check-in occurred. Compl. ¶ 96. Shortly thereafter, ICE detained Mr. Ragbir and processed him for deportation. *Id.* ¶ 97. Mr. Ragbir filed a petition for a writ of habeas corpus in the U.S. District Court for the

8

Southern District of New York seeking to bar his abrupt removal without allowing him time for an orderly departure. *Id.* ¶ 98. In granting the petition, the court expressed "grave concern . . . that petitioner has been targeted as a result of his speech and political advocacy on behalf of immigrants' rights and social justice." *Ragbir*, 2018 WL 623557, at *1 n.1.

Mr. Ragbir has since filed a separate action to block his deportation on the ground that execution of his final removal order reflected unconstitutional retaliation against protected speech. *Id.* ¶ 99. In April 2019, the Second Circuit held that Mr. Ragbir stated a valid claim and had strong evidence to support it. *See Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019). The court reasoned that "[t]o allow this retaliatory conduct to proceed would broadly chill protected speech, among not only activists subject to final orders of deportation *but also those citizens and other residents who would fear retaliation against others.*" *Id.* at 71 (emphasis added).

The detention, arrests, and other adverse actions taken against those connected with New Sanctuary are not unique. As detailed in Pastor Dousa's Complaint, Defendants have targeted many who write about, serve, counsel, or advocate for migrants, including the 58 other individuals in the Operation Secure Line database. Compl. ¶¶ 101–19. Defendants have engaged in a pattern and practice of targeting individuals who exercise their First Amendment rights to criticize immigration policy and minister to migrants. Pastor Dousa filed this lawsuit to end Defendants' unlawful actions, and seeks preliminary injunctive relief to prevent further, irreparable harm.

## ARGUMENT

A plaintiff seeking preliminary injunctive relief must demonstrate "(1) likelihood of success on the merits; (2) likelihood of suffering irreparable harm absent a preliminary injunction; (3) the balance of equities tips in the plaintiff's favor; and (4) injunctive relief is in the public interest." *Leigh v. Salazar*, 677 F.3d 892, 896 (9th Cir. 2012). Each of these factors favors the entry of a preliminary injunction here.

ARNOLD & PORTER
KAYE SCHOLER

## I.   PASTOR DOUSA IS LIKELY TO SUCCEED ON THE MERITS

### A.   Pastor Dousa Has Standing to Assert Her Claims

To establish Article III standing, a plaintiff must show that (1) she suffered an injury-in-fact, (2) a causal connection exists between the injury and the challenged conduct (that is, the injury has to be fairly traceable to the defendants' conduct), and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).   The injury-in-fact must constitute "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (citations omitted).[2]   At the same time, "the deprivation of a valuable government benefit for the purpose of discouraging the exercise of First Amendment rights need not be particularly great in order to find that rights have been violated." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 870 (9th Cir. 2016).

"Constitutional challenges based on the First Amendment present unique standing considerations," which, in most cases, "tilt[] dramatically toward a finding of standing." *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003).   "The touchstone for determining injury in fact is whether the plaintiff has suffered an injury or threat of injury that is credible, not 'imaginary or speculative.'" *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

Pastor Dousa has suffered concrete injuries and has credible fear that Defendants' injury to her First Amendment rights will persist.   *First*, Defendants revoked Pastor Dousa's SENTRI status.   The revocation of a government benefit is sufficient to support standing in a First Amendment case.   *Ariz. Students Ass'n*, 824 F.3d at 870.   *Second*, Pastor Dousa has been subject to detention and intensive

---

[2]   These same standing principles apply to Pastor Dousa's RFRA claim.   *See United States v. Adeyemo*, 624 F. Supp. 2d 1081, 1085 (N.D. Cal. 2008).

ARNOLD & PORTER | KAYE SCHOLER

questioning of her beliefs in secondary inspection at the U.S.-Mexico border. This, too, is a cognizable injury sufficient to support standing. *See Arjmand v. DHS*, No. 14-cv-7960, ECF No. 74 (N.D. Cal. 2015); *Cherri v. Mueller,* 951 F. Supp. 2d 918, 931-33 (E.D. Mich. 2013) (forgoing travel to avoid secondary inspection and questioning about one's religious beliefs is a cognizable injury for standing).[3]

*Third*, Pastor Dousa's "actual and well-founded fear" of future adverse treatment has chilled her from engaging in constitutionally protected conduct. That too constitutes a constitutionally cognizable injury. *Human Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1001 (9th Cir. 2010). The fact that the government took past adverse action against Pastor Dousa based on the same conduct is "strong evidence" that her fear of future adverse action is reasonable. *See Lopez*, 630 F.3d at 786–87; *see also Smith v. Brady*, 972 F.2d 1095, 1098 (9th Cir. 2002); *American-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 508 (9th Cir. 1991). Further, the government's targeting of similarly-situated individuals strengthens the objective reasonableness of Pastor Dousa's fear. *See Lopez*, 630 F.3d at 786–87; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014); *American-Arab Anti-Discrimination Committee*, 970 F.2d at 508.

Pastor Dousa has canceled one planned trip to Mexico, and her ministry at the Southern Border will continue to be curtailed for fear that she will be detained because of her ministry to migrants and criticism of U.S. immigration policy. Ex. 1, Dousa Decl. ¶ 42. She has refrained from blessing further marriages of migrants, because migrants that she has married have been subject to questioning based on her participation in their marriage. *Id.* ¶ 45. Her performance of the necessarily confidential pastoral rites of confession and absolution also has been impeded. *Id.*

---

[3] The court in *Cherri* ultimately dismissed plaintiffs' claims on the merits because, unlike Pastor Dousa, plaintiffs failed to allege that their detention and secondary screening had any adverse impact on their religious exercise. *See* 951 F. Supp. 2d at 935.

ARNOLD & PORTER
KAYE SCHOLER

¶¶ 39–40, 44; *cf. Mockaitis v. Harcleroad*, 104 F.3d 1522, 1530 (9th Cir. 1997) ("safeguards [surrounding the sacrament of penance] have the evident reason that the knowledge, belief, or suspicion that freely-confessed sins would become public would operate as a serious deterrent to participation in the sacrament and an odious detriment accompanying participation"), *overruled on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997).   Further, the fear of ongoing surveillance has stoked fear and reticence among members of her church, deterred participation in worship services by refugees and asylum-seekers, and led her church to make a difficult decision not to host a clinic for asylum seekers or make public offers of additional, formal support to individual refugees.   Ex. 1, Dousa Decl. ¶¶ 37–38.   The Ninth Circuit has held that similar injuries are sufficient to establish standing for a First Amendment claim.  *See Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 521–22 (9th Cir. 1989) (surveillance of churches that led to reduced participation by members and reluctance to seek pastoral counseling caused injury cognizable for purposes of standing).

