ROBERT S. BREWER, JR.
United States Attorney
ERNEST CORDERO, JR
Assistant U. S. Attorney
California Bar No. 131865
E-mail: ernest.cordero@usdoj.gov
MICHAEL A. GARABED
Assistant U.S. Attorney
California Bar No. 223511
E-mail: michael.garabed@usdoj.gov
United States Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101-8893
Telephone: (619) 546-7478/7703
Facsimile: (619) 546-7751

Attorneys for Federal Defendants

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| KAJI DOUSA,<br><br>            Plaintiff,<br><br>        v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS"); U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT ("ICE"); U.S. CUSTOMS AND BORDER PROTECTION ("CBP"); KEVIN K. MCALEENAN, Acting Secretary of DHS; MATTHEW T. ALBENCE, Acting Director of ICE; MARK A. MORGAN, Acting Commissioner of CBP; and PETER FLORES, Director of Field Operations for CBP, San Diego,<br><br>            Defendants. | Case No.:  19-cv-1255-LAB (KSC)<br><br>**FEDERAL DEFENDANTS' MOTION TO DISMISS COMPLAINT FOR FAILURE TO STATE A CLAIM , LACK OF SUBJECT MATTER JURISDICTION, AND TO STRIKE PRAYER FOR RELIEF**<br><br>DATE:  November 13, 2019<br>TIME:   10:00 a.m.<br>CTRM: 14A<br><br><br>Hon. Larry A. Burns |

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ................................................................. 2

II.   BACKGROUND FACTS AND ALLEGATIONS ........................... 3

    A. Facts Related to Plaintiff's Border Crossing Activities .............................. 3
    B. Facts Primarily Related to Actions Involving Third Parties ...................... 8

III.  LEGAL STANDARDS APPLICABLE TO MOTIONS TO
     DISMISS AND STRIKE ...................................................... 9

    A. Legal Standard on Fed.R.Civ.P. 12(b)(1) Motion .................................... 9
    B. Legal Standard on Fed.R.Civ.P. 12(b)(6) Motion .................................... 9
    C. Legal Standard on Fed.R.Civ.P. 12(f) Motion ......................................... 9

IV.   PLAINTIFF LACKS STANDING TO SEEK INJUNCTIVE
     AND OTHER EQUITABLE RELIEF .............................................. 10

    A.  Plaintiff Cannot Show a Concrete and Particular Harm
      Coupled with a Real and Imminent Threat that She will Suffer
      Repeated Injury ........................................................................ 13

        1. The Alleged Deprivation of Plaintiff's Expedited Border
          Crossing Privileges Due to the Supposed Revocation of her
          SENTRI Card .................................................................... 13
        2. The Alleged Risk of Being Repeatedly Required to Undergo
          Secondary Inspection When Crossing the U.S.-Mexico Border ........ 14
        3. The Maintenance of Information on Plaintiff in CBP's
          Databases ...................................................................... 15
        4. Plaintiff Has Not Established that her Alleged Injuries are
          Fairly Traceable to Each Defendant ...................................... 15
        5. Plaintiff Cannot Obtain Injunctive or Other Equitable
          Relief to Remedy the Injuries of Non-Parties ........................ 15

V.    PLAINTIFF'S COMPLAINT FAILS TO STATE PLAUSIBLE
     CLAIMS FOR RELIEF ............................................................ 16

    A. The Alleged Deprivation of Plaintiff's Expedited Border
      Crossing Privileges Due to the Supposed Revocation of
      her SENTRI CARD ................................................................. 17
    B. The Alleged Risk of Being Repeatedly Required to Undergo
      Secondary Inspection When Crossing the U.S.-Mexico Border ............... 18
    C. The Gathering and Maintenance of Information on Plaintiff
      in CBP's Databases ............................................................... 20
    D. Plaintiff Cannot Establish the Plausibility of Her Claims
      Based on Allegations Concerning CBP's Actions As to Others .............. 21
    E.  Plaintiff Has Not Established that her Alleged Injuries are
      Fairly Traceable to Each Defendant .......................................... 22

i

F. Plaintiff Does Not State Plausible Claims that Would Allow the Court to Grant Injunctive or Other Equitable Relief as to Non-Parties ........................................................................ 23

VI. PLAINTIFF FAILS TO STATE A CLAIM FOR VIOLATION OF HER FREE EXERCISE RIGHTS UNDER BOTH THE FIRST AMENDMENT AND RFRA ...................................... 23

VII. THE PRAYER FOR INJUNCTIVE RELIEF SHOULD BE DISMISSED OR STRICKEN ON THE GROUNDS THAT IT REQUESTS ENTRY OF A VAGUE AND UNCERTAIN UNENFORCEABLE ORDER ................................ 24

VIII. CONCLUSION ...................................................... 26

# TABLE OF AUTHORITIES

Page(s)

Cases

*Adams v. Committee on Judicial Conduct & Disability*,
  165 F.Supp.3d 911 (N.D. Cal. 2016) .......................................................... 12

*Armstrong v. Davis*,
  275 F.3d 849 (9th Cir. 2001) ...................................................................... 10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................. 15, 16

*Balasanyan v. Nordstrom, Inc.*,
  294 F.R.D. 550 (S.D. Cal. 2013) ................................................................ 10

*Bates v. United Parcel Service, Inc.*,
  511 F.3d 974 (9th Cir. 2007) ...................................................................... 11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................. 15, 16

*Bernhardt v. Count of Los Angeles*,
  279 F.3d 862 (9th Cir. 2002) ........................................................................ 9

*Brady v. United of Omaha Life Ins. Co*.,
  902 F.Supp.2d 1274 (N.D. Cal. 2012) ........................................................ 24

*Butler v. Porsche Cars North America, Inc.*,
  No. 16-CV-02042-LHK, 2016 WL 4474630 (N.D. Cal. Aug. 25, 2016) .................. 12

*Byrd v. Masonite Corporation*,
  215 F.supp.3d 859 (C.D. Cal. 2016) ........................................................... 11

*Casey v. City of Santa Rosa*,
  No. 4:18-cv-07731-KAW, 2019 WL 2548140 (N.D. Cal. June 20, 2019) ................ 12

*Chapman v. Pier 1 Imps. (U.S.), Inc.*,
  631 F.3d 939 (9th Cir. 2011) ...................................................................... 11

iii

*City of Los Angeles v. Lyons*,
  461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) ........................................... 10, 12

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ...................................................................... 11, 13

*Clark v. City of Lakewood*,
  259 F.3d 996 (9th Cir. 2001) .......................................................... 9

*Confederate Tribes*,
  873 F.2d 1221 (9th Cir. 1989) ........................................................ 9

*Corp. of Seventh-Day Adventists v. McGill*,
  617 F.3d 402 (6th Cir. 2012) ......................................................... 23

*Dzinesquare, Inc. v. Armano Luxury Alloys, Inc.*,
  No. 14-CV-01918-JVS (JCGTx), 2014 WL 12597154 (C.D. Cal. Dec. 22, 2014).... 18

*Fantasy, Inc. v. Fogerty*,
  984 F.2d 1524 (9th Cir.1993) ......................................................... 9

