Oscar Ramallo (Bar No. 241487)
Oscar.Ramallo@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
Telephone: (213) 243-4000
Facsimile: (213) 243-4199

*Attorney for Plaintiff*
*Kaji Dousa*

[Additional counsel listed on following page.]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAJI DOUSA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS"); U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT ("ICE"); U.S. CUSTOMS AND BORDER PROTECTION ("CBP") KEVIN K. MCALEENAN, Acting Secretary of DHS; MATTHEW T. ALBENCE, Acting Director of ICE; MARK A. MORGAN, Acting Commissioner of CBP; AND PETER FLORES, Director of Field Operations for CBP, San Diego,<br><br>　　　　Defendants. | Case No. 19-cv-01255 (LAB)<br><br>**PLAINTIFF'S BRIEF IN SUPPORT OF HER MOTION FOR PRELIMINARY INJUNCTION AND IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND TO STRIKE** |

R. Stanton Jones (*pro hac vice*) (DC SBN 987088)
Stanton.Jones@arnoldporter.com
William C. Perdue (*pro hac vice*) (DC SBN 995365)
William.Perdue@arnoldporter.com
Christian D. Sheehan (*pro hac vice*) (DC 1045233)
Christian.Sheehan@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

Ada Añon (*pro hac vice*) (NY 5030697)
Ada.Anon@arnoldporter.com
Leah J. Harrell (*pro hac vice*) (NY 5623335)
Leah.Harrell@arnoldporter.com
Neesha Chhina (*pro hac vice*) (NY 5726021)
Neesha.Chhina@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th St.
New York, NY 10019
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

Stephanie Llanes (*pro hac vice*) (NY SBN 5580014)
Stephanie.Llanes@protectdemocracy.org
THE PROTECT DEMOCRACY PROJECT, INC.
222 Broadway, 19th Floor
New York, NY 10038
Telephone: (202) 579-4582

Anne Tindall (*pro hac vice*) (DC SBN 494607)
Anne.Tindall@protectdemocracy.org
THE PROTECT DEMOCRACY PROJECT, INC.
2020 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
Telephone: (202) 579-4582
Genevieve Nadeau (*pro hac vice*) (MA SBN 677566)
Genevieve.Nadeau@protectdemocracy.org
Ben Berwick (*pro hac vice*) (MA SBN 679207)

1  Ben.Berwick@protectdemocracy.org
2  THE PROTECT DEMOCRACY PROJECT, INC.
   15 Main St., Suite 312
3  Watertown, MA 02472
4  Telephone: (202) 579-4582

5  *Attorneys for Plaintiff*
6  *Kaji Dousa*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

ARGUMENT...........................................................................................................2

I.    PASTOR DOUSA IS LIKELY TO SUCCEED ON THE MERITS.................2

  A. Pastor Dousa Has Standing to Seek Injunctive Relief ....................................2

    1. Defendants Have Targeted Pastor Dousa Based on Constitutionally
    Protected Activities...........................................................................................2

    2. There Is an Objectively Reasonable Likelihood That Defendants Will
    Continue Targeting Pastor Dousa Based on Her Protected Activity ..............8

    3. Pastor Dousa's Injuries Are Traceable to Defendants and Can Be
    Redressed by Injunctive Relief ......................................................................11

  B. Pastor Dousa Is Likely to Prevail on Her First Amendment Retaliation
  Claim...................................................................................................................12

  C. Pastor Dousa is Likely to Prevail on Her Free Exercise and Hybrid Rights
  Claims .................................................................................................................18

  D. Pastor Dousa Is Likely to Prevail on Her RFRA Claim ...............................19

II.    ALL OTHER EQUITABLE FACTORS SUPPORT A PRELIMINARY
INJUNCTION........................................................................................................21

  A. Pastor Dousa Seeks Workable Relief............................................................21

  B. Pastor Dousa Faces Irreparable Harm Absent an Injunction ........................23

  C. The Equities and the Public Interest Support an Injunction ..........................23

III.    THE COURT SHOULD DENY THE GOVERNMENT'S MOTIONS........24

CONCLUSION......................................................................................................25

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

4

## Cases

5

*Arizona Students' Ass'n v. Ariz. Bd. of Regents*,
　824 F.3d 858 (9th Cir. 2016) ............................................................................. 13

6

7

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) ......................................................................................... 24

8

9

*Brady v. United of Omaha Life Ins. Co.*,
　902 F. Supp. 2d 1274 (N.D. Cal. 2012)............................................................. 22

10

11

*Burwell v. Hobby Lobby Stores, Inc.*,
　573 U.S. 682 (2014) ................................................................................... 19, 21

12

13

*City of Los Angeles v. Lyons*,
　461 U.S. 95 (1983) ......................................................................................... 10

14

15

*Clapper v. Amnesty Int'l USA*,
　568 U.S. 398 (2013) ..................................................................................... 9, 10

16

*Coszalter v. City of Salem*,
　320 F.3d 968 (9th Cir. 2003) ..................................................................... 13, 16

17

18

*Dahlia v. Rodriguez*,
　735 F.3d 1060 (9th Cir. 2013) ......................................................................... 25

19

20

*Does v. Harris*,
　772 F.3d 563 (9th Cir. 2002) ..................................................................... 10, 24

21

22

*Eclectic Properties E., LLC v. Marcus & Millichap Co.*,
　751 F.3d 990 (9th Cir. 2014)........................................................................... 25

23

24

*Elrod v. Burns*,
　427 U.S. 347 (1976) ....................................................................................... 13

25

26

*Employment Division, Dep't of Human Res. of Oregon v. Smith*,
　494 U.S. 872 (1990) ................................................................................... 19, 20

27

*Garcia v. Lawn*,
　805 F.2d 1400 (9th Cir. 1986)......................................................................... 24

28

*Gutierrez-Soto v. Sessions*,
　317 F. Supp. 3d 917 (W.D. Tex. 2018) .............................................................. 18

*Hartmann v. Cal. Dep't of Corr. & Rehab.*,
　707 F.3d 1114 (9th Cir. 2013) ........................................................................... 11

*Hodgers-Durgin v. de la Vina*,
　199 F.3d 1037 (9th Cir. 1999) ........................................................................... 10

*Hyland v. Wonder*,
　972 F.2d 1129 (9th Cir. 1992) ........................................................................... 13

*Lopez v. Candaele*,
　630 F.3d 775 (9th Cir. 2010) ........................................................................... 8, 9

*Melendres v. Arpaio*,
　695 F.3d 990 (9th Cir. 2012) .......................................................................... 9, 23

*Meyer v. Grant*,
　486 U.S. 414 (1988) ........................................................................................... 12

*Mockaitis v. Harcleroad*,
　104 F.3d 1522 (9th Cir. 1997), *overruled on other grounds by City
　of Boerne v. Flores*, 521 U.S. 50 (1997) .......................................................... 12

*Navajo Nation v. U.S. Forest Serv.*,
　535 F.3d 1058 (9th Cir. 2008) ........................................................................... 20

*Perry v. Sinderman*,
　408 U.S. 593 (1972) ............................................................................................. 6