### B.  Pastor Dousa is Likely to Prevail on Her First Amendment Retaliation Claim

Retaliation by the government for the exercise of a constitutional right "offends the Constitution [because] it threatens to inhibit exercise of the protected right." *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998).  The law thus "is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out."  *Hartman v. Moore*, 547 U.S. 250, 256 (2006).  Even if the government could lawfully take such actions for other reasons, it may not take action against an individual "*because of* [her] constitutionally protected speech," *Perry v. Sindermann*, 408 U.S. 593, 597 (1972), or because of her free exercise of religion, *Hamilton v. Hernandez*, 500 F. App'x 592, 595 (9th Cir. 2012).  "For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited." *Rutan v. Republican Party of Ill.*, 497 U.S.

12

62, 72 (1990).

To succeed on a First Amendment retaliation claim, a plaintiff must show that: (1) she engaged in constitutionally protected conduct; (2) Defendants took adverse action against her; and (3) her speech was a "substantial or motivating" factor in the adverse action. *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008). Pastor Dousa is likely to establish these elements.

### i.      Pastor Dousa's Conduct Is Constitutionally Protected

As part of her ministry, Pastor Dousa has provided pastoral care and guidance to migrants, officiated weddings for migrant communities, and administered the sacred rites of confession and absolution. These activities are protected by the First Amendment. *See Watchtower Bible*, 536 U.S. at 161; *see, e.g.*, *Mockaitis*, 104 F.3d at 1530 ("no question" Catholic priest was exercising his religion in seeking to administer Sacrament of Penance and Reconciliation); *Jaffe v. Alexis*, 659 F.2d 1018, 1020 (9th Cir. 1981) (same, regarding religious ritual).

Pastor Dousa also has contributed to the national debate on immigration policy and participated in events that are critical of U.S. policy, including Jericho walks in the vicinity of federal immigration buildings and other prayerful vigils. Her advocacy "involves interactive communication concerning political change," and thus constitutes "core political speech," where "First Amendment protection . . . . is at its zenith." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 186–87 (1999). Because "debate on public issues should be uninhibited, robust, and wide-open," *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), this type of political speech on topics like immigration policy "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).[4]

---

[4]   Further, while the freedom of association is not explicitly set out in the First Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition. *Healy v. James*, 408 U.S. 169, 181 (1972). Thus, the Constitution also

(continued...)

13

ARNOLD & PORTER | KAYE SCHOLER

### ii.   Defendants Took Adverse Action Against Pastor Dousa

Defendants have taken adverse actions against Pastor Dousa in response to her core protected speech, her exercise of religion, and her association with migrant and activist communities.  *First*, Defendants' revocation of Pastor Dousa's SENTRI status constitutes an adverse action for purposes of the First Amendment.   In *Arizona Students' Association*, a student association alleged that the Arizona Board of Regents revised its policies with respect to collection of fees that funded the association's activities in retaliation for the association's support for a ballot initiative the Board opposed.  824 F.3d at 863.  The Ninth Circuit held that although the association was not entitled to the collection of fees, the Board could not simply retract this benefit as retaliation for the association's First Amendment activity.  *Id.* at 869.  So too here. Pastor Dousa may not be entitled to SENTRI status, but Defendants violated the constitution when they revoked her status in retaliation for her protected First Amendment speech and religious exercise.

*Second*, the fact that Defendants detained and questioned Pastor Dousa regarding her beliefs at the U.S.-Mexico border is an adverse action.  In *Duran v. City of Douglas, Arizona*, the Ninth Circuit recognized that a single instance of detention may give rise to a First Amendment claim.  904 F.2d 1372, 1377-78 (9th Cir. 1990).

*Third*, Defendants' targeting of Pastor Dousa and those with whom she associates (including migrants) for surveillance and interrogation is also an adverse action.  *See White v. Lee*, 227 F.3d 1214, 1228–29 (9th Cir. 2000) (months-long investigation regarding plaintiffs' advocacy in opposition to housing project, which included interrogation of plaintiffs about their protected speech, "would have chilled or silenced a person of ordinary firmness from engaging in future First Amendment

---

protects Pastor Dousa's right to associate with others in furtherance of her beliefs. *See Widmar v. Vincent*, 454 U.S. 263, 269 (1981) ("[R]eligious worship and discussion . . . are forms of speech and association protected by the First Amendment.").

14

ARNOLD & PORTER
KAYE SCHOLER

activities"). These actions have inhibited her ministry by reducing migrants' participation in The Park's religious services and making her congregants reluctant or unwilling to seek her counsel. The Plaintiffs in *Presbyterian Church*, alleged harms nearly identical to those in Pastor Dousa's complaint—members withdrew "from active participation in the churches, a bible study group has been canceled for lack of participation, clergy time has been diverted from regular pastoral duties, support for the churches has declined, and congregants have become reluctant to seek pastoral counseling and are less open in prayers and confessions"—and the Ninth Circuit easily concluded that these harms amounted to cognizable injury to the plaintiff church's First Amendment rights. 870 F.2d at 521–22.

### iii. Pastor Dousa's Protected Conduct Was a Substantial or Motivating Factor in Defendants' Adverse Actions Against Her

Pastor Dousa's exercise of her First Amendment rights is "a substantial or motivating factor" for Defendants' adverse actions. In at least one instance of retaliatory behavior, Defendants targeted Pastor Dousa for retaliatory action almost immediately after she began her work with New Sanctuary's mobile faith clinic, the Sanctuary Caravan. *See Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) (close proximity in time between the protected action and the allegedly retaliatory action raises strong inference of retaliation). Beginning in November 2018, Pastor Dousa and other faith leaders ministered to migrants and those providing them with humanitarian aid. Ex. 1, Dousa Decl. ¶¶ 13–17. On January 2, 2019, Defendants interrogated Pastor Dousa at the San Ysidro port of entry regarding her work as a minister, both at the Southern Border and in New York City. *Id.* ¶¶ 19–28. Days later, on or about January 9, 2019, Defendants revoked Pastor Dousa's SENTRI pass and placed her on a list of "Suspected Organizers, Coordinators, Instigators and Media," subjecting her to surveillance, detention, and other adverse actions. Compl. ¶¶ 56–62; Ex. 1, Dousa Decl. ¶¶ 29–32.