*Flores-Montano*,
  541 U.S. & n.3 ........................................................................... 18

*FW/PBS, Inc. v. Dallas*,
  493 U.S. 215 (1990) .................................................................... 9

*Gest v. Bradbury*,
  443 F.3d 1177 (9th Cir. 2006) ........................................................ 9

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ............................................................ 15, 22

*Graham v. Fed. Emergency Mgmt. Agency*,
  149 F.3d 997 (9th Cir.1998) ......................................................... 10

*In re Century Aluminum Co. Secs. Litig.*,
  729 F.3d 1104 (9th Cir. 2013) ..................................................... 16, 18

*Kaemmerling v. Lappin*,
  553 F.3d 669 (D.C. Cir. 2008) ....................................................... 23

iv

*Landon v. Plasencia*,
459 U.S. 21 (1982) ................................................................. 21

*Lewis v Casey*,
518 U.S. 343 (1996) ......................................................... 15, 22

*Lexmark Intern., Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ............................................................... 10

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ............................................................ 9, 10

*Marlyn Nutraceuticals, Inc*. v. *Mucos Pharm GmbH & Co*.,
571 F.3d 873 (9th Cir. 2009) ................................................ 11

*Meghrig v. KFCW, Inc*.,
516 U.S. 479 (1996) .............................................................. 11

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd*.,
518 F.Supp.2d 1197 (C.D. Cal. 2007) .................................. 24

*Montana Envtl. Info. Ctr. v. Stone–Manning*,
766 F.3d 1184 (9th Cir. 2014) .............................................. 11

*N.L.R.B. v Express Publishing Co*.,
312 U.S. 426 (1941) .............................................................. 24

*Navajo Nation v. U.S. Forest Serv*.,
535 F.3d 1058 (9th Cir. 2008) .............................................. 23

*O'Shea v. Littleton*,
414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ............ 10

*Pouncil v. Tilton*,
704 F.3d 568 (9th Cir. 2012) ........................................... 14, 21

*Ruff v. County of Kings*,
No. CV-F-05-631 OWW/GSA, 2009 WL 5111766 (E.D. Cal. Dec. 18, 2009) ......... 24

*Safe Air for Everyone v. Meyer*,
  373 F.3d 1035 (9th Cir. 2004) ....................................................................... 8

*Salazar v. Buono*,
  559 U.S. 700 (2010) ..................................................................................... 21

*Schmidt v. Lessard*,
  414 U.S. 473 (1974) ..................................................................................... 24

*Senne v. Kansas City Royals Baseball Corp.*,
  114 F.Supp.3d 906 (N.D. Cal. 2015) ......................................................... 11

*Sidney–Vinstein v. A.H. Robins Co.*,
  697 F.2d 880 (9th Cir.1983) ......................................................................... 9

*Sopcak v. Northern Mountain Helicopter Serv.*,
  52 F.3d 817 (9th Cir.1995) ........................................................................... 8

*Spokeo, Inc. v. Robins*,
  --- U.S. ---,  136 S.Ct. 1540 (2016) ............................................... 9, 12, 14

*Stanley v. University of Southern California*,
  13 F.3d 1313 (9th Cir. 1994) ..................................................................... 11

*Sud v. Coscto Wholesale Inc.*,
  229 F.Supp.3d ....................................................................................... 14, 21

*Tabbaa v. Chertoff*,
  509 F.3d 89 ................................................................................................. 18

*United States v. Ramsey*,
  431 U.S. 606 (1977) ............................................................................. 13, 18

*United States v. Ritchie*,
  342 F.3d 903 (9th Cir. 2003) ....................................................................... 8

*Valley Forge Christian College v. Americans United for Separation of Church and
  State, Inc.*,
  454 U.S 464 (1982) ..................................................................................... 12

vi

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*,
  454 U.S. 464 (1982) ................................................................................. 10

*Van Buskirk v. Cable News Network, Inc.*,
  284 F.3d 977 (9th Cir. 2002) ...................................................................... 8

*Warth v. Seldin*,
  422 U.S. 490 (1975) ................................................................................. 12

Statutes

6 U.S.C. § 211 ............................................................................................. 19

6 U.S.C. § 211(c)(9) ............................................................................... 14, 19

42 U.S.C. § 2000bb-1 ............................................................................. 22, 23

Rules

Fed.R.Civ.P. 12(b)(1) .............................................................................. 1, 8

Fed.R.Civ. P. 12(b)(6) ............................................................................ 8, 11

Fed.R.Civ. P. 12(b)(f) ................................................................................. 11

Fed.R.Civ.P. 12(f) ........................................................................................ 8

Fed.R.Civ.P. 12(d) ....................................................................................... 8

Fed.R.Civ.P. 65(d)(1)(C) ........................................................................... 23

**MOTION**

The Federal Defendants bring this Motion to Dismiss Complaint for Failure to State a Claim, Lack of Subject Matter Jurisdiction, and to Strike Prayer for Relief pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(f). This motion will be based on this motion, the memorandum of points and authorities, the Declaration of Saro Olivari, the Declaration of Ernest Cordero, Jr., and the ECF pleadings and records in this case. A hearing on the motion has been scheduled for November 13, 2019 at 10:00 a.m. before the Honorable Larry A. Burns in Courtroom 14A.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

Plaintiff Kaji Dousa is a Senior Pastor at the Park Avenue Christian Church located in New York City. She also is an immigration activist who, as part of her ministry, sometimes spends time in Tijuana assisting migrants. To expedite her entry into the United States when returning from international travel, Plaintiff participates in the Global Entry Program. It is one of the Trusted Traveler Programs administered by Customs and Border Protection ("CBP") that allows travelers, who meet certain requirements and have undergone a background check, expedited entry into the United States.

On January 2, 2019 – just one day after CBP was forced to use tear gas to deter a large group of migrants attempting to cross the Mexican border illegally - Plaintiff was sent to secondary screening at the San Ysidro Port of Entry ("SYPOE") as she returned from Tijuana to San Diego. Plaintiff was released in less than 45 minutes and her Global Entry card was returned to her. Approximately three months later, Plaintiff used the same Global Entry card to enter at the SYPOE. Plaintiff's Global Entry card remains valid, is not scheduled to expire until 2022, and allows her the benefits of expedited entry into the United States whenever she returns from a trip outside the country.

Although Plaintiff was sent to secondary screening only once in the past 18 months, and continues to have expedited entry privileges, Plaintiff believes she is being monitored and targeted by CBP due to the exercise of her First Amendment rights and religion. But the Complaint reveals these beliefs are based on speculation, hearsay, and incidents involving other people. Nothing in the Complaint justifies a broad injunction prohibiting the Federal Defendants from "surveilling, detaining and targeting Plaintiff, or taking any adverse action based on her protected expression, association and religious exercise." Furthermore, such an injunction would be too broad, vague and uncertain to be enforceable.