*Ragbir v. Homan*,
　923 F.3d 53 (2d Cir. 2019) ........................................................................... 12, 18

*Rueda Vidal v. U.S. DHS*,
　No. 18-9276 (C.D. Cal. Aug. 28, 2019) ........................................................... 18

*Snyder v. Phelps*,
　562 U.S. 443 (2011) ........................................................................................... 12

*Soranno's Gasco, Inc. v. Morgan*,
　874 F.2d 1310 (9th Cir. 1989) ............................................................................. 6

*Van Dyke v. Regents of Univ. of Cal.*,
  815 F. Supp. 1341 (C.D. Cal. 1993) ....................................................... 23

*Widmar v. Vincent*,
  454 U.S. 263 (1981) ............................................................................... 12

**Statutes**

6 U.S.C.
  § 211(c)(9) ................................................................................................ 5
  § 211(g)(4)(C)(1) ..................................................................................... 5

42 U.S.C.
  § 2000bb-1 .............................................................................................. 21
  § 2000bb-1(a) ......................................................................................... 20
  § 2000bb(a)(2) ....................................................................................... 20

**Rules**

Fed. R. Civ. P. 12(b)(1) ............................................................................. 12

Fed. R. Civ. P. 12(d) ................................................................................. 25

Fed. R. Civ. P. 56(d) ................................................................................. 25

**Other Authorities**

Bureau of Transportation Statistics, U.S. Dep't of Transportation,
  Border Crossing Entry Data - Annual Data, https://bit.ly/2PIs4Jm ................... 6

CBP, *CBP Announces 5 Million Global Entry Members*, Apr. 3,
  2018, http://bit.ly/2Vg1JDB ................................................................... 6

Letter from Jennifer L. Costello, Acting Inspector General, DHS, to
  Sen. Tom Udall (July 15, 2019), https://bit.ly/34EOwaE ..................................... 4

Tom Jones, Mari Payton, & Bill Feather, *Government Secrets: Why
  and How a Special Agent-Turned-Whistleblower Uncovered
  Controversial Borders Surveillance Tactics*, NBC San Diego,
  Nov. 19, 2019, http://bit.ly/348beIC ....................................................... 4

# **INTRODUCTION**

This case is about whether the U.S. government can target members of the clergy for surveillance, detention, interrogation, and harassment for exercising their First Amendment right to minister to people whom the government disfavors. Pastor Dousa's complaint alleges that Defendants included her name and a photo of her face marked with a yellow "X" on a list of 59 "[s]uspected [o]rganizers, [c]oordinators, [i]nstigators, and [m]edia." She alleges that Defendants targeted those 59 individuals for enhanced surveillance and other adverse treatment as part of a multi-agency investigation known as Operation Secure Line. And she alleges that Defendants chose her as one of their targets because she engaged in "acts of devotion commanded by the core tenets of her Christian faith"—namely, advocating for and ministering to migrants in New York and at the Southern Border by blessing their marriages, dedicating their children to Christ, hearing their confessions, and providing them other forms of pastoral care.

Shortly after filing her complaint, Pastor Dousa moved for a preliminary injunction to halt Defendants' illegal targeting of her based on protected activity. She then successfully moved for limited expedited discovery. The documents that Defendants have produced confirm exactly what Pastor Dousa alleged: Defendants singled out Pastor Dousa and other "[s]uspected [o]rganizers, [c]oordinators, [i]nstigators, and [m]edia" because of their protected First Amendment activity, including their advocacy work on behalf of immigrant communities and, in Pastor Dousa's case, her work ministering to migrants seeking refuge in this country.

Neither the government's response to Pastor Dousa's motion nor its motion to dismiss disputes that she and others were targeted based on their exercise of First Amendment rights. The government does not contest that Defendants compiled a dossier on Pastor Dousa, that they tracked prayer vigils and rallies she led in New York, or that they surveilled the church where she coordinates with the New Sanctuary Coalition because of her work with and for migrants. The government

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

also does not dispute that her ministry and advocacy work is constitutionally protected.  Most notably, the government does not dispute that Pastor Dousa would not have been included on a DHS targeting list, or been subject to surveillance, if not for the views she expresses and the people with and for whom she prays.

Rather than defend their targeting of Pastor Dousa and others based on protected activity, the government principally argues that Defendants' actions have not concretely harmed her.  But uncontested evidence shows that Pastor Dousa has curtailed her ministry, both at the Southern Border and in New York, because she fears Defendants will continue to target her based on her protected conduct.  Given the undisputed facts and the government's own documents, that fear is well-founded.  Indeed, the government never argues that the targeting list containing Pastor Dousa's photo has been rescinded, that Operation Secure Line is inactive, or that Defendants' surveillance activities are somehow a thing of the past.

The Court should grant Pastor Dousa's preliminary injunction motion.  At a minimum, the Court should deny Defendants' motions to dismiss and to strike.

## ARGUMENT

## I.  PASTOR DOUSA IS LIKELY TO SUCCEED ON THE MERITS

### A.  Pastor Dousa Has Standing to Seek Injunctive Relief

Pastor Dousa has amply demonstrated concrete and particularized harms sufficient to confer standing.  Defendants have repeatedly targeted her for adverse treatment because she engaged in constitutionally protected activities, which has deterred her from providing the pastoral services that are central to her faith.

#### 1.  Defendants Have Targeted Pastor Dousa Based on Constitutionally Protected Activities

The government first argues that Pastor Dousa lacks standing because she has not shown a "concrete and particularized harm."  Opp. 8.  In fact, Pastor Dousa

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

alleges—and the discovery documents confirm—that Defendants have repeatedly targeted her for adverse treatment based on her protected activities in three ways.

*First*, Defendants detained and interrogated Pastor Dousa at the Southern Border because of her protected activity, which is plainly an injury-in-fact. The government's documents demonstrate that Defendants created a "lookout" and entered an "[i]nterdiction" for Pastor Dousa on December 5, 2018. CBP-00048-49.[1] That was just days after her first trip to Mexico with the "Sanctuary Caravan," a group of faith leaders, congregants, and humanitarian workers that provided pastoral services to several hundred asylum-seekers traveling to the United States. 7/24/19 Dousa Decl. ¶¶ 8, 13-15. The sole purpose of Pastor Dousa's trip was to engage in protected ministry; she prayed with migrants, officiated their weddings, heard their confessions, and anointed the sick. *Id.* ¶¶ 14-15. Defendants responded to this exercise of constitutionally protected rights by flagging Pastor Dousa's name, which led directly to her detention and interrogation for a "Tactical Terrorism Response Team" interview. *See* CBP-00030 (explaining that Pastor Dousa's name triggered a "computer generated alert" in CBP's system when she sought to cross the border on January 2, 2019); CBP-00003 (noting Pastor Dousa's "TTRT exam").