Clear evidence also demonstrates that Defendant's purported justifications for

15

ARNOLD & PORTER
KAYE SCHOLER

their investigation of Pastor Dousa and others are pretextual. *See Coszalter*, 320 F.3d at 977. For example, minutes after San Diego NBC 7 published Operation Secure Line documents to its website, CBP officials told the station "that the names in the database are all people who were present during violence that broke out at the border in November." Compl. ¶ 72. But Pastor Dousa was not present for confrontations between migrants and CBP in November or at any other time, and Defendants *never asked her* about that violence during her interrogation at San Ysidro. Ex. 1, Dousa Decl. ¶¶ 17, 25.

Elsewhere, Defendants have been remarkably forthcoming regarding their reasons for targeting Pastor Dousa and her colleagues. In January 2018, ICE officers stated that they felt "resentment" about prayer vigils led by Pastor Dousa and about New Sanctuary's criticism of their implementation of U.S. immigration policy. Compl. ¶ 96. ICE also cautioned Pastor Dousa that her non-citizen colleagues at New Sanctuary should not "make matters worse by saying things." Ex. 1, Dousa Decl. ¶ 48. Such "expressed opposition" to Pastor Dousa's conduct is strong evidence that Defendants' motivations were unlawful. *See Coszalter*, 320 F.3d at 977. For all these reasons, Pastor Dousa is likely to prevail on her First Amendment retaliation claim.

## C.     Pastor Dousa is Likely to Prevail on Her Free Exercise Claim

Defendants also violated the First Amendment by implementing policies and practices that impair Pastor Dousa's free exercise of genuinely-held religious beliefs. *United States v. Lee*, 455 U.S. 252, 256–57 (1982); *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994), *supplemented*, 65 F.3d 148 (9th Cir. 1995).

As an initial matter, there is no question that Pastor Dousa's religious belief is genuine. Her long-held Christian faith compels her to provide pastoral services to refugees, asylum seekers, and other migrants, and she practices that faith by offering spiritual counsel, comfort and sacraments to the immigrant community and its advocates. Ex. 1, Dousa Decl. ¶ 9. She has preached that "to oppose an immigrant is to oppose Jesus" and warned that "if we do not stand on the side of immigrants right

16

ARNOLD & PORTER
KAYE SCHOLER

now, history will find us as the ones who were complicit in their persecution." *Id.* ¶ 10.

Defendants have targeted individuals who, like Pastor Dousa, provide comfort, care, and aid to migrants (as well as journalists who cover migration) for adverse action. As a DHS whistleblower revealed in March 2019, Defendants (1) created and maintain a database of activists and religious leaders associated with immigrant rights organizations, as well as journalists who report on migration to the Southern Border; (2) designated those individuals for interrogation and enhanced screening procedures at the border; and (3) took punitive actions such as revocation of visas and SENTRI passes. Compl. ¶¶ 56–66. Further, Defendants developed dossiers on these individuals including information regarding their lawful activities both at the Southern Border and hundreds of miles away in churches and at vigils, as well as online. *Id.* ¶ 61. As Deputy ICE Director Scott Mechkowski told Pastor Dousa in January 2018, "I know exactly how to find you. You're on the web. You're all over the documents that I have." Ex. 1, Dousa Decl. ¶ 49. Further, Defendants have used this information to question individuals, including Pastor Dousa, regarding their beliefs, religious practice and private lives.

This retaliatory pattern and practice implemented by Defendants is not content neutral, because it reflects a discretionary decision to target individuals based on their beliefs and lawful actions, including the provision of pastoral services. *See, e.g.*, *Askins v. DHS*, No. 12-CV-2600 W (BLM), 2013 WL 5462296, at *6 (S.D. Cal. Sept. 30, 2013) (CBP rule is content-based where "authorization depends on whether or not the CBP believe[d] the content of the photography compromise[d] the DHS/CBP mission"), *supplemented*, 2015 WL 12434362 (S.D. Cal. Jan. 29, 2015). Defendants have targeted Pastor Dousa because of her pastoral service to migrants and her outspoken criticism of U.S. immigration policy, "uniquely burdening" Pastor Dousa on account of her religious beliefs. *See Manning v. Powers*, 281 F. Supp. 3d 953, 962 (C.D. Cal. 2017). Defendants' actions are, therefore, subject to strict

17

ARNOLD & PORTER | KAYE SCHOLER

scrutiny. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993). Under these circumstances "the Government bears the burden of proving the constitutionality of its actions." *Askins*, 899 F.3d at 1045. Defendants' practices are constitutional only if they advance "interests of the highest order and [are] narrowly tailored in pursuit of those interests." *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 546.

To date, Defendants have not identified a compelling government interest to support their efforts to target Pastor Dousa, and others like her. They represented "that the names in the [Operation Secure line] database are all people who were present during violence that broke out at the border in November" and that their actions related to an investigation of that alleged violence. Compl. ¶ 72. But Pastor Dousa was not present at any instances of violence along the Southern Border. Ex. 1, Dousa Decl. ¶ 17. And, notably, Defendants have never questioned Pastor Dousa regarding that alleged violence, although they continue to target her as part of this purported "investigation." *Id.* ¶ 25. Thus, Defendants' purported interest plainly is pretextual.

Any argument that Defendants' actions are justified by a general interest in border security and immigration enforcement should fail. To allow Defendants to engage in the challenged conduct based on such a generalized interest would effectively give the government *carte blanche* to pursue retaliatory investigations. To be clear, the government has broad power to detain and question people at the border; but that power is still subject to the constraints imposed by the First Amendment. So while the government could have detained and questioned Pastor Dousa because they legitimately suspected that she was involved in criminal activity, or even as part of randomly applied enhanced screening, they *cannot* do so on the basis of protected First Amendment activity. *See Perry v. Sindermann*, 408 U.S. at 597; *Hamilton*, 500 F. App'x at 595. Constitutional protections apply, even at the border, where courts have "rejected an 'anything goes approach.'" *Askins*, 899 F.3d at 1045 (quoting *United States v. Cotterman*, 709 F.3d 952, 957 (9th Cir. 2013) (en banc)).

ARNOLD & PORTER
KAYE SCHOLER

**D.      Pastor Dousa is Likely to Prevail on Her Hybrid First Amendment Rights Claim**

Where a Free Exercise claim is brought in conjunction with a claim alleging a separate constitutional violation for the same communicative activity, strict scrutiny is triggered and the governmental policy, custom or practice in question must be justified by a compelling governmental interest and narrowly tailored to advance that interest. *See San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024 (9th Cir. 2004).