Finally, the Complaint fails to state plausible claims for violation of First Amendment rights and the Religious Freedom Restoration Act (RFRA"). Plaintiff also does not have standing to seek injunctive relief. In particular, Plaintiff does not plead or show she has suffered a concrete and particularized legal harm with a sufficient likelihood that it will be repeated. Plaintiff also cannot seek relief for non-parties. For these reasons, the Complaint should be dismissed. The Prayer for Relief also should be stricken.

## II.

## BACKGROUND FACTS AND ALLEGATIONS[1]

### A.    Facts Related to Plaintiff's Border Crossing Activities

Plaintiff Kaji Dousa is a U.S. citizen and the Senior Pastor at Park Avenue Christian Church in New York City. Complaint, ECF No. 1, ¶ 22. She also is the Co-Chair of the New Sanctuary Coalition ("New Sanctuary"). *Id*. New Sanctuary is a faith-based network of congregations, organizations, and individuals devoted to immigrant rights. *Id*. Part of Plaintiff's work at New Sanctuary involves prayer vigils near federal immigration buildings. *Id*, ¶ 31. She also participates in New Sanctuary's Accompaniment Program which provides her opportunities to accompany immigrants who have immigration court dates and ICE check-in appointments. *Id*., ¶ 32.

---

[1] This motion cites many of the Complaint's allegations as "facts" and accepts them as true for purposes of this motion. To the extent some allegations will not be accepted as true, they will be rebutted by extrinsic evidence.

In 2018, through New Sanctuary, Plaintiff helped organize a "Sanctuary Caravan." *Id*., ¶ 34. The goal of the caravan was to provide pastoral services, including prayer and church-blessed marriage ceremonies, to migrants seeking asylum in the United States. *Id*. The Sanctuary Caravan lasted 40 days and 40 nights with dozens of volunteers ministering to hundreds of asylum seekers in Mexico. *Id*.

On November 26, 2018, Plaintiff made her first trip to San Diego in connection with the Sanctuary Caravan. *Id*., ¶ 44. The purpose of her trip was to learn what on-the-ground organizing was in place to receive a large group of migrants traveling to the United States through Central and South America. *Id*. On November 27, 2018, the Sanctuary Caravan officially began its advance work and the group crossed the border to Tijuana to meet with a Sanctuary Caravan partner – El Otro Lado. *Id*., ¶ 45. The latter provides legal services to migrants on both sides of the border. *Id*. At a press conference via Facebook on the same day, Al Otro Lado announced that members of the clergy would be available to minister to migrants and officiate weddings. *Id*. Over the next couple of days, Plaintiff along with other clergy, officiated 17 weddings. *Id*. During that time, Plaintiff twice returned to San Diego through the SYPOE without incident before traveling to New York City on November 29, 2018. *Id*.

On December 30, 2018, Plaintiff returned to San Diego to meet with Sanctuary Caravan leaders.  *Id*., ¶ 46. On January 1, 2019, while Plaintiff was in meetings in San Diego, confrontations erupted at the border between CBP and migrants. The incident, which involved the use of tear gas, received widespread coverage in the media. *Id*. Neither Plaintiff nor any clergy in the Sanctuary Caravan were present or participated in the confrontations. *Id*.

On January 2, 2019, the day after the confrontations, Plaintiff returned to Tijuana. *Id*., ¶ 47. She posted a video to her Facebook page stating that she would be meeting with Sanctuary Caravan partners and hoped to learn about the prior day's confrontations. *Id*. By "tagging" the SYPOE on her Facebook post, she allowed people visiting her site to see

where she was located. *Id.*

Around 4:30 p.m., Plaintiff began her return trip to San Diego. *Id.* Upon reaching the SYPOE, she presented her TSA-issued Global Entry card. *Id.*, ¶ 48. She then was sent to the secondary inspection area. *Id.* Although she had crossed the border several times before with her Global Entry card, this was the first time she was sent for secondary screening. *Id.*

Plaintiff alleges she remained in the waiting area for several hours. *Id.*, ¶ 50. But CBP records indicate only about 43 minutes passed between the time she was sent to secondary and her release by CBP.  Declaration of Saro Oliveri ("Oliveri Decl."), ¶ 6. Although Plaintiff asked CBP officers for the reasons she was being held for further screening and the amount of time it would take, they did not tell her. Complaint, ¶ 50. While waiting, Plaintiff put on her clerical collar to identify herself as a member of the clergy. *Id.*  CBP officers told her that she would not be allowed to go until questioned by unspecified officials. *Id.* She was allowed to use a desk phone to call her husband but he did not answer. *Id.*

Finally, an officer in a uniform different than those worn by CBP officers brought her to a cubicle to question her. *Id.*, ¶ 51. The officer asked her for personal identification information, how many times she had crossed the border, and the reasons she was in Tijuana. *Id.* He also asked about her work with the "migrant caravan." *Id.* In addition, the officer inquired about Plaintiff's work with New Sanctuary and whether she encouraged asylum seekers to lie in their asylum applications. *Id.* ¶ 52. Plaintiff denied helping them lie and indicated that she sometimes would assist them in explaining what caused them to flee their homes. *Id.* The officer asked if she was involved in illegal activities which Plaintiff denied. *Id.*, 53. He did not ask about the January 1, 2019 confrontations between the migrants and CBP officials at the border or human smuggling.  *Id.*

Upon completion of the interview, Plaintiff shared her business card with the officers. *Id.*, ¶ 54. They did not share contact information with her but did provide their names. *Id.* They also returned her Global Entry card allowed her back into the United States. *Id.*

On March 6, 2019, NBC 7 San Diego published what appeared to be internal Department of Homeland Security ("DHS") documents purportedly from a whistleblower. Complaint, ¶ 56. Plaintiff contends that the documents are part of CBP's "Operation Secure Line" and contain data on fifty-nine individuals collected by DHS, the Federal Bureau of Investigation ("FBI") and CBP's International Liaison Unit. *Id.*, ¶¶ 56-57. The information includes photographs (usually from passports or social media) and personal information such as date of birth, whether an alert has been placed on a passport, suspected connections to immigrants, and any history of arrest, interviews or adverse immigration actions. *Id.*, ¶ 59. Plaintiff also contends that dossiers have been created with personal information and that some of the individuals involved have been flagged for enhanced secondary screenings. *Id.*, ¶ 61.

Plaintiff also learned of CBP officials allegedly telling NBC 7 San Diego that "the names in the database are all people who were present during the violence that broke out at the border in November." Complaint, ¶ 72. Plaintiff was not present in the area on that day. *Id.*, ¶ 72. While viewing the documents online at an unspecified website, Plaintiff also noticed her picture with an "x" drawn through it and the words "SENTRI Revoked." *Id.*, ¶ 62.

Plaintiff contends she received her SENTRI (Secure Electronic Network for Travelers Rapid Inspection) membership in June 2016; and she used her SENTRI status to enter the United States without incident several times before January 2019. *Id.*, ¶¶ 64-65. Because of what she saw on the Internet regarding her SENTRI status, she "believes" it has been revoked. Declaration of Plaintiff Kaji Dousa ("Dousa Decl."), ECF No. 25-1, ¶ 32 ("As far as I know, my SENTRI status is still revoked.").