*Second*, Defendants have extensively monitored Pastor Dousa's activities at the border and inside the United States based on her protected activity. Even though Pastor Dousa's interrogation yielded "[n]o derogatory information," CBP-00030, Defendants subsequently placed her on an internal targeting list of 59 "Suspected Organizers, Coordinators, Instigators, and Media," CBP-00035, 37—a list that is now the subject of an investigation by the DHS Inspector General. *See*

---

[1] All documents cited by Bates number refer to the redacted versions of documents produced by Defendants in discovery on November 1, 2019, which are attached in their entirety to the Declaration of William C. Perdue. Defendants subsequently provided unredacted versions of these documents to Pastor Dousa and Magistrate Judge Crawford. Pastor Dousa is prepared to file the unredacted versions under seal if the Court so requests.

Letter from Jennifer L. Costello, Acting Inspector General, DHS, to Sen. Tom Udall (July 15, 2019), https://bit.ly/34EOwaE (acknowledging "specific concerns" about the list of "individuals, including journalists and attorneys, who may have been singled out for enhanced inspection at U.S. ports of entry").

As discussed in greater detail below, *see infra* pp. 13-18, the documents produced in discovery strongly suggest that Defendants chose these targets, including Pastor Dousa, based on their protected activities—in particular, their opposition to U.S. immigration policy and their efforts to help migrants enter and gain status in the United States through established legal channels. *See, e.g.*, CBP-00022 (describing the "migrant caravan"—a group of migrants traveling from Central America to the Southern Border for whom Pastor Dousa's Sanctuary Caravan provided pastoral care—as "a common cause for numerous open border, humanitarian, and other groups with the goal to challenge U.S. immigration laws"). In Pastor Dousa's case, the documents indicate that Defendants targeted her specifically because of the religious nature of her work; CBP reports describe her as a "Suspected Organizer, Pastor" who had been "[i]dentified as performing marriage ceremonies in Tijuana, MX." CBP-00002.

Defendants have conducted extensive surveillance of Pastor Dousa and other targets on the list. The whistleblower who first disclosed the operation—now identified as a nine-year-veteran special agent in DHS's Homeland Security Investigations unit, the investigative arm of ICE—has stated that Defendants compiled dossiers on the individuals included on the targeting list. *See* Mem. 6, 17; Tom Jones, Mari Payton, & Bill Feather, *Government Secrets: Why and How a Special Agent-Turned-Whistleblower Uncovered Controversial Borders Surveillance Tactics*, NBC San Diego, Nov. 19, 2019, http://bit.ly/348beIC; *see also* CBP-00002 (CBP profile on Pastor Dousa); CBP00020-22 (field intelligence report including Pastor Dousa's name, photos, and social media activity alongside

information about other immigrant-rights advocates). And immigration officials in New York have tracked and surveilled prayer vigils and rallies Pastor Dousa has led. 7/24/19 Dousa Decl. ¶¶ 33-35. They surveilled the New Sanctuary Coalition's offices at the Judson Memorial Church. *Id.* ¶ 34. An ICE official in New York even told Pastor Dousa that he "know[s] exactly how to find [her]," that she is "all over the documents that [he] has," and that he "know[s] [her] network just as good as [she] do[es]." *Id.* ¶¶ 47, 49. None of this is disputed.

Defendants' monitoring and surveillance, moreover, has upended Pastor Dousa's ministry. She canceled a planned trip to Mexico this year and has refrained from blessing marriages of migrants. *Id.* ¶¶ 42, 45. She feels compelled to warn penitents about the possibility of government surveillance, chilling her ability to provide pastoral counseling and absolution. *Id.* ¶¶ 40-41, 44. Her church has declined to host a *pro se* asylum clinic and has seen migrants and refugees deterred from participating in church activities. *Id.* ¶¶ 37-38. It is difficult to overstate the effect this disruption has had on Pastor Dousa's ministry. Pastor Dousa has "offered pastoral care to [immigrant-rights] advocates and to the migrants they serve for nearly a decade," and "[m]inistering to migrants is a large part of [her] work as a pastor." *Id.* ¶ 43. Because of Defendants' targeting, she "no longer feel[s] that [she is] able to fulfill this core part of [her] faith." *Id.* The government never addresses these harms, and simply ignores the cases holding that they constitute concrete injuries-in-fact sufficient to confer standing. *See* Mem. 12 (citing cases).

The government instead suggests that any information-gathering about Pastor Dousa is not a cognizable injury because CBP is authorized by statute to collect information about travelers to the United States. Mot. to Dismiss 14 (citing 6 U.S.C. § 211(c)(9), (g)(4)(C)(1)); Opp. 10-11, 18-19. But the documents make clear that Defendants' surveillance of Pastor Dousa was not routine information-gathering. Defendants monitored her as part of an investigation specifically

targeting individuals exercising their rights to pray with, advocate for, and report on migrants traveling to the United States. *See, e.g.*, CBP-00002, 5, 20-22. The targeting list was comprised of just 59 individuals—out of the more than 5 million who have Global Entry memberships and more than 77 million who crossed the California-Mexico land border in 2018. *See* CBP, *CBP Announces 5 Million Global Entry Members*, Apr. 3, 2018, http://bit.ly/2Vg1JDB; Bureau of Transportation Statistics, U.S. Dep't of Transportation, Border Crossing Entry Data - Annual Data, https://bit.ly/2PIs4Jm (last visited Dec. 20, 2019). And in any event, even if some of Defendants' monitoring falls within the scope of the statutes, the Supreme Court has long recognized that even authorized government actions can be both harmful and unlawful if undertaken "because of … constitutionally protected speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *see also Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1318 (9th Cir. 1989) (plaintiffs alleged sufficient injury-in-fact by alleging that "the defendants' actions were taken in retaliation for [their] exercise of first amendment rights"); Mem. 12, 18.

*Finally*, Defendants also concretely injured Pastor Dousa by revoking—or at least attempting to revoke—some portion of her trusted traveler status in response to her protected activity. The government does not dispute that the DHS targeting list includes a photo of Pastor Dousa with a yellow "X" over her face and the notation "Disposition: SENTRI Revoked." 7/24/19 Dousa Decl. ¶ 29; *see also* CBP-00037. The meaning is clear: Defendants decided to withdraw a government benefit because they deemed Pastor Dousa a "[s]uspected [o]rganizer[], [c]oordinator[], [or] [i]nstigator[]" based on her work ministering to migrants. The government offers no alternative explanation for that notation, and Pastor Dousa has no reason to believe it to be false. 10/11/19 Dousa Decl. ¶ 17.

The government nonetheless appears to dispute whether Pastor Dousa was ever technically enrolled in SENTRI in addition to Global Entry. *See* Opp. 4-6 &

n.2 (referring to Pastor Dousa's "alleged SENTRI card"); Mot. to Dismiss 17 (same). But there is evidence to the contrary. As Pastor Dousa explained, she successfully applied to the Global Entry program in 2016, and many of the communications from CBP regarding her Global Entry application referenced SENTRI as well. 10/11/19 Dousa Decl. ¶¶ 2-9. She also has used her Global Entry card to gain access to expedited processing lanes at San Ysidro that are marked with the term "SENTRI." *Id.* ¶¶ 8, 10-11. Moreover, the government's own documents refer to Pastor Dousa in connection with SENTRI. One CBP record expressly states that Pastor Dousa has status in the "SENTRI Highway" program. CBP-00048. And another CBP record was updated on March 8, 2019—suspiciously, one day after DHS's targeting list was first reported in the media—to include the notation: "Do not revoke SENTRI based on this lookout." CBP-00003. These documents suggest that Pastor Dousa *did* previously enjoy SENTRI status, and that Defendants at least contemplated revoking it before March 8, 2019.