Here, Pastor Dousa's Free Exercise claim is brought in conjunction with her First Amendment retaliation claim and thus Defendants' conduct is subject to strict scrutiny.  For the reasons discussed above, Defendants cannot survive strict scrutiny because their practice of subjecting Pastor Dousa to, among other things, heightened surveillance and extensive interrogation is not justified by a compelling governmental interest and is not narrowly tailored to achieve that interest.

**E.      Pastor Dousa is Likely to Prevail on Her RFRA Claim**

Under RFRA, a plaintiff must first provide evidence sufficient to allow a trier of fact to find that (1) the activities the plaintiff claims are burdened by the government action are an exercise of religion and (2) the government action substantially burdens the plaintiff's exercise of religion.  *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008).  Where a plaintiff demonstrates a substantial burden on her religious exercise, "the burden of persuasion shifts to the government to prove that the challenged government action is in furtherance of a 'compelling governmental interest' and is implemented by 'the least restrictive means.'" *Id.*  If the government cannot meet its burden, the court *must* find a RFRA violation.  *Id.*

Pastor Dousa's activities in ministering to migrants in Mexico and the United States constitute an exercise of religion based on sincerely held religious beliefs.  *See supra* at 13.   Religiously motivated charitable work, such as Pastor Dousa's religiously-motivated counsel and advocacy on behalf of migrants, are also well within the scope of RFRA.  For example, in *Western Presbyterian Church v. Board of Zoning*

19

*Adjustment*, 862 F. Supp. 538, 544, 547 (D.D.C. 1994), a federal district court held that a Presbyterian church's feeding program was protected under RFRA, calling it "a form of worship akin to prayer" and noting that "the concept of acts of charity as an essential part of religious worship is a central tenet of all major religions." Accordingly, a zoning board decision that prohibited the church from feeding the homeless on their premises substantially burdened the church's right to free exercise of religion in violation of RFRA. *Id.* at 545–47; *see also Fifth Ave. Presbyterian Church v. City of New York*, No. 01 Civ. 11493 (LMM), 2004 WL 2471406, at *2 (S.D.N.Y. Oct. 29, 2004) (that a "Church's practice of allowing homeless persons to sleep out-of-doors on its property is an 'exercise of sincerely held religious beliefs'. . . cannot be seriously disputed.") (citation omitted), *aff'd*, 177 F. App'x 198 (2nd Cir. 2006).

A substantial burden exists "when individuals are forced to choose between following the tenets of their religion and receiving a government benefit," or, alternatively, when individuals are "coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Navajo Nation*, 535 F.3d at 1070. In this case, Pastor Dousa's religion requires her to honor "a covenant to serve the oppressed and those pushed to the margins," such as migrants in the United States and Mexico.[5] To fulfill that mission, before January 2019, her ministry regularly took her to the Southern Border to provide pastoral care to migrants and their advocates. Ex. 1, Dousa Decl. ¶¶ 7–8, 13–16. But Defendants' conduct, including revocation of her SENTRI pass, has impeded Pastor Dousa's ministry in Mexico and diminished her ability to engage in activities with fellow clergy and religious leaders in Mexico. *Id.* ¶¶ 41–43, 45. Every time Pastor Dousa travels to Mexico she must weigh the added burden of secondary screening and the uncertainty of a timely return to the U.S. against the value

---

[5]     Park Avenue Christian Church, *Social Justice*, available at: https://parkavenuechristian.com/social-justice/.

ARNOLD & PORTER KAYE SCHOLER

of her ministry to migrants and their advocates.

Defendants also burden Pastor Dousa's exercise of her deeply held religious beliefs by intruding on the confidentiality of her communications with parishioners, penitents, and others. Courts recognize that confidentiality is critical to the relationship between a minister and those she serves. *See Trammel v. United States*, 445 U.S. 40, 51 (1980); *Mockaitis*, 104 F.3d at 1533. Pastor Dousa cannot simply overlook the potential loss of privacy in her communications with the faithful, lest she endanger the very individuals to whom she is compelled to offer support, aid, and counsel. In order to provide religious counsel, Pastor Dousa must first caution those who seek it to take concrete actions to safeguard communications, which limits communications with her and injects suspicion into a relationship which depends on trust. Ex. 1, Dousa Decl. ¶¶ 43–44; *see Mockaitis*, 104 F.3d at 1533 (surveillance of conversation between priest and parishioner "invades the[] free exercise of religion [of those seeking penance] and . . . makes it impossible for [priest] to minister the sacrament to those who seek it . . .").

Defendants cannot establish a compelling interest for surveilling and targeting Pastor Dousa in this manner. As the Supreme Court explained in *Burwell v. Hobby Lobby Stores, Inc.*, the compelling interest/least-restrictive-means standard is "exceptionally demanding." 573 U.S. 682, 728 (2014). It requires a "focused inquiry" under which the government must "demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Id.* at 726; *United States v. Christie*, 825 F.3d 1048, 1056–57 (9th Cir. 2016). Accordingly, Defendants must affirmatively demonstrate that they have a compelling interest in the continued surveillance and targeting of Pastor Dousa (a New York-based, U.S. citizen who has not been accused of posing any threat to security), and in denying her SENTRI privileges. Defendants cannot meet this burden. Surveillance and detention of Pastor Dousa for the simple act of providing pastoral services to asylum seekers is hardly the

21

ARNOLD & PORTER
KAYE SCHOLER

least restrictive means to achieve border security.

## II. PASTOR DOUSA WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

There is little doubt that, if left unchecked, Defendants' campaign of intimidation and retaliation will continue, irreparably harming Pastor Dousa, those she serves, and the public at large.

The deprivation of constitutional rights, for even a minimal amount of time, "'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (holding that the likely possibility that plaintiffs would be detained in the future was irreparable injury) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Manning*, 281 F. Supp. 3d at 964 (confirming the principle articulated in *Elrod* applies to religious as well as political speech). Likewise, restrictions that render speech less effective—even if speech is not banned altogether—may impermissibly burden expression. In *McCullen v. Coakley*, 573 U.S. 464 (2014), for example, the Court invalidated a law imposing a buffer zone around abortion clinics. The law did not prohibit the plaintiffs—individuals who sought to counsel women on alternatives to abortion—from speaking. But the law rendered their speech "far less frequent" and "far less successful" by preventing them from engaging in personal conversations with the women they wished to counsel. The loss of these "primary methods" of expression "effectively stifled" the plaintiffs' speech. *Id.* at 489–90; *Sorrell v. IMS Health Inc.*, 564 U.S. 522, 564 (2011).