In truth, Plaintiff does not know if her SENTRI status has been revoked because she either never had a SENTRI card or, alternatively, has not used it in years due to the greater entry privileges she enjoys with her Global Entry card.[2] Plaintiff's Global Entry card was

---

[2] SENTRI is one of CBP's Trusted Traveler Programs. Oliveri Decl., ¶ 3. Another is the Global Entry Program. *Id*. Global Entry and SENTRI are both Trusted Traveler

5

issued on December 14, 2016 and has never been revoked or suspended. Oliveri Decl., ¶ 4. It currently is valid and expires on August 22, 2022. *Id*.

By her own admission, Plaintiff used her Global Entry card to enter at the SYPOE on January 2, 2019 – the day she was sent for secondary inspection. Dousa Decl. ¶ 19; *see also* Complaint, ¶¶ 47-48. It was given back to her when she left. Dousa Decl., ¶ 27. Plaintiff also acknowledges that she crossed the border on several prior occasions - each time using her Global Entry card. *Id*., ¶ 19.

CBP records indicate Plaintiff entered the United States at the SYPOE four times during the eighteen-month period from February 2018 through August 2019. *Id*., ¶ 5. Three times, she used her Global Entry card. Specifically, she used it when crossing as a pedestrian on (1) November 27, 2018; (2) January 2, 2019; and (3) April 4, 2019. She also crossed on November 28, 2018, but this time she used her U.S. Passport which likely was linked to her Global entry number. *See Id*., ¶ 3.

On April 4, 2019, after spending time in Tijuana, Plaintiff again entered the United States at the SYPOE with her Global Entry card. Oliveri Decl., ¶ 3. This time, she was not sent to secondary inspection. *Id*. This was three months after January 2, 2019, the day she entered at the SYPOE and was sent to secondary. *Id*.[3] As of August 15, 2019, Plaintiff had

---

Programs that provide some overlapping benefits, but they also have differences. *Id*. For example, both Global Entry and SENTRI allow for expedited entry at land ports when crossing from Mexico and Canada. *Id*. However, Global Entry also can be linked to a passport for use when arriving by air. *Id*. With respect to someone returning to the United States from Mexico on foot or in an automobile, Global Entry and SENTRI provide the same expedited clearance benefits. *Id*.

[3] Prior to Plaintiff's filing of her motion for preliminary injunction, counsel for the parties conferred about a proposed informal exchange of relevant documents and information, including documents related to the alleged SENTRI card. In an effort to obtain information, counsel for the Federal Defendants inquired and was told by a contact at CBP that Plaintiff had a SENTRI card. The individual did not have access to information about any possible revocations or suspensions. In an effort to verify this fact, and obtain additional information, counsel contacted a higher level official, CBP Officer Oliveri, who has been the CBP Branch Chief at the Port of Otay Mesa for the last ten years. Oliveri Decl., ¶ 1. As the Branch Chief, he is responsible for the Trusted Traveler Enrollment Center. *Id*. He clarified that Plaintiff has a Global Entry card. *Id*., ¶ 2.

In light of this information, counsel for the Federal Defendants requested Plaintiff's attorneys to informally produce a copy of Plaintiff's alleged SENTRI card or at least some evidence of it. Plaintiff's attorneys did not do so even though the alleged revocation of

not again sought entry through the Port. *Id.*, ¶ 5. On August 6, 2019, Plaintiff left New York City on a flight to the Bahamas without incident. *Id.*, ¶ 6.

Plaintiff asserts she no longer has access to the expedited screening she enjoyed as a SENTRI holder, which makes it more difficult to cross the border. Complaint, ¶ 82. This is not true. As discussed above, she has the same expedited entry privileges using her Global Entry card. Oliveri Decl., ¶ 3. Because of CBP's alleged "surveillance" and "retaliation" against her, Plaintiff contends that she no longer can be assured her interactions with migrants will be "private." *Id.*, ¶¶ 75-87. She fears some migrants will damage their chances for asylum due to their association with her. *Id.*, ¶ 84. Since learning of the alleged surveillance, she has curtailed her ministry at the Southern Border and abstained from performing marriages of migrants. *Id.*, ¶¶ 81, 87.

**B.    Facts Primarily Related to Actions Involving Third Parties**

Plaintiff alleges that CBP has targeted others who offer aid, counsel or ministry to migrants in addition to journalists. *Id.*, ¶ 88. In particular, she cites CBP's efforts to remove Jean Montrevil and Ravi Ragbir, two individuals associated with New Sanctuary. *Id.*, ¶¶ 93-94.[4] Mr. Montrevil was removed based on a drug charge. *Id.*, ¶ 93. Mr. Ragbir was ordered removed but is contesting his removal in the courts. *Id.*, ¶¶ 96-99. Plaintiff fears she also will suffer alleged retaliation for her work with migrants. *Id.*, ¶ 100.

Plaintiff, based on various media reports, also believes others who have assisted migrants have been targeted for increased screening and interrogation at the SYPOE. *Id.*, ¶¶ 102-105. On information and belief, she identifies 5 individuals who allegedly have been targeted as part of Operation Secure Line and subjected to CBP's enhanced screening when traveling internationally. *Id.*, ¶¶ 106-119.

---

Plaintiff's SENTRI card is a key fact underlying her request for injunctive relief. *See* Joint Motion for Determination of Discovery Dispute, ECF No. 33, pp. 18-19.

    [4] The Complaint does not specifiy whether the entity attempting to remove the individuals was Immigration and Customs Enforcement ("ICE") or CBP. For ease of reference, CBP will be used unless the Complaint indicates otherwise.

# III.

# LEGAL STANDARDS APPLICABLE TO MOTIONS TO DISMISS AND STRIKE

## A.    Legal Standard on Fed. R. Civ. P. 12(b)(1) Motion

On a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), plaintiff bears the burden of proof that jurisdiction exists. *See, e.g., Sopcak v. Northern Mountain Helicopter Serv*., 52 F.3d 817, 818 (9th Cir.1995). A motion to dismiss challenging subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) may be "facial" or "factual." *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial attack contends the allegations of a complaint are "insufficient on their face to invoke federal jurisdiction." *Id*. A factual attack is one which challenges the truth of the allegations that would invoke federal jurisdiction. *Id*. When there is a factual attack on federal jurisdiction, a court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. *Id*. at 1039 (internal quotation marks and citation omitted).

## B.    Legal Standard on Fed. R. Civ. P. 12(b)(6) Motion

In deciding a motion under Federal Rule of Civil Procedure 12(b)(6), the court generally looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc*., 284 F.3d 977, 980 (9th Cir. 2002). A court may convert a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment if it "considers evidence outside the pleadings." *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003); *see also* Fed.R.Civ.Proc. 12(d). A court may consider documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice without converting the motion to dismiss into a motion for summary judgment." *Ritchie*, 342 F.3d at 907-08.

## C.    Legal Standard on Fed.R.Civ.P. 12(f) Motion

Under Federal Rule of Civil Procedure 12(f), a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

"[T]he function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Sidney–Vinstein v. A.H. Robins Co*., 697 F.2d 880, 885 (9th Cir.1983). Immaterial matter is that which has no essential or important relationship to the claim for relief or the defenses being pled. *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir.1993), *rev'd on other grounds* 510 U.S. 517 (1994) (internal citations and quotations omitted). Impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question. *Id*.