The government attaches a declaration from CBP Branch Chief Oliveri, but he notably does not address Pastor Dousa's SENTRI status. He asserts that Pastor Dousa is enrolled in Global Entry, but never states whether she was enrolled in SENTRI, even though CBP administers the SENTRI program. *See* Oliveri Decl. ¶¶ 1, 2. The government instead argues that it is implausible that CBP "would revoke the SENTRI card as a punishment while leaving her with the more valuable Global Entry status." Opp. 16. But again, the documents indisputably show that Defendants *intended* to revoke the SENTRI portion of Pastor Dousa's trusted traveler status; perhaps Defendants meant to revoke her status and simply did so ineffectually. Regardless, even an attempted withdrawal of a government benefit can cause concrete harm by chilling protected activity. At a minimum, attempting to withdraw Pastor Dousa's border-crossing privileges based on her protected activities corroborates the other concrete harms Pastor Dousa has suffered.

## 2. There Is an Objectively Reasonable Likelihood That Defendants Will Continue Targeting Pastor Dousa Based on Her Protected Activity

The government next asserts that Pastor Dousa lacks standing to seek injunctive relief because she faces no "objectively reasonable likelihood" of future injury by Defendants. Opp. 10. That assertion is irreconcilable with the evidence. "[P]ast" actions alone are "strong evidence" of a "credible threat of adverse state action." *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010); *see* Mem. 11 (citing additional cases). Here, Defendants literally placed Pastor Dousa in their crosshairs, including her on a secret DHS list dated one week after her detention and interrogation, with a yellow "X" over her face. And the government documents produced in discovery confirm that Pastor Dousa's inclusion on this list was not a mistake or an aberration; it was part of a concerted effort to probe her activities and affiliations based on her protected activities. *See supra* pp. 3-5. The government does not contend that this targeting operation is no longer active. Indeed, the government offers *no* response to the targeting list, even though it is at the very center of this lawsuit. In the argument sections of its two filings, the government does not even *mention* the list, much less persuasively explain it away.

Moreover, records produced by the government continue to describe Pastor Dousa as a "suspect," with no supporting evidence. CBP-00050. That, too, makes it reasonably likely that Defendants will continue to monitor Pastor Dousa's activities, including by tracking her public events and surveilling the church where she often coordinates her work in New York City. Again, the government does not dispute that this surveillance has occurred. And Pastor Dousa is not alone. Defendants have deported Pastor Dousa's New Sanctuary colleague Jean Montrevil and attempted to do the same to her colleague Ravi Ragbir. *See* Mem. 8-9. As part of Operation Secure Line, Defendants compiled dossiers on 58 other individuals and placed them on the same targeting list. And immigration officials

have targeted dozens of immigrant-rights advocates across the country.  *See* Mem. 7-9.  Contrary to the government's suggestion, this disturbing pattern and practice does not indicate that Pastor Dousa is seeking relief "on behalf of non-parties to this case."  Opp. 11-12.  Rather, it shows "[a] history of past enforcement against parties similarly situated to" Pastor Dousa, which "cuts in favor of a conclusion that a threat is specific and credible."  *Lopez*, 630 F.3d at 786-87.  It is well settled that "a pattern of officially sanctioned behavior, violative of the plaintiffs' federal rights," can be sufficient to establish that an injury is likely to recur.  *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012) (quotation marks omitted; cleaned up).

The government's attempt to cast doubt on Pastor Dousa's fear of further surveillance, detention, and interrogation is similarly unavailing.  The government first observes that Pastor Dousa crossed the border without incident on April 4, 2019.  Opp. 1, 5-6.  But she did so "only … because [her] lawyer could accompany [her]."  10/11/19 Dousa Decl. ¶ 17.  "In all of [her] international travel, by land or air, since [her] detention and interrogation, [she] ha[s] carried with [her] a letter from [her] lawyer outlining [her] rights to travel."  *Id.*  The government also notes that Pastor Dousa has not "allege[d] any intent to travel to Mexico in the near future."  Opp. 10.  But to the extent Pastor Dousa has limited her travel, it is precisely because she fears further targeting by Defendants.  The fact that Defendants' targeting of Pastor Dousa has chilled her international ministry does not undermine her standing to sue; it *supports* it.

The government is left to argue that Pastor Dousa's fear of future detention rests on a "highly attenuated chain of possibilities," citing *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013).  Opp. 10.  But the facts of this case and *Clapper* could hardly be more different.  The plaintiffs in *Clapper* had "no actual knowledge of the Government's … targeting practices."  568 U.S. at 411.  And they could "only speculate" about (1) whether the government would use the

challenged program rather than other means of surveillance, (2) whether a court would authorize the surveillance, (3) whether the surveillance would succeed in acquiring the communications of the plaintiffs' foreign contacts, and (4) whether the surveillance would also incidentally acquire the plaintiffs' communications as well. *Id.* at 412-14. Here, Pastor Dousa *does* know about the government's "targeting practices"—her photo appears on a CBP targeting list with a yellow "X" over her face. Unlike in *Clapper*, moreover, there is no reasonable possibility that Defendants would try to take Pastor Dousa into secondary inspection but fail in the attempt. And the government itself takes the position that CBP officials do not need court approval, or even any particular level of suspicion, to search or detain travelers like Pastor Dousa at the border. *See* Opp. 10-11 & n.3.[2]

The government also cites *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), *see* Opp. 9, but that case is no more helpful than *Clapper*. The alleged injury in *Lyons* required speculation that, having been placed in a chokehold by police on one occasion in the past, the plaintiff would be stopped by police again in the future, and that the incident would escalate so as to lead to another chokehold. *See* 461 U.S. at 105-06. The Ninth Circuit has held that *Lyons* does not govern when the "plaintiffs engaged in entirely innocent conduct" and "there is no string of contingencies necessary to produce an injury." *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1041-42 (9th Cir. 1999). Here, crossing the border to perform expressive, associative, and religious work is not only "entirely innocent"—it is constitutionally protected. And no "string of contingencies" is needed to predict

---

[2] For similar reasons, it is irrelevant that CBP added the notation "Interdiction canceled" to Pastor Dousa's file on July 25, 2019. CBP-00048. That notation is dated the very same day Pastor Dousa filed her motion for a preliminary injunction, suggesting that Defendants acted only in response to this lawsuit. And because CBP can detain travelers regardless of whether an interdiction has been entered, the notation provides no assurance that Defendants will not detain and interrogate Pastor Dousa on subsequent trips to the border.

10

that, absent an injunction, Defendants will exercise their broad border control powers to do again what they have already done before—surveil, detain, and interrogate Pastor Dousa based on her protected activities.