Although Pastor Dousa has continued to speak out and perform ministerial functions, her speech has been rendered far less frequent and its reach has been diminished. Her ability to function as a pastor has been compromised by the constant specter of surveillance. And her ability to associate with others to further her beliefs, to pray, and to provide sacraments has been burdened. She also no longer has access to the expedited screening she received as a SENTRI holder, which makes it more difficult for her to cross the border to access migrants in need of ministry. Ex. 1, Dousa

22

Decl. ¶¶ 37–45.  In short, Defendants' actions have restricted Pastor Dousa's speech and exercise of religion, and constrained its reach.

Moreover, Defendants' targeting of Pastor Dousa will result in irreparable harm to a host of third parties who are also chilled by these retaliatory actions.  *Cf. Garcia v. Lawn,* 805 F.2d 1400, 1405–06 (9th Cir. 1986) (remanding with the suggestion that third party chilling can constitute irreparable harm); *Holt v. Cont'l Grp., Inc.,* 708 F.2d 87, 91 (2d Cir. 1983) (the risk that other employees may be deterred from protecting their rights may constitute irreparable injury).  "[C]ourts will more readily grant [injunctive] relief where allegations of retaliation are involved, because such conduct is likely to cause irreparable harm to the public interest in enforcing the law by deterring others from" exercising their rights.  *Garcia*, 805 F.2d at 1405; *see also Manning*, 281 F. Supp. 3d at 965.

Here, the nearly 60 other individuals targeted as part of Operation Secure Line also will be irreparably harmed by further enforcement and surveillance actions.  *See* Compl. ¶¶ 101–19.  In addition, Pastor Dousa's church is independently harmed by Defendants' retaliatory actions.  It has lost congregants and abandoned plans to house a pro se clinic for asylum seekers and to publicly offer sanctuary as part of outreach to the migrant community because of Defendants' surveillance of Pastor Dousa and retaliation against her.  Defendants' conduct also creates fear in The Park's members and those it serves, undoubtedly leading many who desire to seek ministry from Pastor Dousa to refrain from doing so for fear of identification, detention, family separation, and deportation.  Ex. 1, Dousa Decl. ¶¶ 37–45.

## III.  THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST SUPPORT A PRELIMINARY INJUNCTION

The balance of hardships and the public interest weigh in favor of a preliminary injunction.  "These [two] factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

23

Here, the balance of hardships tips sharply in favor of Pastor Dousa.  There is a "significant public interest in upholding First Amendment principles." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014); *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002) ("Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles."), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008).

Conversely, neither Defendants nor the public will face any substantial hardship as a result of the injunctive relief Pastor Dousa seeks.  Defendants likely will argue that their actions serve the interest of, generally, national security, border security, and immigration enforcement.  This argument warrants close examination.  "[C]oncerns of national security and foreign relations do not warrant abdication of the judicial role." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010).  And this Court must be skeptical of claims that the security of the nation will suffer if individuals are allowed to exercise their First Amendment rights. *See N.Y. Times Co. v. United States*, 403 U.S. 713, 719 (1971) ("The word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment.") (Black, J., concurring).

In any event, in this case, Pastor Dousa is not asking that Defendants be enjoined from all surveillance, detention, or screening of individuals at the border.  The government is permitted to engage in legitimate law enforcement activities such as surveillance and secondary screening at the border.  But it cannot use those tools to punish individuals for exercising their fundamental rights.  Pastor Dousa merely seeks an injunction preventing Defendants from conducting those actions in a manner that violates the Constitution of the United States and federal law.

## CONCLUSION

For the foregoing reasons, the Court should grant a preliminary injunction ordering Defendants to cease surveilling, detaining, and otherwise targeting Pastor

24

Dousa; ordering Defendants to restore her SENTRI status; restraining Defendants from taking any future adverse action against her based on her protected expression, association, or religious exercise; and restoring Pastor Dousa to the *status quo ante*.

Dated: July 25, 2019

Respectfully submitted,
ARNOLD & PORTER KAYE
SCHOLER LLP

By:  /s/ Oscar Ramallo

    Oscar Ramallo (Bar No. 241487)
    Oscar.Ramallo@arnoldporter.com
    R. Stanton Jones  (*pro hac vice*)
    Stanton.Jones@arnoldporter.com
    William C. Perdue (*pro hac vice*)
    William.Perdue@arnoldporter.com
    Ada Añon (*pro hac vice*)
    Ada.Anon@arnoldporter.com
    Christian D. Sheehan (*pro hac vice*)
    Christian.Sheehan@arnoldporter.com
    Jaba Tsitsuashvili (Bar No. 309012)
    Jaba.Tsitsuashvili@arnoldporter.com
    Leah J. Harrell (*pro hac vice*)
    Leah.Harrell@arnoldporter.com
    Jean Chang*
    Jean.Chang@arnoldporter.com

ARNOLD & PORTER KAYE
    SCHOLER LLP

    Stephanie Llanes (*pro hac vice*)
    stephanie.llanes@protectdemocracy.org
    Anne Tindall (*pro hac vice*)
    anne.tindall@protectdemocracy.org
    Genevieve Nadeau (*pro hac vice*)
    Ben Berwick (*pro hac vice*)

PROTECT DEMOCRACY

Attorneys for Plaintiff Kaji Dousa

*Amended pro hac vice application forthcoming*

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ARNOLD & PORTER
| KAYE SCHOLER

**EXHIBIT 1**

1
2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

3

4

5

KAJI DOUSA,

6

Plaintiff,

7

v.

8
9
10
11
12
13
14
15

U.S. DEPARTMENT OF HOMELAND
SECURITY ("DHS"); U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT
("ICE"); U.S. CUSTOMS AND BORDER
PROTECTION ("CBP"); KEVIN K.
MCALEENAN, Acting Secretary of DHS;
MATTHEW T. ALBENCE, Acting Director
of ICE; MARK A. MORGAN, Acting
Commissioner of CBP; and PETER
FLORES, Director of Field Operations for
CBP, San Diego,

16

Defendants.