## IV.

### PLAINTIFF LACKS STANDING TO SEEK INJUNCTIVE AND OTHER EQUITABLE RELIEF

Judicial power is limited to "Cases" and "Controversies." U.S. Const. art. III, § 2; *Spokeo, Inc. v. Robins*, --- U.S. ---,  136 S.Ct. 1540, 1547 (2016). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Id*. Courts are required *sua sponte* to examine jurisdictional issues such as standing. *Bernhardt v. Count of Los Angeles*, 279 F.3d 862, 868 (9th Cir. 2002). "A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears." *Stock West, Inc. v. Confederate Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989). As the party invoking subject matter jurisdiction, Plaintiff bears the burden of proving standing. *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990). Standing is determined by the facts that exist at the time the complaint is filed. *Clark v. City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001).

To establish Article III standing, a plaintiff must show (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) the harm must be "fairly trace[able]" to the defendant's conduct, and (3) the Court must be able to redress the claimed injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation marks and citations omitted). Article III standing for declaratory or injunctive relief further requires the plaintiff to show he or she is "realistically threatened by a repetition of the violation." *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006) (quoting

9

*Armstrong v. Davis*, 275 F.3d 849, 860–61 (9th Cir. 2001)). There must be a "real and immediate threat of repeated injury." *Balasanyan v. Nordstrom, Inc.*, 294 F.R.D. 550, 562 (S.D. Cal. 2013).

At a minimum, Article III's constitutional demands require that a plaintiff show he or she has "personally . . . suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," that can be "fairly" traced to the defendant's challenged conduct, and which "is likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982). Judicially created prudential limitations also include: a general prohibition on raising another person's legal rights, a preference for the resolution of generalized grievances in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by pertinent law. *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014).

As explained by the Ninth Circuit, a plaintiff seeking injunctive relief must meet the following requirements for standing:

> The standing formulation for a plaintiff seeking prospective injunctive relief is simply one implementation of *Lujan's* requirements. The plaintiff must demonstrate that he has suffered or is threatened with a "concrete and particularized" legal harm, *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130, coupled with "a sufficient likelihood that he will again be wronged in a similar way." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). As to the second inquiry, he must establish a "real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). "[P]ast wrongs do not in themselves amount to [a] real and immediate threat of injury necessary to make out a case or controversy." *Lyons*, 461 U.S. at 103, 103 S.Ct. 1660. However, "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea*, 414 U.S. at 496, 94 S.Ct. 669. In addition, the claimed threat of injury must be likely to be redressed by the prospective injunctive relief. *Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1003 (9th Cir.1998) (recognizing that "[p]laintiffs need not demonstrate that there is a 'guarantee' that their injuries will be redressed by a favorable

10

decision" but "only that a favorable decision is likely to redress" their injuries) *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 985-86 (9th Cir. 2007) (en banc).

Where a plaintiff seeks injunctive relief, he or she must show not only a prior injury, but also a real and immediate threat of repeated injury. *Chapman v. Pier 1 Imps. (U.S.), Inc.*, 631 F.3d 939, 948 (9th Cir. 2011). A highly attenuated series of possibilities does not satisfy the requirement that the threatened injury must be impending with a reasonable likelihood that the injury will occur. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). A plaintiff also must plead facts showing standing as to each defendant. *Senne v. Kansas City Royals Baseball Corp.*, 114 F.Supp.3d 906, 911 (N.D. Cal. 2015). "In the context of a declaratory judgment suit, the inquiry depends upon whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Montana Envtl. Info. Ctr. v. Stone–Manning*, 766 F.3d 1184, 1188 (9th Cir. 2014) (internal quotations and citation omitted).

Injunctions are classified as either prohibitory or mandatory. *See Meghrig v. KFCW, Inc.*, 516 U.S. 479, 484 (1996). A prohibitory injunction restrains a party from further action, while a mandatory injunction orders a party to take certain action. *Id*. "In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Marlyn Nutraceuticals, Inc.* v. *Mucos Pharm GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal quotations omitted); *see also Stanley v. University of Southern California*, 13 F.3d 1313, 1320 (9th Cir. 1994) (mandatory injunctions are particularly disfavored).[5]

When a plaintiff lacks standing to seek injunctive or other equitable relief, some courts have dismissed the prayer under Fed. R. Civ. P. 12(b)(6), while others have held that the prayer should be stricken pursuant to Fed. R. Civ. P. 12(b)(f). *See Byrd v. Masonite*

---

[5] The injunctive relief Plaintiff seeks is both mandatory and prohibitory.

11

*Corporation*, 215 F.supp.3d 859, 869 (C.D. Cal. 2016) (dismissing the prayer for injunctive relief); *Butler v. Porsche Cars North America, Inc*., No. 16-CV-02042-LHK, 2016 WL 4474630, at *8 (N.D. Cal. Aug. 25, 2016) (same); *Casey v. City of Santa Rosa*, No. 4:18-cv-07731-KAW, 2019 WL 2548140, at *6 (N.D. Cal. June 20, 2019) (challenge to prayer for injunctive and declaratory relief should be brought pursuant to Rule 12(f)).

As discussed below, Plaintiff cannot demonstrate standing to seek injunctive or declaratory relief. For this reason, the prayer for relief should be dismissed or stricken.

## A. Plaintiff Cannot Show a Concrete and Particular Harm Coupled with a Real and Imminent Threat that She will Suffer Repeated Injury

To establish an injury in fact, a plaintiff must show "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan* at 560. The plaintiff must personally have suffered an actual or threatened injury. *Valley Forge*, 454 U.S. at 4722. The injury must be real, not abstract. *Spokeo*, 136 S.Ct. at 1548. A person seeking injunctive relief cannot rely on past wrongs to satisfy the injury requirement. Past exposure to illegal conduct does not establish a present case or controversy unless accompanied by continuing, present adverse effects. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Plaintiff cannot base her claim for relief on the legal rights or interests of others. *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *Adams v. Committee on Judicial Conduct & Disability*, 165 F.Supp.3d 911, 920 (N.D. Cal. 2016). As discussed below, Plaintiff cannot meet her burden to show she has suffered a concrete and particularized harm where there is a real and imminent threat of further repeated injury.

### 1. The Alleged Deprivation of Plaintiff's Expedited Border Crossing Privileges Due to the Supposed Revocation of her SENTRI Card

Plaintiff has not established any concrete harm due to the supposed revocation of her SENTRI card. Even if CBP did revoke that card – something she fails to plausibly allege – Plaintiff has not lost her expedited border crossing privileges. Those continue to be

available through her membership in the Global Entry program, as the Complaint makes clear. The core allegation at the heart of Plaintiff's suit – that she was "singled out" for secondary screening on January 2, 2019 – occurred more than nine months ago. Approximately three months following that event, Plaintiff crossed into Mexico and returned through the same port of entry using the same Global Entry card without incident. Plaintiff then waited almost four additional months before filing this suit. And since then, Plaintiff has travelled to and from the Bahamas without incident. In sum, Plaintiff alleges no plausible basis upon which to conclude that her ability to travel has been limited by the supposed revocation or will be in the future.