### 3. Pastor Dousa's Injuries Are Traceable to Defendants and Can Be Redressed by Injunctive Relief

Finally, the government briefly contends that Pastor Dousa's injuries are not traceable to or redressable by each of the defendants named in her complaint. *See* Opp. 11; Mot. to Dismiss 14. That argument is unavailing. Pastor Dousa seeks relief against CBP, ICE, and DHS—along with the individual heads of each agency, in their official capacities—as well as CBP's Director of Field Operations in San Diego, also in his official capacity. Each of these agencies and officials was either "involve[d] in the acts or omissions constituting the alleged constitutional violation" or "can appropriately respond to injunctive relief." *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1127 (9th Cir. 2013). CBP participated in Operation Secure Line, and CBP officers effectuated Pastor Dousa's detention and interrogation at San Ysidro, which is overseen by CBP's San Diego field office. Compl. ¶¶ 29, 48-53. ICE likewise participated in the targeting operation; indeed, the whistleblower himself was an ICE agent. *See supra* p. 4. ICE officials have surveilled Pastor Dousa and her associates, deported one of her close New Sanctuary colleagues, and attempted to deport another close colleague. Compl. ¶¶ 56-70, 92-100. And both CBP and ICE are components within DHS, which also participated in Operation Secure Line. *Id.* ¶¶ 24-25, 56. The government never explains why injunctive relief against any Defendant would not redress Pastor Dousa's injuries. Pastor Dousa has therefore adequately demonstrated her standing to seek injunctive relief against each of them.[3]

---

[3] Because Pastor Dousa has standing, the Court should also deny Defendants' motion to dismiss for lack of jurisdiction under Rule 12(b)(1).

11

### B.   Pastor Dousa Is Likely to Prevail on Her First Amendment Retaliation Claim

Pastor Dousa is likely to prevail on her claim for First Amendment retaliation. That claim has three elements: protected activity by the plaintiff, adverse action by the government, and a showing that the protected activity was a substantial or motivating factor behind the adverse action. *See* Mem. 13.  The government here does not dispute that Pastor Dousa has engaged in expressive, associative, and religious activities protected by the First Amendment. *See id.*  Nor could it.  Pastor Dousa's speech on "matter[s] of 'public concern' is at 'the heart of First Amendment protection,' and 'occupies the highest rung of the hierarchy of First Amendment values.'"  *Ragbir v. Homan*, 923 F.3d 53, 69-70 (2d Cir. 2019) (quoting *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011)) (cleaned up).  Indeed, "[b]ecause [her] speech concerns 'political change,' it is also 'core political speech' and thus 'trenches upon an area in which the importance of First Amendment protections is at its zenith.'"  *Id.* at 70 (quoting *Meyer v. Grant*, 486 U.S. 414, 421-22 (1988)) (emphasis omitted).  Pastor Dousa's associative conduct with migrants and advocates likewise is "protected by the First Amendment."  *Widmar v. Vincent*, 454 U.S. 263, 269 (1981).  And there is "[n]o question" that preaching, offering pastoral care, and performing rites like marriage ceremonies are protected exercises of religion.  *Mockaitis v. Harcleroad*, 104 F.3d 1522, 1530 (9th Cir. 1997), *overruled on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997).

Defendants also have taken adverse actions against Pastor Dousa—it is undisputed that they have targeted her and others she associates with for detention, interrogation, surveillance, and other enforcement actions.   Mem. 14-15. Moreover, to the extent Defendants have revoked Pastor Dousa's SENTRI privileges, that too is an adverse action supporting her retaliation claim.  *See Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 870 (9th Cir. 2016) (deprivation of a valuable government benefit is a sufficient adverse action).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The government suggests that some of these actions (but not others) were not sufficiently "adverse."  For example, the government notes that Pastor Dousa "does not allege that she has ever been prevented from crossing the border," Opp. 17, and asserts that she was detained in secondary inspection for "only about 43 minutes," *id.* at 3.  But "the type of sanction imposed to discourage the exercise of First Amendment rights 'need not be particularly great in order to find that rights have been violated.'"  *Hyland v. Wonder*, 972 F.2d 1129, 1135 (9th Cir. 1992) (quoting *Elrod v. Burns*, 427 U.S. 347, 359 n.13 (1976)).  To support a retaliation claim, the adverse action need only be sufficient to "chill a person of ordinary firmness from continuing to engage in the protected activity." *Ariz. Students' Ass'n*, 824 F.3d at 867 (quotation marks omitted).  *Any* retaliatory detention and interrogation meets that standard, regardless of its precise length.  And the government notes that Pastor Dousa is a person of *more*-than-ordinary firmness—she "does not shy away from controversy or engagement." Opp. 17 n.6. But even she has significantly curtailed her ministry and gone to great lengths to avoid further adverse actions.

Finally, Pastor Dousa's protected activity was plainly a substantial or motivating factor in the adverse actions taken against her.  Defendants created a CBP "lookout" for Pastor Dousa mere days after she first crossed the border to engage in protected ministry—far less than the "three to eight months" the Ninth Circuit has held falls "easily within a time range that can support an inference of retaliation." *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003). Defendants then placed her on a list of "Suspected Organizers, Coordinators, Instigators, and Media," along with the notation "Disposition: SENTRI Revoked." The obvious inference is that Defendants withdrew this benefit *because* they deemed her to be a "[s]uspected [o]rganizer[], [c]oordinator[], [or] [i]nstigator[]."

The documents produced in discovery shed considerable light on how Defendants determined which individuals to target as a "[s]uspected [o]rganizer[],

13

[c]oordinator[], [or] [i]nstigator[]."   One field report describes the "Migrant Caravan" as "a common cause for numerous open border, humanitarian, and other groups with the goal to challenge U.S. immigration laws." CBP-00022.  These groups, the report continues, "attempt to use mechanisms such as the U Visa, the Credible Fear screening process for refugees, and Humanitarian Parole to allow aliens to gain legal status in the U.S." *Id.*  The report identifies Pastor Dousa and other targets as among those who have traveled to the Southern Border to provide such assistance to migrants. CBP-00020-22.  And it includes screenshots of social media posts in which targeted individuals express opposition to U.S. immigration policy, including one post discussing Pastor Dousa's work with the New Sanctuary Coalition. CBP-00017-21.  These documents strongly support Pastor Dousa's allegations that Defendants chose targets based on their protected activities—their opposition to U.S. immigration policy and their efforts to help migrants enter and gain status in the United States through established legal channels.

In Pastor Dousa's case, moreover, it was not simply her advocacy work that landed her on CBP's radar—it was the *religious* nature of her work.  Defendants described Pastor Dousa as a "Suspected Organizer, Pastor" and targeted her because she was "[i]dentified as performing marriage ceremonies in Tijuana." CBP-00002; *see also* CBP-00013 (discussing intelligence efforts to "identify several subjects involved in performing marriages in Tijuana" for members of the migrant caravan).  Performing those marriages was unquestionably a core protected religious activity.  And Pastor Dousa has explained (and the government has not disputed) that her faith requires her to offer pastoral care to migrants, including by providing the church's blessing for their marriages.  7/24/19 Dousa Decl. ¶¶ 9, 15.