Case No. 3:19-cv-01255-LAB-
KSC

**DECLARATION OF
PLAINTIFF KAJI DOUSA**

17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 1

1  I, Kaji Dousa, state and declare as follows:

2      1.    I am a United States citizen over the age of 18 and make this

3  declaration based on my personal knowledge.

4  **Background**

5      2.    I am the Senior Pastor at Park Avenue Christian Church ("The Park"),

6  located on the Upper East Side of Manhattan in New York City.  I was elected to

7  my position at The Park on June 19, 2016, by a unanimous vote—the first woman

8  in the congregation's 206-year history.

9      3.    I also serve as the Co-Chair of the New Sanctuary Coalition ("New

10  Sanctuary"), a faith-based network of congregations, organizations, and individuals

11  devoted to immigrant rights.  New Sanctuary is housed at Judson Memorial Church

12  in New York City.  I first began working with New Sanctuary a decade ago while

13  serving at Saint Peter's Lutheran Church in New York City.

14      4.    I am President of the Yale Divinity School Alumni Board and serve as

15  a Trustee for Andover Newton Seminary at Yale.  I have served on the United

16  Church of Christ ("UCC") Board of Directors' Executive Council.

17      5.    As part of my work with New Sanctuary, I serve as a spiritual advisor

18  to its leaders and members, including Ravi Ragbir, its Executive Director.  Through

19  New Sanctuary, I have organized and led weekly prayer vigils, or "Jericho Walks,"

20  near federal immigration buildings.  These interfaith gatherings borrow the

21  symbolism of the Battle of Jericho from the Book of Joshua, in which the Israelites

22  marched around the city of Jericho seven times, causing the city walls to fall.  New

23  Sanctuary prays every week that "the walls of immigration injustice will come

24  tumbling down."

25      6.    My ministry with New Sanctuary includes the organization's

26  Accompaniment Program, which ensures that immigrants who have immigration

27

28

EXHIBIT 1
2
DECLARATION OF PLAINTIFF KAJI DOUSA

1   court dates and Immigration and Customs Enforcement ("ICE") check-in

2   appointments appear as required, but do not face them alone.  I regularly

3   accompany and pray with immigrants through this ministry.

4         7.     Before joining The Park, I was the Senior Minister at The Table: La

5   Mesa United Church of Christ in California, just miles from the United States

6   border with Mexico ("the Southern Border"), where I led the congregation in

7   various forms of support for newly arrived immigrants.  Members of the

8   congregation offered housing and helped connect immigrants with their family

9   members throughout the United States.  During this time, I frequently provided

10  pastoral care for Casa Hogar, an orphanage in Baja California in Mexico.  With the

11  League of Women Voters, I met with the Consulate General of Mexico to help

12  connect migrants with family members in the United States.  I also brought my

13  congregation to a yearly Christmas service at "Friendship Park," which is located at

14  a space where a barricade between Mexico and the United States can be opened so

15  that U.S. citizens and family members deported to Mexico may gather and pray

16  together.  The *La Mesa Today* newspaper named me to the La Mesan of the Year

17  list in 2015 for my ministry to immigrant children.

18        8.     I continued my work on the Southern Border after being called to The

19  Park in 2016.  In 2018, through New Sanctuary, I helped organize a "Sanctuary

20  Caravan," a mobile clinic of faith leaders, congregants, and humanitarian workers

21  who provided pastoral services, including prayer and church-blessed marriage

22  ceremonies, to migrants seeking asylum in the United States.  Lasting 40 days and

23  40 nights (a period of Biblical significance), the Sanctuary Caravan included

24  dozens of volunteers ministering to several hundred asylum-seekers south of the

25  U.S.-Mexico border.

26

27

28

## My Christian Faith

9.      As a Christian and UCC leader, I believe I must follow Jesus Christ by mirroring his ministry to the vulnerable and dispossessed.  My faith teaches me to see Jesus Christ in those who suffer as he suffered.  So, I view actions that cause further harm to the suffering as actions causing harm to Jesus Christ.  I am thus called to pray with and protect refugees, asylum seekers, and other migrants— remembering that Jesus, too, was received as a refugee in Egypt.  I view this calling as a command from God and answering it is a requirement of my faith.  In fact, the dangers that lead migrants to flee Central America's Northern Triangle (Guatemala, Honduras, and El Salvador) for the United States, and the traumatic experiences they endure along the way, make offering them pastoral care an urgent requirement of my Christian faith.

10.      Because Jesus crossed a foreign border as a refugee and an immigrant, I have preached to my congregation and other audiences of faith that "to oppose an immigrant is to oppose Jesus," and that "if we do not stand on the side of immigrants right now, history will find us as the ones who were complicit in their persecution."

11.      I offer pastoral care to longtime U.S. residents facing deportation and separation from their families.  I meet with them.  I lead them in prayer.  I organize prayer vigils for and with these vulnerable people.  And I have done the same for newly arrived refugees who fled violence and extreme poverty in their home countries.

12.      Worshippers come to me for ministry and religious guidance in overcoming, among other things, sexual assault, family violence, and fear of political persecution.  I have a religious and moral obligation to receive this testimony in a setting sealed from the outside world.  Confidentiality is also essential to my pastoral duty to hear confession and offer Christ's absolution,

1  whereby penitents share privately what burdens their consciences and I give them

2  complete forgiveness—as if from Christ himself.  The ability to minister to

3  Christians in this way is at the heart of my calling.

4  **<u>My Recent Experience at the Southern Border</u>**

5       13.    I made my first trip to San Diego in connection with the mobile faith

6  clinic, Sanctuary Caravan, on November 26, 2018.  I traveled with a group of

7  clergy and Mr. Ragbir to learn what on-the-ground organizing was already in place

8  for pastoral care and humanitarian aid for a large group of migrants traveling to the

9  United States through Central America and Mexico (what some have called the

10  "migrant caravan").

11       14.    On November 27, 2018, the Sanctuary Caravan officially began its

12  advance work, and our group crossed the border to Tijuana to meet with leaders of

13  Al Otro Lado, an organization we work with that provides legal services to

14  migrants on both sides of the border.  That day, Al Otro Lado announced at a press

15  conference and via Facebook that day that members of the clergy would be

16  available to minister to migrants and would be able to officiate weddings.

17       15.    Over the course of the next two days, a group of clergy and I officiated

18  17 weddings for families too poor or isolated to have received church blessing of

19  their unions in the past.  I prayed with scores of migrants and their advocates, heard

20  their confessions, and offered them absolution.  I anointed the sick and consoled the

21  mourning.  I laid hands on the injured and offered grace to the anguished.  I

22  dedicated the children of migrants born on their journey in search of safe refuge.