### 2. The Alleged Risk of Being Required to Undergo Secondary Inspection When Crossing the U.S.-Mexico Border

Plaintiff's alleged harm from undergoing a secondary inspection is similarly insufficient to ground standing. As noted above, CBP has substantial authority to question travelers crossing into this country. *See United States v. Ramsey*, 431 U.S. 606, 616 (1977). Plaintiff has been sent to secondary inspection only once out of the four times she entered the United States at the SYPOE in the last 18 months. Moreover, she entered without incident several months after the time she was questioned by CBP.

Although there is no guarantee Plaintiff will never again be questioned in the secondary inspection area upon entering the United States (no U.S. citizen holds any such guarantee), she has shown no objectively reasonable likelihood of harassment solely for the purpose of interfering with her First Amendment rights, nor likelihood of such harassment in the future absent an injunction. A highly attenuated series of possibilities does not satisfy the requirement that the threatened injury must be impending with a reasonable likelihood that the injury will occur. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

///

///

13

### 3. The Gathering and Maintenance of Information on Plaintiff in CBP's Databases

Plaintiff likewise cannot show that CBP's gathering and maintenance of her personal information in a database is a concrete harm sufficient to ground a First Amendment claim. As a participant in the Global Entry program, CBP must gather and maintain personal information on her as part of its law enforcement duties. Indeed, in order to carry out its responsibilities, CBP is statutorily directed to "develop and implement screening and targeting capabilities, including the screening, reviewing, identifying, and prioritizing of passengers and cargo across all international modes of transportation." 6 U.S.C. § 211(c)(9). Congress further directed CBP to establish "targeting operations within [CBP] to collect and analyze traveler and cargo information in advance of arrival in the United States to identify and address security risks." *Id*. § 211(g)(4)(C)(i). Plaintiff has not shown that CBP's collection of her personal information falls outside of its Congressional authorization.

### 4. Plaintiff Has Not Established that her Alleged Injuries are Fairly Traceable to Each Defendant

Plaintiff must show she has standing to bring her claims against each defendant. *See Monica Sud v. Costco Wholesale Corp.*, 229 F.Supp.3d 1075, 1081 (N.D. Cal. 2017). A government official is a proper defendant to a claim for prospective injunctive relief if the official would be responsible for ensuring the injunctive relief is carried out, even if not personally involved in the conduct giving rise to the claim. *Pouncil v. Tilton*, 704 F.3d 568, 576 (9th Cir. 2012). Here, Plaintiff has not alleged how each of the individual officials sued as defendants personally caused her injury or is responsible for ensuring that injunctive relief, if obtained, will be carried out.

### 5. Plaintiff Cannot Obtain Injunctive or Other Equitable Relief to Remedy the Injuries of Non-Parties

Plaintiff complains that others are similarly affected. But an injury-in-fact for standing purposes must affect the plaintiff in a personal and individual way. *Spokeo*, 136

14

S.Ct. at 1548. She cannot obtain an injunction based on conduct allegedly directed at others. Both Article III and equitable principles require that injunctive relief be limited to redressing a plaintiff's own injuries stemming from a violation of his or her own rights. *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). The remedy sought must be limited to the "inadequacy that produced the injury in fact" alleged by the plaintiff. *See Lewis v Casey*, 518 U.S. 343, 357 (1996). Plaintiff has no standing to seek injunctive and declaratory relief on behalf of non-parties to this case.

## V.

## PLAINTIFF'S COMPLAINT FAILS TO STATE PLAUSIBLE CLAIMS FOR RELIEF

To survive a motion to dismiss, a claim must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has facial plausibility when the claimant pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556.

Under the *Twombly/Iqbal* standard, it is not enough that a claim for relief be merely "possible" or "conceivable." Instead, it must be "plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim for relief is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Twombly*, 550 U.S. at 556). This standard is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. To cross the threshold from conceivable to plausible, a complaint must contain a sufficient quantum of "factual matter" alleged with a sufficient level of specificity to raise entitlement to relief above the speculative level. *Twombly*, 550 U.S. at 555.

"[F]acts that are 'merely consistent with' a defendant's liability" fall short of a

plausible entitlement to relief. *Id*. at 557. Further, the Court need not accept as true "legal conclusions" contained in the complaint. *Id*. at 555. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678. When considering plausibility, courts also must consider an "obvious alternative explanation" for defendant's behavior. *Id*. at 682 (quoting *Twombly*, 550 U.S. at 567). "The plausibility standard requires more than the sheer possibility or conceivability that a defendant has acted unlawfully." *Id*. When considering plausibility, courts must also consider an 'obvious alternative explanation for defendant's behavior. *Iqbal*, 556 U.S. at 678.

> "When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are merely consistent with their favored explanation but are also consistent with the alternative explanation. **Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible**."

*In re Century Aluminum Co. Secs. Litig*., 729 F.3d 1104, 1108 (9th Cir. 2013) (emphasis added)).

Here, the gravamen of the Complaint's four claims is CBP's alleged interference with Plaintiff's exercise of her First Amendment rights and its imposition of an alleged substantial burden on her religious exercise under the RFRA. The Complaint attributes improper motives to CBP's alleged conduct. But even taken as a whole, the Complaint's allegations do not exclude other possible explanations for the conduct that would not trigger liability. For this reason, the allegations do not state plausible claims.

### A. The Alleged Deprivation of Plaintiff's Expedited Border Crossing Privileges Due to the Supposed Revocation of her SENTRI Card

Plaintiff contends she has a SENTRI card that CBP revoked in an effort to suppress her First Amendment rights. She has not attached a copy of the card to her Complaint or

cited to any evidence to support her contention. Moreover, although she seeks an injunction requiring the restoration of the alleged card, she is not sure of its current status. Dousa Decl., ECF No. 25-1, ¶ 32 ("**As far as I know**, my SENTRI status is still revoked." (emphasis added)). She is basing her allegations primarily on information she obtained from an NBC 7 San Diego news story – not personal knowledge.

Plaintiff also alleges she has been damaged by the purported revocation of her SENTRI status because she no longer can cross the U.S.-Mexico border with expedited entry privileges. But the well-pleaded facts in her Complaint belie this assertion. Most importantly, as her Complaint makes clear, even if CBP had revoked her alleged SENTRI card (something not reflected in CBP's records and not shown to the case through any credible evidence presented by Plaintiff), Plaintiff continues to have expedited border crossing privileges available through her membership in the Global Entry program. Indeed, she has used her Global Entry privileges to enter the United States on multiple occasions over the past 18 months. Even assuming that she once had a SENTRI card, the enhanced benefits of the Global Entry program have rendered the SENTRI card of no use to her. It is not plausible that CBP would revoke the SENTRI card as a punishment while leaving her with the more valuable Global Entry status that allows her even more privileges. If punishment were the goal, revocation of the SENTRI card would be a senseless action.