The government does not argue that any factor other than Pastor Dousa's protected activity was the *actual* basis for Defendants' actions.  Rather, the government points to a variety of supposedly "plausible alternative explanation[s]"

beyond retaliation that, in its view, could *potentially* explain Defendants' actions. Opp. 17; *see also id.* at 15-19.  To the extent the government suggests Pastor Dousa must rule out all potential alternative explanations or prove that retaliation was the *sole* basis for Defendants' adverse actions, that is incorrect.   To obtain a preliminary injunction, Pastor Dousa need only show that, at trial, she is "likely" to establish that her protected activity was a "substantial or motivating factor" in the adverse actions taken against her.  She has more than satisfied that burden.

Furthermore, none of the government's alternative explanations withstands scrutiny.  In its initial public response to the targeting list, CBP stated that "the names in the [Operation Secure Line] database are all people who were present during violence that broke out at the border in November," Compl. ¶ 72.  That statement was false—Pastor Dousa undisputedly was *not* present during any violence and was not even asked about any violence during her interrogation.  *See* 7/24/19 Dousa Decl.  ¶ 17, 25; Mem. 16.

Similarly, in its recent filings, the government suggests that Pastor Dousa's detention and interrogation could have reflected a routine exercise of CBP's "substantial authority to question travelers upon reentry into the United States." Opp. 17.  According to the government, it was only natural for CBP "to ask Plaintiff questions about her activities in Mexico" because of migrants' recent "confrontations with CBP" and a post by Pastor Dousa on Facebook about hoping to learn about those confrontations.   Opp. 17-18.  But again, the discovery documents contain no suggestion that Pastor Dousa was connected to any border violence (or that Defendants could reasonably have believed that she was).  In any event, routine questioning cannot explain placing an electronic alert on Pastor Dousa's name, including her photo on a targeting list, performing research on her activities, and compiling a profile about her, complete with additional information Defendants hoped to learn through further investigation.  *See supra* pp. 3-5; CBP-

00002.  That Defendants' "proffered explanations … were false and pretextual" "show[s] that retaliation was a substantial or motivating factor behind [their] adverse … actions."  *Coszalter*, 320 F.3d at 977 (quotation marks omitted).

The government also offers that any personal information Defendants have compiled on Pastor Dousa could reflect the ordinary operation of the Global Entry program, customs enforcement efforts, or other security screening measures.  Opp. 18-19.  But this case is not about the CBP's recordkeeping practices under the Global Entry program.  Again, these particular dossiers were compiled on just 59 individuals as part of a surveillance operation directed at those who offered care and support to or reported on the migrant caravan.  The whistleblower has stated that the dossiers are part of Operation Secure Line, not Global Entry, and the discovery documents support that statement.  *See supra* p. 4.

In light of those discovery documents, the government may attempt to offer yet another theory of why Defendants targeted Pastor Dousa—that they were investigating potential marriage fraud.  The documents indicate that in a November 30, 2018 field interview, a Honduran national allegedly told agents that Pastor Dousa, an "organizer," had encouraged migrants in Tijuana to "get married to each other" to "facilitate their political asylum claim[s]."  CBP-00007.  To be clear, Pastor Dousa said no such thing.  She told all couples she married that she was performing a religious ceremony and provided them with documentation reflecting only the religious nature of the marriage.  12/5/19 Dousa Decl. ¶¶ 5, 7.  At most, Pastor Dousa told couples that "a certificate, in English, documenting their marriage could help reunite their families after crossing into the United States."  *Id.* ¶ 7.

Regardless, the discovery documents do not indicate that Defendants conducted any real investigation into marriage fraud.  During her interrogation in January, Pastor Dousa was not asked a single question about the marriages she performed.  *Id.* ¶ 8.  Nor is there any suggestion in the documents that CBP

conducted any inquiry into which migrants Pastor Dousa had married or whether their marriages were fraudulent.  That is telling, as Pastor Dousa expressly told migrants she married that they should share her card with government officials if they received questions about their church-blessed marriages.  *Id.* ¶ 7.  Moreover, the CBP report addressing possible marriage fraud discusses only a single marriage—for a wedding Pastor Dousa did not attend, with a certificate she did not sign—and notes no reason to believe that the certificate was illegitimate.  CBP-00013.  Instead, the report appears to use the certificate as a justification for a sprawling analysis of individuals potentially tied in some way to the marriage, as well as their "[a]ssociate[s]."  CBP-00013, 16.  One individual, for example, had potential connections to an "open border activist/attorney" working with the migrant caravan.  CBP-00013.  The report then catalogs several "politically active" social media posts by that activist, including one that mentioned Pastor Dousa and the New Sanctuary Coalition.  CBP-00017-21.  The report concludes by reiterating that the targeted individuals associate with groups that "challenge U.S. immigration laws" and seek to "assist migrants with their goal of entering the U.S." CBP-00022.  The discovery documents thus are more consistent with Defendants using "marriage fraud" as a pretext to target Pastor Dousa and others based on protected activities, rather than the predicate for a bona fide investigation.

Finally, the government asserts that it is "more plausible" that Defendants targeted Pastor Dousa's colleagues and numerous other immigrant-rights advocates nationwide "because each was in violation of one or more immigration laws or otherwise subject to removal."  Opp. 19.  But the Second Circuit has held that Ravi Ragbir, the Executive Director of New Sanctuary, the organization Pastor Dousa co-chairs, for example, "adduced plausible—indeed, strong—evidence that officials responsible for the decision to deport him did so based on their disfavor of Ragbir's speech."  *Ragbir*, 923 F.3d at 73.  Other courts have held similarly.

1
2
3
4
5
6
7
8

*See, e.g.*, *Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917, 934 (W.D. Tex. 2018) (Mexican journalist raised genuine dispute of fact regarding retaliatory revocation of his humanitarian parole); Order Re: Defendants' Motions to Dismiss at 19-21, *Rueda Vidal v. DHS*, No. 18-9276 (C.D. Cal. Aug. 28, 2019) (ECF No. 48) (DACA recipient stated a plausible claim that DHS revoked her status in retaliation for political activism). Pastor Dousa's complaint references numerous other instances with strong circumstantial indications of retaliatory intent. *See* Compl. ¶¶ 88-119. The government cannot rebut evidence of retaliation by simply wishing it away.

9
10

### C. Pastor Dousa is Likely to Prevail on Her Free Exercise and Hybrid Rights Claims

11
12
13
14
15
16
17
18

Pastor Dousa also is likely to prevail on the merits of her claims under the Free Exercise Clause and the hybrid rights doctrine. The government does not dispute that governmental actions burdening the free exercise of religion are subject to strict scrutiny if they (1) are not generally applicable or neutral with respect to religion or (2) are generally applicable and neutral, but also implicate other rights beyond free exercise, such as free speech. *See* Mem. 17-18. The government also does not dispute that if Defendants' actions against Pastor Dousa here are subject to strict scrutiny, they cannot survive. *Id.* at 18-19, 21-22.

19
20
21
22
23

Instead, the government argues that its actions targeting Pastor Dousa do not trigger strict scrutiny in the first place. With respect to the hybrid rights claim, the government never even mentions that doctrine, and thus appears to rely entirely on the notion that Defendants' actions do not implicate Pastor Dousa's free speech rights at all. That is wrong, for the reasons explained above. *See supra* p. 12.