23       16.    I crossed the border twice without any problem during this time and

24  returned to New York City on November 29, 2018.

25       17.    On December 30, 2018, I returned to San Diego to meet and pray with

26  Sanctuary Caravan leaders and assist with internal logistics.  On January 1, 2019,

27

28

EXHIBIT 1           DECLARATION OF PLAINTIFF KAJI DOUSA

1    while I was in meetings at the First United Methodist Church of Chula Vista, San

2    Diego, confrontations between migrants and Customs and Border Protection

3    ("CBP") officers erupted at the border.  Neither I nor other clergy in the Sanctuary

4    Caravan had anything to do with those confrontations.  We were not even present

5    when the confrontations took place.

6        18.    On January 2, 2019, I returned to Tijuana and posted a video to my

7    Facebook page telling people that I would be meeting with my faith clinic partners.

8    I "tagged" the San Ysidro point of entry on my post.

9        19.    On January 2, I spent the day in Tijuana and then began my return to

10   San Diego at around 4:30 p.m.  When I reached the San Ysidro port of entry, I

11   presented my TSA-issued Global Entry card to a CBP official.  The CBP official

12   looked at my card and asked me to follow him to a waiting room for secondary

13   screening, where (I now know) immigration officials conduct enhanced questioning

14   of certain border-crossers.  Several times before, I crossed the border using my

15   Global Entry card.  Never before had I been subject to secondary screening.

16       20.    I asked the CBP officers in the waiting room why I was being held

17   without explanation and how long they intended to keep me. They would not

18   answer.  While I was being held, I saw several other border-crossers in the waiting

19   area.  They each answered a handful of questions from the officers and then

20   promptly departed.

21       21.    I remained in the waiting area for several hours without any

22   explanation.  At one point, I put on my clerical collar in order to identify myself as

23   a pastor. I tried again to speak with the CBP officers.  I asked an officer to allow me

24   to contact my family.  I used the officers' desk phone to call my husband, but he

25   did not answer.  More time passed.  When I asked again about how long they

26   intended to hold me, an officer told me that I would not be allowed to go anywhere

27   until somebody else—it was not clear who—was ready to question me.

28

EXHIBIT 1              DECLARATION OF PLAINTIFF KAJI DOUSA

22.     Finally, an officer who was wearing a different kind of uniform, which I understood to mean he worked in a different unit or held a different rank, took me to a cubicle for interrogation.  The officer asked me personal questions. He wanted to know my address and date of birth. He asked how many times I had crossed the border. He queried what I was doing in Tijuana.  He interrogated my ministry to migrants in the "migrant caravan." He wanted to know why I chose to provide pastoral care to "the aliens."  I told him that my faith compelled me to provide pastoral services to migrants.  I explained that I am a Christian, that Jesus Christ was a refugee, and that ministering to refugees is an essential Christian duty.

23.     The officer also specifically asked me about my involvement with the mobile faith clinic, the Sanctuary Caravan.  He asked other questions about my work with New Sanctuary in New York City that led me to believe that he had prior knowledge of my ministry to immigrants.  He asked about my ministry to asylum-seekers and whether I encouraged them to lie on asylum applications.  I told him that lying would be a violation of my faith and I explained that sometimes during my ministry, I helped asylum-seekers, many of whom speak no English, describe as clearly as possible what had caused them to flee their homes.

24.     The officer asked me if I was involved in illegal activity.  I told him that I was not doing anything illegal and said again that I was in Tijuana to provide pastoral services.

25.     The officer did not ask me anything about confrontations between migrants and immigration officials at the Southern Border or about human smuggling.

26.     Over time, another officer, similarly uniformed to the one asking questions, joined the interrogation.

27.     At the end of this questioning, I gave my business card to the officers. The officers did not give me their contact information, but they did tell me their

1    names, and they returned my Global Entry card.

2         28.    I returned to New York on January 5, 2018.

3    **The Government's Targeting of Me**

4         29.    In early March 2019, friends told me about a report on NBC 7 San

5    Diego regarding leaked government documents showing that the Department of

6    Homeland Security ("DHS") was targeting me and others, including journalists,

7    attorneys, and immigrant rights advocates, for enhanced government surveillance as

8    part of their response to increased migration to the Southern Border—something

9    they call "Operation Secure Line."  I then looked at the documents online and saw

10   what appeared to be a blurred photograph of my face with a yellow "X" over it and

11   the note "Disposition: SENTRI Revoked."

12        30.    I contacted NBC 7 San Diego reporter Tom Jones, who confirmed that

13   I had in fact appeared in the Operation Secure Line documents.  Tom sent me a not-

14   blurred version of the image that I had seen online and it was a photograph of my

15   face.

16        31.    I received my SENTRI membership in June 2016.  Before January

17   2019, I crossed U.S. borders, including the Southern Border, on several occasions

18   using my SENTRI status without any problem.

19        32.    As far as I know, my SENTRI status is still revoked.  When I log in to

20   my Trusted Traveler program account on the DHS website, my SENTRI status no

21   longer appears.  I have spoken with others who are also SENTRI members, and

22   they have advised me that they can see their SENTRI status immediately upon

23   logging in to their Trusted Traveler accounts.

24        33.    Also on March 6, 2019—the same day as the NBC 7 San Diego report

25   about Operation Secure Line—I read a report in *The Nation* about ICE surveillance

26   of protests in New York City.  According to that report, New Sanctuary was listed

27   on an ICE spreadsheet labeled "Anti-Trump Protests."  The article also discussed

28

DECLARATION OF PLAINTIFF KAJI DOUSA

EXHIBIT 1

1  email exchanges between ICE officers in which they talked about events organized
2  by New Sanctuary.

3      34.    One such event was the annual Ash Wednesday prayer vigil, which I
4  frequently lead.  As part of that event, clergy apply ashes to the foreheads of anyone
5  who presents themselves to receive them, including ICE officials.  In the same
6  email exchanges reported by *The Nation*, an assistant field office director said that
7  the vigil "saves us the trip of going over to the church," which I took to mean that
8  ICE was surveilling Judson Memorial Church.  I often work out of Judson
9  Memorial Church with my New Sanctuary partners.

10     35.    Another event on the spreadsheet was a "Suitcase Rally," during which
11  we invited participants to consider the question, "what would you pack if you were
12  deported?"  I was the emcee of the event and my four-year-old daughter appeared
13  alongside me in the pulpit.