### B. The Alleged Risk of Being Repeatedly Required to Undergo Secondary Inspection When Crossing the U.S.-Mexico Border

Plaintiff's allegations about CBP's motives for sending her to secondary screening, her fear about it, and the likelihood it will happen again, are not plausible. She claims to be afraid to cross the border at the SYPOE. Yet, approximately three months after her January 2, 2019 crossing (when she was sent to secondary), Plaintiff crossed into Mexico and returned through the same port of entry without incident using her Global Entry pass without incident. Oliveri Decl., ¶¶ 5-6.[6] Plaintiff does not plead that she has ever been prevented

---

[6] Plaintiff contends she is afraid to cross the U.S.-Mexico border due to the alleged conduct

from crossing the border. Plaintiff also has not alleged or otherwise demonstrated an objectively reasonable likelihood she will repeatedly be sent to secondary inspection. Whether it will happen in the future when returning to the United States through the SYPOE is nothing more than speculation.

On the face of the Complaint, there is a plausible alternative explanation for why Plaintiff was sent to secondary on January 2, 2019 that does not involve improper motives. Pursuant to the "long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country," *United States v. Ramsey*, 431 U.S. 606, 616 (1977), CBP has substantial authority to question travelers upon reentry into the United States. The Government's paramount interest in protecting its borders has been held to justify suspicionless searches and questioning of travelers lasting multiple hours. *See Tabbaa v. Chertoff*, 509 F.3d 89, 94–95, 99 (2d Cir. 2007); *see also, e.g., Flores-Montano*, 541 U.S. at 155 & n.3 ("[D]elays of one to two hours at international borders are to be expected."). And just one day before Plaintiff crossed the border on January 2, 2019, there had been coordinated attempts by large groups of migrants to enter the United States illegally leading to confrontations with CBP. One would expect heightened security procedures following such an incident.

For her part, on the day she was sent to secondary for questioning, Plaintiff had posted a video to her Facebook page stating that she would be meeting with Sanctuary Caravan partners and hoped to learn about the prior day's confrontations "tagging" the SYPOE.

---

of CBP. But this assertion is not credible. In fact, Plaintiff recently boasted on her Twitter feed @KajiDousa that is open for viewing by the public: "Because I have a voice and won't be intimidated – even by the most powerful government in the world – I am suing #DHS #ICE #CBP." *See* Declaration of Ernest Cordero, Jr. ("Cordero Decl."), Exhibit 1, p. 1. Plaintiff also does not shy away from controversy or engagement. Rather, as evident from her Twitter postings, she is an experienced activist who regularly networks with organizations seeking to bring about political and social change in various areas, especially with respect to U.S. immigration policy. *Id*. The Court may take judicial notice of the Twitter feed pursuant to Federal Rule of Evidence 201(b). *Dzinesquare, Inc. v. Armano Luxury Alloys, Inc*., No. 14-CV-01918-JVS (JCGTx), 2014 WL 12597154, at *3 (C.D. Cal. Dec. 22, 2014).

Given the publicity surrounding her visit, which included information on various websites about the Sanctuary Caravan, it would not be surprising or improper for CBP to ask Plaintiff questions about her activities in Mexico. She also invited a discussion about her religious activities by putting on her clerical collar just before the questioning began. In sum, nothing in Plaintiff's Complaint supports the conclusion that her questioning at the secondary inspection area was either unusual or improper. Plaintiff's pleading of an improper motive is thus merely speculation, refuted by an alternative, plausible explanation.

## C. The Gathering and Maintenance of Information on Plaintiff in CBP's Databases

Plaintiff also speculates in her Complaint that CBP surveils her and then maintains information on her in a database in an attempt to violate her First Amendment and religious rights. But CBP can gather and maintain information about border crossers as part of a legitimate law enforcement function. In fact, it would be very surprising if CBP did not maintain information on Plaintiff given her membership in the Global Entry program. CBP also is responsible for enforcing hundreds of laws and regulations, including, among others, those addressing immigration, customs, trade, narcotics and the safety of agricultural products and other goods. *See* 6 U.S.C. § 211. In order to carry out these responsibilities, CBP is statutorily directed to "develop and implement screening and targeting capabilities, including the screening, reviewing, identifying, and prioritizing of passengers and cargo across all international modes of transportation." 6 U.S.C. § 211(c)(9).

Congress further directed CBP to establish "targeting operations within [CBP] to collect and analyze traveler and cargo information in advance of arrival in the United States to identify and address security risks." *Id*. § 211(g)(4)(C)(i). These rules allow CBP Officers to inspect a person, shipment, or conveyance even though an individual may not have been previously associated with a law enforcement action or otherwise be noted as a person of concern to law enforcement. Clearly, CBP may compile and utilize databases of information in fulfilling its mission responsibilities relating to border security. Therefore, Plaintiff's

19

allegations are insufficient to overcome the plausible explanation for CBP's gathering and maintenance of personal information in a database.

### D.   Plaintiff Cannot Establish the Plausibility of Her Claims Based on Allegations Concerning CBP's Actions As to Others

Some of Plaintiff's Complaint is devoted to immigration enforcement actions taken by CBP with respect to two other individuals. Plaintiff alleges no facts showing the conduct directed at those individuals was intended to restrict her exercise of First Amendment rights. It is more plausible, based on the factual allegations in her Complaint, that CBP took action against the individuals because each was in violation of one or more immigration laws or otherwise subject to removal. For example, her Complaint alleges that Mr. Montrevil had a final order of removal, apparently based on a drug charge, when he was arrested and deported. Likewise, her Complaint alleges that Mr. Ragbir was already subject to ICE check-ins before he was detained for deportation.

Similarly, Plaintiff alleges that CBP maintains personal information on other immigration activists. Even if true, the people she identifies have crossed the U.S.-Mexico border, in some cases have SENTRI or Global Entry passes, and have spent time in Mexico engaging with migrants who seek to enter the United States. It would not be unusual or improper for CBP to maintain information on those individuals for the same reasons it may retain personal information about Plaintiff. This is a more plausible explanation than the speculative theory alleged in Plaintiff's Complaint. Plaintiff also claims that CBP's "surveillance" conducted at religious events, and during protests against U.S. immigration policies, has put migrants at risk of detention and even deportation. Because some migrants fear the actual or perceived presence of CBP, they have stayed away from those events. Plaintiff claims she has also curtailed some of her activities involving migrants for fear of exposing them to the risk of immigration enforcement actions due to their association with her.

//

But, CBP has not prohibited Plaintiff from engaging in any religious or protest activities. It also has not barred her from travel to Mexico or anywhere. Plaintiff also cites two immigration actions taken by CBP with respect to her associates in New York City. These were limited actions taken against two individuals, not large groups of immigrants in her church. Although Plaintiff and some immigrants associated with her may fear CBP, fear cannot justify an injunction absent significant improper or unlawful conduct by CBP.

CBP cannot violate the constitutional rights of Plaintiff or those who associate with her. But an injunction cannot bar CBP from conducting legitimate enforcement actions against certain individuals just because they are associated with Plaintiff. The Complaint does not plead a plausible claim that CBP has unlawfully targeted Plaintiff's associates. It does not exclude the possibility that the conduct alleged involved legitimate enforcement actions.