24
25
26
27
28

The government's arguments on Pastor Dousa's free exercise claim are more difficult to discern. At times, the government seems to suggest that Defendants' actions against Pastor Dousa were ordinary applications of neutral, generally applicable border security policies, which burdened Pastor Dousa's exercise of religion at most incidentally. *E.g.*, Opp. 10. Under *Employment Division,*

18

*Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), of course, "valid and neutral law[s] of general applicability" generally do not violate the Free Exercise Clause. *Id.* at 879 (quotation marks omitted). But as explained, Defendants' actions against Pastor Dousa were not neutral or general at all—they were targeted at her because of her work ministering to migrants.

Elsewhere, the government asserts without elaboration that Defendants' actions did not "directly infringe[] upon or substantially burden[] the 'exercise' of [Pastor Dousa's] religion." Mot. to Dismiss 23. To the extent that assertion challenges the correctness or sincerity of Pastor Dousa's belief that serving the needs of migrants is a requirement of her Christian faith, the argument is absurd. Pastor Dousa preaches about her beliefs regularly and acts upon them daily. "[T]he federal courts have no business addressing []whether the religious belief asserted ... is reasonable," or "presum[ing] to determine the plausibility of a religious claim." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014) (quotation marks omitted; cleaned up).

To the extent the government instead means to minimize the effect of Defendants' actions on Pastor Dousa, the argument is at odds with uncontested evidence. Again, Pastor Dousa has canceled a trip to Mexico, refrained from blessing migrant marriages, had her pastoral counseling chilled, and had potential parishioners deterred from attending her church. Those burdens are real and substantial. The government simply ignores the case law recognizing similar burdens as constitutionally significant. *See* Mem. 19-21 (citing cases).

### D. Pastor Dousa Is Likely to Prevail on Her RFRA Claim

Pastor Dousa also is likely to prevail on her claim under RFRA. The government does not dispute that Defendants' actions would fail strict scrutiny; it argues only that those actions do not "substantially burden [Pastor Dousa's] exercise of religion." 42 U.S.C. § 2000bb-1(a); Mot. to Dismiss 23. Importantly,

PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND IN OPPOSITION TO MOTION TO DISMISS

RFRA's plain text makes clear that a substantial burden may "result[] from a rule of general applicability." *Id.* Indeed, the express purpose of RFRA was to overrule *Smith* and require a compelling justification for *any* substantial burden on the free exercise of religion, including burdens from laws that are "'neutral' toward religion." 42 U.S.C. § 2000bb(a)(2). Pastor Dousa accordingly can prevail on her RFRA claim *even if*, against the great weight of the available evidence, the government were to demonstrate that Defendants' actions against her reflected the operation of neutral, generally applicable rules and policies.

The government conclusorily denies that the challenged actions here "substantially burden the exercise of [Pastor Dousa's] faith," but also acknowledges that governmental action "substantially burdens" the exercise of religion under RFRA if it compels individuals "'to choose between following the tenets of their religion and receiving a government benefit.'" Mot. to Dismiss 23 (quoting *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069-70 (9th Cir. 2008)). That is precisely the choice Defendants have forced upon Pastor Dousa here. Because Pastor Dousa chose to counsel and minister to migrants across the border, Defendants have revoked the privilege of returning to the United States free from detention and interrogation. Now, every time Pastor Dousa contemplates returning to Mexico to minister, she must weigh the added burden of secondary inspection in the balance. She must make similarly difficult decisions every time an asylum applicant approaches her for pastoral guidance, every time her church contemplates a new migrant-focused program, and every time she considers publicly expressing or acting upon what her faith teaches about serving migrants. The whole point of RFRA is to avoid requiring religious adherents to make those kinds of painful choices between the demands of their faith and their government.

Again, the government has not argued that Defendants' targeting of Pastor Dousa advances a compelling government interest. Even if it were now to suggest

that Defendants' actions served a compelling interest in rooting out marriage fraud, *see* CBP-00009, 10, 22, 29, that argument would fail. For one thing, the fraud allegations appear to have been a mere pretense for targeting Pastor Dousa based on her protected activity. *See supra* pp. 16-17. And Defendants' actions were not the "least restrictive means" of uncovering any fraud. *See* 42 U.S.C. § 2000bb-1(b)(2). Defendants targeted Pastor Dousa not just by questioning her at the border, but also by monitoring her rallies, prayer vigils, and other religious activity in New York. They have never asked Pastor Dousa a single question about marriages or identified any suspect marriages she performed. *See supra* pp. 16-17. It is implausible that Defendants' extensive targeting and surveillance of Pastor Dousa was less restrictive than other obvious steps they could have taken to uncover any marriage fraud. The "exceptionally demanding" least-restrictive-means standard requires the government to tread lightly when burdening religious practice. *Hobby Lobby*, 573 U.S. at 728. Defendants have done precisely the opposite.

## II.   ALL OTHER EQUITABLE FACTORS SUPPORT A PRELIMINARY INJUNCTION

### A.   Pastor Dousa Seeks Workable Relief

Pastor Dousa's remedial request is simple—the Court should order Defendants to redress the consequences of their past retaliatory and discriminatory actions and to refrain from similar unlawful actions in the future. In concrete terms, Defendants should be preliminarily enjoined (1) to restore Pastor Dousa's SENTRI status; (2) to rescind the document entitled "Suspected Organizers, Coordinators, Instigators, and Media," as well as any associated targeting policy; (3) to rescind and destroy the profile compiled on Pastor Dousa, CBP-00002; FOIA-00002; and (4) to refrain from undertaking further surveillance, detention, interrogation, or other investigative or enforcement actions against Pastor Dousa, or individuals associated with her, based on protected expressive, associative, or religious speech or conduct. Nothing about that relief is impermissibly vague or indeterminate.

1
2
3
4
5
6
7
8
9
10
11
12

The government attempts to parse the Prayer for Relief in Pastor Dousa's complaint as if it set forth the only possible injunction this Court could enter. *See* Opp. 22. Much of that parsing is demonstrably incorrect. For example, the government asserts that Defendants would be enjoined from "ever surveilling, detaining or otherwise targeting [Pastor Dousa] regardless of the justification," *id.*, but that is wrong—adverse actions against her would be barred only if "based on her protected expression, association, or religious exercise." Compl. at 38. Regardless, the Court has broad discretion to fashion appropriate equitable relief, and the Prayer for Relief was deliberately framed in broad terms precisely to allow the Court to tailor any injunction to the facts and the evidence. The government's suggestion that the Prayer for Relief is "redundant, immaterial, impertinent, or scandalous," so as to justify a motion to strike under Rule 12(f), is baseless.

13
14
15
16
17
18
19
20
21
22
23
24
25
26

The two cases the government relies on are of no help. In one, the court rejected a proposed injunction that would have enjoined an insurer from "'obtaining input from biased medical consultants' who are 'not appropriately trained and experienced,'" without providing any "clear or enforceable standards for how [the insurer] would determine whether a medical consultant is appropriately trained and experienced or biased or has a conflict of interest." *Brady v. United of Omaha Life Ins. Co.*, 902 F. Supp. 2d 1274, 1283-85 (N.D. Cal. 2012) (quoting proposed injunction; cleaned up). Here, Pastor Dousa seeks an injunction ordering Defendants to undertake three discrete, concrete actions, and to refrain from targeting her in the future based on her protected expressive, associative, or religious speech or conduct. Nothing about that relief requires Defendants to make judgments about appropriate training, bias, conflicts of interest, or the like. Defendants presumably know the basis of their own actions, so no further clarity is necessary for them to be able to conform their conduct to this Court's order.