14     36.    When I learned that the federal government had targeted me as a risky
15  traveler and was surveilling me in New York, I was extremely upset.  I felt
16  intensely afraid and vulnerable, and I felt as though my privacy had been violated.

17  **Effects on My Ministry**

18     37.    The events of the last several months have had a significant impact on
19  my ability to practice my religion.  Not only am I afraid, but many of The Park's
20  members and those it serves are also afraid.  This has deterred participation in
21  worship services by refugees and asylum-seekers.

22     38.    Among other things, The Park reversed its plans to host a pro se clinic
23  for asylum seekers and has had to restrict the provision of sanctuary to individual
24  refugees. The church was afraid that the government's surveillance and retaliation
25  against me could potentially subject those we serve to arrest, detention, or even
26  deportation.

27     39.    Government surveillance also interferes with my ability to provide the
28

DECLARATION OF PLAINTIFF KAJI DOUSA

EXHIBIT 1

1   hope of consolation and peace of absolution.  People seeking pastoral care often

2   find themselves navigating life's greatest challenges, including the burden of past

3   mistakes.  I help to guide people back to the promises of their faith through

4   forgiveness.  To receive Christ's forgiveness, penitents must be free to confess

5   absolutely everything weighing on their consciences.  This vital Christian practice,

6   through which a person shares the deepest hurt, pain guilt and shame in their life,

7   demands the strictest confidence.  Without privacy, people cannot feel free to

8   unburden their consciences or truly receive the assurance of forgiveness and

9   consolation.

10         40.    Since I have been targeted by the government, I have advised penitents

11   who seek my counsel that they should convey confidential information to me in

12   person or through secure and encrypted technology.  Even in person, some of my

13   parishioners have told me that they are concerned that the surveillance of me means

14   that there is a "microphone in the confessional."

15         41.    Being targeted by the government has made it particularly difficult for

16   me to minister to migrants and their advocates at the Southern Border.  One such

17   person in Tijuana relies exclusively on me for pastoral care.  Because of my

18   inclusion in Operation Secure Line and the difficulty of my travel to Mexico, I am

19   limited to ministering to this person through electronic communications. Such

20   guarded communications cannot provide the same personal interaction between

21   pastor and parishioner that is important for effective ministry.

22         42.    For the first time in my life, I fear traveling across the border to

23   Mexico.  I have had to limit my ministry at the Southern Border and curtailed my

24   trips to Mexico.  In fact, I had planned to return to Tijuana both on January 3, 2019

25   and again on January 4, 2019, but I cancelled these trips because I was afraid of

26   again being detained and interrogated by U.S. government authorities for

27   ministering to migrants.  When I do travel, I no longer have access to the expedited

28

EXHIBIT 1

DECLARATION OF PLAINTIFF KAJI DOUSA

1   screening I enjoyed as a SENTRI pass holder, which makes crossing the border

2   more time-consuming and difficult.

3       43.   Ministering to migrants is a large part of my work as a pastor. I have

4   deep connections with immigrant-rights advocates in California, New York, and in

5   Mexico, and I have offered pastoral care to those advocates and to the migrants they

6   serve for nearly a decade. But I no longer feel that I am able to fulfill this core part

7   of my faith because I might be detained and interrogated when crossing the border

8   without my attorney. I am also afraid that migrants who associate with me will hurt

9   their chances of receiving asylum.

10      44.   I feel I have to tell my parishioners about the possibility of

11  surveillance. This interferes with the trust between us and their ability to freely

12  seek my care. Instead of offering the consolation and assurance of Christ's love

13  and forgiveness, my practice of confession is burdened by an uneasiness in the

14  pastoral relationship that fundamentally undermines confidence in my ministerial

15  function. The reality is that seeking ministry from me or any other faith leader

16  under government surveillance could mean risking identification, detention, family

17  separation, and deportation.

18      45.   At least one migrant whose marriage was blessed by clergy in the

19  Sanctuary Caravan was interrogated by immigration officials regarding her

20  association with me when she submitted an application for asylum. Since learning

21  of her interrogation, I have not blessed additional marriages of migrants at the

22  border.

23  **My Colleagues and Parishioners Have Been Targeted**

24      46.   On January 3, 2018, ICE agents arrested someone in my care, Jean

25  Montrevil, at his New York home. I have ministered to Mr. Montrevil for more

26  than a decade.

27      47.   A co-founder of New Sanctuary and a member of Judson Church, Mr.

28

EXHIBIT 1                    DECLARATION OF PLAINTIFF KAJI DOUSA

1  Montrevil is a Haitian national, immigrant-rights activist, and lawful permanent

2  resident who had lived in the United States for over 20 years. When ICE arrested

3  him, he was in the process of trying to have his immigration case reopened.  ICE

4  deported Mr. Montrevil to Haiti just days later.

5       48.    Just before Mr. Montrevil was deported, on January 5, 2018, I led a

6  group of three other clergy to meet with ICE's New York Field Office Deputy

7  Director, Scott Mechkowski, to discuss Mr. Montrevil's case.  During this meeting,

8  Mr. Mechkowski told us, "Nobody gets beat up in the news more than we do, every

9  single day.  It's all over the place . . . how we're the Nazi squad, we have no

10  compassion . . . .  The other day Jean [Montrevil] made some very harsh statements.

11  . . . I'm like, 'Jean, from me to you . . . you don't want to make matters worse by

12  saying things.'"

13       49.    During this meeting, Mr. Mechkowski said to me, "I know exactly

14  how to find you.  You're on the web.  You're all over the documents that I have."

15  He further said: "We all know the network of people that you have at your disposal.

16  You have City Hall in your pocket.  Like, we get it."  He also said:  "Trust me, I

17  know your network just as good as you do."

18       50.    I have also ministered to Mr. Ragbir for many years and he has

19  received similar treatment by the government.

20       51.    Another of my parishioners, Nicole Ramos, also has been targeted as

21  part of Operation Secure Line.  Ms. Ramos, an attorney, is the Refugee Program

22  Director for Al Otro Lado.

23       52.    I am afraid that the government will continue to retaliate against me

24  and those with whom I associate.

25       I declare under penalty of perjury that the foregoing is true and correct.

26

27

28

DECLARATION OF PLAINTIFF KAJI DOUSA

EXHIBIT 1

1   Executed on July 24, 2019, in New York, NY.

2

3   _____

4   KAJI DOUSA

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13
DECLARATION OF PLAINTIFF KAJI DOUSA

EXHIBIT 1