### E. Plaintiff Has Not Established that her Alleged Injuries are Fairly Traceable to Each Defendant

Plaintiff must show she has standing to bring her claims against each defendant. *See Sud*, 229 F.Supp.3d at 1081. A government official is a proper defendant to a claim for prospective injunctive relief if the official would be responsible for ensuring the injunctive relief is carried out.  *Pouncil*, 704 F.3d at 576. Here, Plaintiff has not alleged how each of the individual defendants personally caused her injury or would be responsible for ensuring that injunctive relief, if obtained, will be carried out. Therefore, she has not alleged plausible claims as to each individual official sued.

The need for Plaintiff to limit her suit to the proper defendants is especially important in this case because it involves the administration of immigration and national security laws at the U.S.-Mexico border. As recognized by the Supreme Court, "a court should be particularly cautious when contemplating relief that implicates public interests…" *Salazar v. Buono*, 559 U.S. 700, 714 (2010) (citations omitted). Here, there is a substantial government interest in the efficient administration of immigration laws at the border. *See*

*Landon v. Plasencia*, 459 U.S. 21, 34 (1982). An injunction that applies to more government officials than necessary interferes with CBP's discharge of its immigration and law enforcement duties.

### F.   Plaintiff Does Not State Plausible Claims that Would Allow the Court to Grant Injunctive or Other Equitable Relief as to Non-Parties

Plaintiff complains that others who have provided assistance to migrants are similarly being targeted by CBP. But she cannot obtain injunctive or declaratory relief for others. Both Article III and equitable principles require that relief be limited to redressing a plaintiff's own injuries stemming from a violation of his or her own rights. *See Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). The remedy sought must be limited to the "inadequacy that produced the injury in fact" alleged by the plaintiff. *See Lewis v Casey*, 518 U.S. 343, 357 (1996); *see also Whitford*, 138 S. Ct. at 1934 ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."). In sum, Plaintiff does not plead plausible claims entitling her to seek injunctive and declaratory relief based on alleged injuries to non-parties.

### VI.
### PLAINTIFF FAILS TO STATE A CLAIM FOR VIOLATION OF HER FREE EXERCISE RIGHTS UNDER BOTH THE FIRST AMENDMENT AND RFRA

Plaintiff has not stated a claim for violation of her free exercise rights under either the First Amendment or the RFRA. Plaintiff does not sufficiently allege that CBP has infringed upon or substantially burdened the exercise of her religion. She has not shown that CBP's questioning her at the border, or the legitimate immigration enforcement actions involving her associates, infringe upon or burden the free exercise of her religion. The First Amendment provides in relevant part that "Congress shall make no law . . . prohibiting the free exercise" of religion. Similarly, the RFRA provides that the Government "shall not substantially burden a person's exercise of religion" unless it shows that such burden is the "least restrictive means" of furthering a "compelling government interest." 42 U.S.C. §

22

2000bb-1 (emphasis added). Here, Plaintiff has not demonstrated that government action directly infringes upon or substantially burdens the "exercise" of her religion.

Under the RFRA, a "rule of general applicability" that "substantially burden[s] a person's exercise of religion" may be upheld only if it is the least restrictive means of advancing a compelling government interest. See 42 U.S.C. § 2000bb-1. A plaintiff must show two elements to establish a *prima facie* claim under RFRA: "First, the activities the plaintiff claims are burdened by the government action must be an 'exercise of religion.' Second the government action must 'substantially burden' the plaintiff's exercise of religion." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008) (en banc); *see Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2012) (RFRA plaintiff must show that government action substantially burdens a sincerely held religious belief).

"A 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit . . . or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Navajo Nation*, 535 F.3d at 1069–70. "An inconsequential or de minimis burden on religious practice does not rise to this level, nor does a burden on activity unimportant to the adherent's religious scheme." *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008). As discussed above, there are no concrete factual allegations showing that CBP's' alleged actions directly infringe upon Plaintiff's religious conduct or substantially burden the exercise of her faith. For this reason, Plaintiff cannot state a claim under the Free Exercise Clause or the RFRA. These claims should be dismissed.

//

//

//

//

//

23

## VII.

## THE PRAYER FOR INJUNCTIVE RELIEF SHOULD BE DISMISSED OR STRICKEN ON THE GROUNDS THAT IT REQUESTS ENTRY OF A VAGUE AND UNCERTAIN UNENFORCEABLE ORDER

An order granting injunctive relief must "describe in reasonable detail … the act or acts restrained or required." Fed.R.Civ.P. 65(d)(1)(C). Because a party is entitled to receive fair and precisely drawn notice of what an injunction prohibits or requires, blanket injunctions to "obey the law" are disfavored. *Ruff v. County of Kings*, No. CV-F-05-631 OWW/GSA, 2009 WL 5111766, at *18 (E.D. Cal. Dec. 18, 2009) (citing *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd*., 518 F.Supp.2d 1197, 1226 (C.D. Cal. 2007).

"Courts have declined injunctive relief where the injunction sought is of such an indeterminate character that an enjoined party cannot readily determine what conduct is being prohibited." *Brady v. United of Omaha Life Ins. Co*., 902 F.Supp.2d 1274, 1284 (N.D. Cal. 2012) (citing *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ("Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed."). "The requirement of specificity in injunction orders performs a second important function. Unless the trial court carefully frames its orders of injunctive relief, informed and intelligent appellate review is greatly complicated, if not made impossible." *N.L.R.B. v Express Publishing Co*., 312 U.S. 426, 435-36 (1941).

Here, Plaintiff's Prayer for Relief requests preliminary and permanent injunctions "ordering Defendants to cease surveilling, detaining, and otherwise targeting Plaintiff; restraining Defendants from taking any future adverse action against her based on protected expression, association, or religious exercise; and generally restoring Plaintiff to the status quo ante." Complaint, Prayer for Relief. The requested injunction would be sweeping in nature, vague and not sufficiently connected to the injuries alleged in this case. For example, some of the proposed injunction language would enjoin the Federal Defendants from ever

surveilling, detaining or otherwise targeting Plaintiff regardless of the justification.

Other proposed language would require the Federal Defendants to determine which of their future unspecified actions might infringe on Plaintiff's "protected expression, association, or religious exercise." As noted above, courts have declined to grant such relief where the injunction sought is of such an indeterminate character that an enjoined party cannot readily determine what conduct is being prohibited. Because this is exactly the type of "follow the law" relief sought by Plaintiff, the Court should dismiss or strike the prayer for injunctive relief.

## VIII.

## CONCLUSION

For the foregoing reasons, the Court is requested to grant the Federal Defendants' Motion to Dismiss or Strike the Complaint.


DATED:      September 10, 2019            Respectfully submitted,


                                         ROBERT S. BREWER, JR.
                                         United States Attorney


                                         *s/ Ernest Cordero, Jr.*
                                         ERNEST CORDERO, JR.
                                         Assistant United States Attorney
                                         MICHAEL A. GARABED
                                         Assistant United States Attorney