27
28

In the government's other case, the court rejected a proposed injunction against "using state funds … to fund anti-religious activities … which have the purpose *or effect* of disrupting, destroying, impeding and interfering with the free exercise by plaintiffs of their religion." *Van Dyke v. Regents of Univ. of Cal.*, 815 F. Supp. 1341, 1346 (C.D. Cal. 1993). But Pastor Dousa's proposed injunction would turn on the *basis* of any future actions Defendants might take against Pastor Dousa—which Defendants can and should know—not their "*effect*."

### B. Pastor Dousa Faces Irreparable Harm Absent an Injunction

If this Court does not grant preliminary relief, Pastor Dousa is likely to suffer irreparable harm. Deprivation of a constitutional right, even for a minimal period, "unquestionably constitutes irreparable injury." *Melendres*, 695 F.3d at 1002 (quotation marks omitted). And laws that merely burden speech even without banning it outright still irreparably impair First Amendment rights. *See* Mem. 22.

The government does not dispute these principles, or even that—if Pastor Dousa is likely to succeed on the merits—these principles apply here. Instead, the government combines its merits and irreparable harm arguments, *see* Opp. 15-19, and never offers any reason why, if the Court determines that Pastor Dousa is likely to succeed on the merits of any claim, the Court should still deny an injunction due to an absence of irreparable harm. If the Court finds a likelihood of success on the merits, it accordingly should find a likelihood of irreparable harm as well.

### C. The Equities and the Public Interest Support an Injunction

The balance of equities and the public interest weigh decidedly in favor of a preliminary injunction. The government does not dispute that there is a "significant public interest in upholding First Amendment principles." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (quotation marks omitted). Nor does it dispute that "courts will more readily grant [injunctive] relief where allegations of retaliation are involved, because such conduct is likely to cause irreparable harm to the public

interest … by deterring others from" exercising their rights.  *Garcia v. Lawn*, 805 F.2d 1400, 1405 (9th Cir. 1986) (quotation marks omitted).  The government notes that Defendants have not banned Pastor Dousa from traveling to Mexico, Opp. 19, but that hardly makes it equitable to threaten her with adverse action every time she crosses the border, ministers to migrants, or posts on Facebook about doing so.

On the other side of the ledger, the government at times suggests that Pastor Dousa unreasonably delayed in bringing suit.  *See* Opp. 5-6.  Not so.  She filed her complaint six months after the Operation Secure Line documents were publicly disclosed, and moved for a preliminary injunction two weeks later.  Dkt. 1, 25.

As predicted, the government also invokes a generalized "interest in the efficient administration of immigration laws."  Opp. 20; *see* Mem. 24.  But the government never explains concretely how redressing past retaliation against Pastor Dousa and refraining from future retaliation will actually endanger the border.  If anything, an injunction should *strengthen* border security by reminding Defendants that their broad enforcement tools are meant for genuine security threats, and not to punish U.S. citizens for exercising constitutional rights.

## III.    THE COURT SHOULD DENY THE GOVERNMENT'S MOTIONS

Because Pastor Dousa is likely to succeed on the merits, *a fortiori* she also has alleged claims that are plausible, precluding dismissal.  But even if this Court were to deny a preliminary injunction, it should deny the government's motion to dismiss.  To survive a motion to dismiss, Pastor Dousa need only allege facts showing a claim that is "plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  On a preliminary injunction motion, moreover, courts may draw whatever inferences they find appropriate, whereas on a motion to dismiss, they "must draw all reasonable inferences in [the plaintiff's] favor." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1077 (9th Cir. 2013).

1
2
3
4
5
6
7
8
9
10
11
12

The government muddies these clear standards by invoking the concept of "plausibility" throughout its response to Pastor Dousa's preliminary injunction motion. But a "complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *implausible*." *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) (quotation marks omitted). A plaintiff thus need only point to alleged "facts tending to exclude the possibility that the [defendant's] alternative explanation is true." *Id.* at 996-97. Pastor Dousa has alleged *many* such facts. CBP's targeting list alone is more than sufficient. And if the Court deems it necessary, Pastor Dousa is prepared to amend her complaint to include information from the discovery documents. As explained, the government's alternative explanations are even less plausible in light of those documents.

13
14
15
16
17
18
19
20
21
22

The government also floats the possibility of converting its motion to dismiss into a motion for summary judgment. Mot. to Dismiss 8. But the discovery documents show that the government could not possibly meet its burden on summary judgment. Among other things, the government could not show that there is no genuine dispute of material fact as to whether Defendants targeted Pastor Dousa based on protected activity and whether their actions burdened her religious practice. In any event, the Court cannot convert the government's motion without giving Pastor Dousa "a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). That includes material obtainable only through full discovery, including depositions. *See* Fed. R. Civ. P. 56(d).

## **CONCLUSION**

23
24
25
26

For the foregoing reasons, the Court should grant Pastor Dousa's motion for a preliminary injunction and deny Defendants' motions to dismiss and to strike.

27
28

Dated: December 20, 2019

Respectfully submitted,

By:  /s/ Oscar Ramallo

ARNOLD & PORTER KAYE SCHOLER LLP

Oscar Ramallo
Oscar.Ramallo@arnoldporter.com
R. Stanton Jones  (*pro hac vice*)
Stanton.Jones@arnoldporter.com
William C. Perdue (*pro hac vice*)
William.Perdue@arnoldporter.com
Ada Añon (*pro hac vice*)
Ada.Anon@arnoldporter.com
Christian D. Sheehan (*pro hac vice*)
Christian.Sheehan@arnoldporter.com
Jaba Tsitsuashvili (Bar No. 309012)
Jaba.Tsitsuashvili@arnoldporter.com
Leah J. Harrell (*pro hac vice*)
Leah.Harrell@arnoldporter.com
Neesha Chhina (*pro hac vice*)
Neesha.Chhina@arnoldporter.com

THE PROTECT DEMOCRACY PROJECT, INC.

Stephanie Llanes (*pro hac vice*)
Stephanie.Llanes@protectdemocracy.org
Anne Tindall (*pro hac vice*)
Anne.Tindall@protectdemocracy.org
Genevieve Nadeau (*pro hac vice*)
Genevieve.Nadeau@protectdemocracy.org
Ben Berwick (*pro hac vice*)
Ben.Berwick@protectdemocracy.org

*Attorneys for Plaintiff Kaji Dousa*

## **CERTIFICATE OF SERVICE**

     I hereby certify that on December 20, 2019, I electronically filed the foregoing with the Court using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

               Respectfully,

               ARNOLD & PORTER KAYE SCHOLER LLP

               By:  */s/ Oscar Ramallo*
               Oscar Ramallo
               Oscar.Ramallo@arnoldporter.com