# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

KAJI DOUSA,

                 Plaintiff,

    vs.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, et al.,

                 Defendants.

CASE NO. 19cv1255-LAB (KSC)

**ORDER DENYING PLAINTIFF'S
MOTION FOR A PRELIMINARY
INJUNCTION [Dkt. 25];**

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS [Dkt. 36]**

      Plaintiff Kaji Dousa, a Christian pastor, is compelled by her religious beliefs to minister to asylum seekers and others on the Mexican side of our nation's southern border. As a result of her activities on the border, she alleges the Government has subjected her to surveillance, detention, and harassment, all of which impermissibly burden her right to freely exercise her religion. She now seeks a preliminary injunction requiring the Government to cease its pattern of retaliation. The Government, for its part, argues that Dousa's claims are not cognizable and must be dismissed. For the reasons discussed below, Dousa's Motion for a Preliminary Injunction is **DENIED** and Defendants' Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.

# BACKGROUND

Plaintiff Kaji Dousa is a U.S. citizen who serves as the Senior Pastor at Park Avenue Christian Church in New York City. She also serves as the co-chair of the New Sanctuary Coalition ("New Sanctuary"), a faith-based network of congregations, organizations, and individuals dedicated to immigrant rights. As a member of the United Church of Christ, Dousa follows the teachings of Jesus Christ and is compelled by her religious beliefs to minister to, among others, migrants and refugees.

For several years, Dousa has felt specifically compelled to minister to migrants at the U.S. Southern Border with Mexico. In 2018, for example, she helped organize a "Sanctuary Caravan," which she describes as a mobile clinic of faith leaders, congregants, and humanitarian workers who provided pastoral services, including prayer and church-blessed marriage ceremonies, to migrants seeking asylum in the United States. Her ministry is wide-ranging and includes providing support and religious guidance to individuals who have suffered sexual assault, family violence, and political persecution. As a pastor, she claims a religious and moral obligation to keep all information she receives confidential.

As part of the Sanctuary Caravan, Dousa continued visiting Tijuana, Mexico throughout the winter of 2018 and 2019 to provide pastoral services to migrants and their advocates. On January 1, 2019, while Dousa was in meetings in San Diego, confrontations erupted at the border between United States Customs and Border Patrol ("CBP") agents and a group of migrants. The incident, which involved the use of tear gas, received widespread coverage in the media. Neither Dousa nor any other clergy in the Sanctuary Caravan were directly involved in this confrontation.

On January 2, 2019, Dousa traveled from San Diego to Tijuana to gather information about the previous day's confrontation. When she attempted to reenter the United States that afternoon using her Global Entry card—a method she had previously used to enter the United States without incident—she was sent to a secondary inspection area. At some point during this secondary inspection, Dousa was questioned by a CBP

officer who asked her for standard information, including her name and date of birth, how many times she had crossed the border, and the reasons she was in Tijuana. But the officer also asked more probing questions, including details of her work with the "migrant caravan," whether she had encouraged asylum seekers to lie in their asylum applications, and whether she was involved in illegal activities. Dousa denied involvement with anything illegal or encouraging asylum seekers to lie, and she was eventually released into the United States. The parties disagree on the length of Dousa's detention. Dousa alleges that she was "[confined to] the waiting area for several hours" before being questioned by the CBP officer, while the Government argues that, according to its records, "only about 43 minutes passed between the time [Dousa] was sent to secondary and her release by CBP." Complaint ("Compl."), Dkt. 1, ¶ 49; Opposition ("Opp."), Dkt. 36, at 4.

On March 6, 2019, NBC 7 San Diego published whistleblower documents from the Department of Homeland Security ("DHS") related to a program called "Operation Secure Line." The document relevant here, titled "San Diego Sector Foreign Operations Branch: Migrant Caravan FY-2019, Suspected Organizers Coordinators, Instigators, and Media," is dated January 9, 2019 and contains information about 59 people supposedly associated with the migrant caravan. This document contains a photograph of each individual—usually from a passport, but in some cases from social media—and other personal information, including date of birth, arrest records, and any adverse immigration action taken by the Government, such as having a visa or SENTRI card[1] revoked. In Dousa's case, she observed that her photo had a yellow "X" over it and an accompanying note stating "Disposition: SENTRI Revoked." *See* October 11, 2019 Dousa Declaration,

---

[1] According to the Government, SENTRI (Secure Electronic Network for Travelers Rapid Inspection) and Global Entry are both "Trusted Traveler" programs that allow expedited entry into the United States. Although there are some differences between the programs, the two programs provide the same expedited clearance benefits for someone returning to the United States on foot or in an automobile. *See* Oliveri Decl., Dkt. 59-2, ¶ 3.

Dkt. 55-1, Exs. F, G.  She alleges the Government's decision to place her on this list and revoke her SENTRI membership was a direct result of her activity on the border.

Dousa claims the Government's retaliation following the January 2019 border incident was part of a larger pattern of surveillance of immigration activists dating back at least a year.  On the same day she learned of the NBC 7 report about Operation Secure Line, for example, she read an article by *The Nation* regarding Immigration and Customs Enforcement ("ICE") surveillance of protests in her hometown of New York.  *See* Jimmy Tobias, *Exclusive: ICE Has Kept Tabs on 'Anti-Trump' Protesters in New York City*, THE NATION (Mar. 6, 2019), https://www.thenation.com/article/ice-immigration-protest-spreadsheet-tracking/.  According to that article, one of her organizations, New Sanctuary, was repeatedly referenced in an ICE spreadsheet labeled "Anti-Trump Protests."  The report quoted email exchanges between ICE officers in which the officers discussed events organized by New Sanctuary.  One such event was an immigration-related Ash Wednesday demonstration in New York in February 2018, nearly a year before the border incident.  According to the article, ICE officials attended this event and one official is quoted as saying that monitoring the event "saves us the trip of going over to the church," which Dousa understood to mean that ICE was also surveilling the Judson Memorial Church where she often works with New Sanctuary.  Another event on the spreadsheet was a "Suitcase Rally" Dousa led.  She believes this event was likewise monitored by the Government.  Finally, when Dousa and several others went to meet with ICE's New York Field Office Deputy Director, Scott Mechkowski, in January 2018, the official told Dousa that he "know[s] exactly how to find [her]," that she is "all over the documents that [he] has," and that he "know[s] [her] network just as good as [she] do[es]." July 24, 2019 Dousa Decl., Dkt. 25-1, ¶ 49.

Dousa brought this suit in July 2019 alleging four causes of action: (1) Retaliation in Violation of the First Amendment; (2) Violation of the First Amendment's Free Exercise Clause; (3) Hybrid First Amendment Rights Claim; and (4) Violation of the Religious Freedom Restoration Act ("RFRA").  She now seeks a preliminary injunction (1)

restraining the Government from surveilling, detaining, or otherwise targeting her for her protected activity, and (2) ordering Defendants to restore her SENTRI status. The various defendants—who, except where relevant, are referred to collectively as "Defendants" or "the Government"—move to dismiss Dousa's complaint, arguing that she does not have standing to bring this suit and, in any event, has not stated a plausible cause of action.

## ANALYSIS

### 1.     Standing

The Court begins, as it must, with deciding whether Dousa has standing to pursue her claims. It concludes that she does.

The judicial power of federal courts is limited to "cases and controversies." *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting U.S. Const. art. III, § 2). The shorthand for determining whether a live case or controversy exists is whether a given plaintiff has "standing" to pursue the claims at issue. *Id.* To satisfy Article III's standing requirement, a plaintiff must show (1) she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

A plaintiff seeking injunctive relief, as Dousa does here, must meet several other requirements to have standing. As the Ninth Circuit explained in *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985-86 (9th Cir. 2007):

> The standing formulation for a plaintiff seeking prospective injunctive relief is simply one implementation of *Lujan*'s requirements. The plaintiff must demonstrate that he has suffered or is threatened with a "concrete and particularized" legal harm, *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130, coupled with "a sufficient likelihood that he will again be wronged in a similar way." *City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). As to the second inquiry, he must establish a "real and immediate threat of repeated injury." *O'Shea v. Littleton,* 414 U.S. 488, 496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). "[P]ast wrongs do not in

themselves amount to [a] real and immediate threat of injury necessary to make out a case or controversy." *Lyons,* 461 U.S. at 103, 103 S.Ct. 1660. However, "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea,* 414 U.S. at 496, 94 S.Ct. 669. In addition, the claimed threat of injury must be likely to be redressed by the prospective injunctive relief. *Graham v. Fed. Emergency Mgmt. Agency,* 149 F.3d 997, 1003 (9th Cir.1998) (recognizing that "[p]laintiffs need not demonstrate that there is a 'guarantee' that their injuries will be redressed by a favorable decision" but "only that a favorable decision is *likely* to redress" their injuries) (quotation marks and citation omitted).

The parties' dispute here focuses largely on the first prong of the standing analysis: whether Dousa has suffered a concrete, particular harm that is likely to repeat without court intervention. In Dousa's view, she has suffered at least three separate harms, which the Court addresses in turn. First, she alleges the Government has revoked, or at least attempted to revoke, her SENTRI card, thereby hindering her ability to enter the United States. Second, the Government detained and interrogated her on January 2, 2019 as a direct result of her engaging in protected activity on the Southern Border. Third, the Government has "extensively monitored" her domestic activities even prior to the January 2019 border incident. The cumulative effect of these harms, Dousa argues, is that she is dissuaded from traveling to Mexico and ministering to refugees, something her religious beliefs compel her to do. More saliently, she "feels compelled to warn penitents about the possibility of government surveillance, chilling her ability to provide pastoral counseling and absolution." Reply, Dkt. 55, at 5; July 24, 2019 Dousa Decl. ¶¶ 40, 41.

The Court concludes that the first two alleged harms are not of the type that would provide Dousa standing to sue. As to the supposed revocation of Dousa's SENTRI card, the Government has submitted competent evidence[2] that Dousa *never* possessed a

---

[2] The Government makes both factual and facial challenges to Dousa's standing. In resolving a factual attack, such as this argument regarding the revocation of Dousa's SENTRI card, the court may "review evidence beyond the complaint without converting the motion into a motion for summary judgment. The court need not presume the

SENTRI card.  *See* Oliveri Decl. ¶ 4.  Instead, in 2016, Dousa applied for and received Global Entry, a similar but distinct program that allows expedited entry into the United States.  *Id.*  Dousa's Global Entry privileges have never been revoked or suspended, and her Global Entry status remains valid until it expires on August 22, 2022.  *Id.*  Why Dousa's photo appeared on the NBC 7 whistleblower documents with the comment "SENTRI revoked" remains a mystery, (*see* October 11, 2019 Dousa Declaration, Dkt. 55-1, Exs. F, G), but the evidence shows that the Government did not in fact revoke Dousa's expedited entry privileges, so this is not the type of concrete harm that provides standing to sue.

So too with her detention and interrogation at the border in January 2019.  As discussed above, Dousa alleges that when she attempted to return to the United States from the Sanctuary Caravan meeting in Tijuana, CBP officials held her for "several hours" before questioning and ultimately releasing her into the United States.  *See* July 24, 2019 Dousa Decl. ¶ 21.  The official first asked personal questions, including her address, date of birth, and how many times she had crossed the border.  *Id.* ¶ 22.  He also inquired into her activities in Tijuana, her ministry to migrants, and her involvement with the Sanctuary Caravan.  Id. ¶ 23.  Finally, he asked more probing questions about whether she had engaged in any illegal activities in Tijuana and whether she had ever encouraged migrants to lie on their asylum applications.  Id. ¶ 24.  Dousa provided truthful answers to these questions and was eventually released.  Although Dousa alleges that this encounter lasted "several hours," government evidence now shows that just 43 minutes elapsed between the time she was referred to secondary inspection and the time she was released into the United States.  *See* Oliveri Decl. ¶ 6 ("[T]he time between [Dousa's] referral to the secondary inspection area at the SYPOE[ ] and her release by officers questioning her in secondary[ ] was 43 minutes."); Oliveri Decl. Ex. B ("At approximately 1847 hours,

---

truthfulness of the plaintiff's allegations."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (internal citations omitted).

Kaji Dousa applied for entry into the [United States]. . . . Dousa was released at approximately 1930 hours."). More importantly, though, the detention appears to have been an isolated incident. Since the January 2, 2019 questioning, Dousa has left and reentered the United States three times. *Id.* ¶¶ 5-7. Two of these trips—one in April 2019 and another in November 2019—involved the same San Ysidro port of entry where she was detained in January. *Id.* The other trip, in August 2019, was to the Bahamas. *Id.* On two of these trips, she used her Global Entry card for reentry, and on all three of the trips she was allowed to reenter the United States without detention or questioning. As such, even assuming for the sake of argument that Dousa's January 2, 2019 detention was a direct result of her engaging in protected activity, she has not shown that she faces "a real and immediate threat of repeated injury" absent an injunction. *Updike v. Multnomah Cty.*, 870 F.3d 939, 948 (9th Cir. 2017) ("Although past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury, past wrongs do not in themselves amount to a real and immediate threat of injury necessary to make out a case or controversy.") (citations, quotation marks, and alterations omitted). She therefore lacks standing to seek injunctive relief based on this harm.[3]

Dousa's final alleged harm—the Government's pattern of domestic surveillance and the chilling effect it has on Dousa's ministry—is a closer call. Dousa points to at least four separate incidents dating back to early 2018 as support for her argument that the Government regularly surveils her religious and political activities. First, according to leaked government spreadsheet she found online, ICE officials attended two separate immigration-related demonstrations she held in early 2018: an Ash Wednesday demonstration she organized in New York in February 2018 and a "Suitcase Rally" she organized sometime later. Notably, ICE officials were quoted as saying that attending the Ash Wednesday "saves us the trip of going over to the church," which Dousa understood

---

[3] The Court acknowledges that this incident may still be relevant to the extent it is part of a larger pattern of surveillance. By itself, though, it is not enough to provide Dousa with standing to seek prospective injunctive relief.

to mean that ICE was also surveilling the Judson Memorial Church where she often works with New Sanctuary.  July 24, 2019 Dousa Decl., ¶ 34.  Second, in January 2018, Dousa and several others met with ICE's New York Field Office Deputy Director, Scott Mechkowski.  During that meeting, Mechowski told Dousa that he "know[s] exactly how to find [her]," that she is "all over the documents that [he] has," and that he "know[s] [her] network just as good as [she] do[es]."  *Id.* ¶ 49. Finally, and perhaps most relevant to this case, Dousa has uncovered a document entitled "Migrant Caravan FY-2019 Suspected Organizers, Coordinators, Instigators, and Media," in which the Government lists Dousa and 58 others as possible targets for investigation.  *See* Perdue Decl., Dkt. 55-12, at CBP 00035-44.  This list was compiled roughly one week after Dousa was detained and questioned at the border, even though the Government acknowledges that the questioning resulted in no "derogatory information" about Dousa.  *Id.* at CBP 00030.

Dousa alleges that this surveillance has "upended" her ministry.  *See* Reply at 5. Among other things, she has canceled a planned trip to Mexico and has refrained from blessing marriages of migrants, fearing that her involvement might subject the participants to government monitoring.  *See* July 24, 2019 Dousa Decl. ¶ 42, 45.  She also feels compelled to warn penitents about the possibility of government surveillance, chilling her ability to provide pastoral counseling and absolution.  *Id.* ¶¶ 40-41, 44.  Finally, her church has declined to host a *pro se* asylum clinic and has seen migrants and refugees deterred from participating in church activities.  *Id.* ¶¶ 37-38.

The Court concludes that this surveillance is a concrete harm that gives rise to standing.  The Ninth Circuit has long recognized that where a party is "chilled from participating in worship activities . . . because they fear the Government is spying on them," that party, under certain circumstances, has standing to sue.  *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 522 (9th Cir. 1989).  Dousa has plausibly shown that the Government surveilled her religious and political activities for the better part of two years and that she has withdrawn from many of her normal religious activities as a result of that surveillance.

Further, unlike the January 2019 border stop, there is no indication that the surveillance will stop without court intervention. The surveillance began in early 2018 and continued at least through January 2019, several months before Dousa brought this suit. Government records from August 8, 2019 continue to describe Dousa as a "Suspect," although they do not describe what makes her a suspect. *See* Perdue Decl. at CBP 00050. All told, the duration and extent of past surveillance means that it's not a stretch to think the surveillance continues today. Dousa therefore faces "a real and immediate threat of repeated injury." *Updike*, 870 F.3d at 947. As discussed in more detail below, these allegations may be insufficient to support the entry of a preliminary injunction, but Dousa has shown that she has suffered a concrete (if subjective) harm as a result of the Government's actions, which is sufficient to find standing here.

The Government's final argument on standing is that the conduct alleged in Dousa's complaint is not fairly traceable to each of the named defendants. Dousa seeks relief against CBP, ICE, DHS, the individual heads of each of those agencies agency in their official capacities, and CBP's Director of Field Operations in San Diego. Each of these agencies and officers was at least arguably involved in the pattern of surveillance Dousa alleges. CBP's San Diego field office oversees the San Ysidro Port of Entry, and CBP is itself a division of DHS. Because the January 2019 incident at San Ysidro is a significant part of Dousa's allegation of government surveillance, each of those defendants is properly named. ICE, which is also a division of DHS, is alleged to have participated in the surveillance through, among other things, its monitoring of Dousa's political activity in New York. The Court finds that Dousa has adequately demonstrated her standing to seek injunctive relief against each of the defendants.

In short, Dousa has demonstrated that she has standing to pursue her claims against the Government based on its pattern of surveillance and the chilling effect this surveillance has had on her exercise of protected activity. Defendants' motion to dismiss for lack of jurisdiction under Rule 12(b)(1) is **DENIED**.

/ / /

**2.      Dousa's Motion for Preliminary Injunction**

Dousa seeks a preliminary injunction restraining the Government from surveilling, detaining, or otherwise targeting her for engaging in protected activity. As discussed previously, Dousa brings four separate causes of action: (1) Retaliation in Violation of the First Amendment; (2) Violation of the First Amendment's Free Exercise Clause; (3) Hybrid First Amendment Rights Claim; and (4) Violation of RFRA. The Government argues that she is unlikely succeed on the merits of any of these claims and that her request for a preliminary injunction must therefore be denied.

A plaintiff seeking a preliminary injunction must establish that she is "likely to succeed on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in h[er] favor, and that an injunction is in the public interest." *W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012) (quoting *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)). These are commonly referred to as the "*Winter* factors."

**a.      Likelihood of Success on the Merits**

The first prong of the injunction inquiry is whether the plaintiff is likely to succeed on the merits of her claims. "Likelihood of success on the merits 'is the most important' *Winter* factor," and the Court need not consider the remaining factors if this threshold element is not satisfied. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citations omitted). Taking each of Dousa's substantive claims in turn, the Court concludes that she cannot, at this stage, show a likelihood of success on the merits.

**i.      Free Exercise**

Dousa first alleges that the Government's pattern of surveillance impermissibly burdens her First Amendment right to freely exercise her religious beliefs.

The Free Exercise Clause guards an individual's practice of her own religion against restraint or invasion by the Government. *See Sch. Dist. Of Abington Twp., Pa. v. Schempp,* 374 U.S. 203, 222–23 (1963). In order to establish a violation of the Free

Exercise Clause, a plaintiff must establish that the challenged conduct resulted in an impairment of the plaintiff's free exercise of genuinely held beliefs. *See United States v. Lee,* 455 U.S. 252, 256–57 (1982). In evaluating these claims, the Court must be mindful that "every person cannot be shielded from all burdens incident to exercising every aspect of the right to practice religious beliefs." *Id.* at 261. Indeed, "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Emp't Div. v. Smith,* 494 U.S. 872, 879 (1990); *see also Christian Legal Soc. Chapter of the Univ. of Cal. Hastings Coll. Of Law v. Martinez,* 561 U.S. 661, 697 n. 27 (2010) ("[T]he Free Exercise Clause does not inhibit enforcement of otherwise valid regulations of general application that incidentally burden religious conduct.").

Ordinarily, the framework for analyzing a Free Exercise claim is straightforward. The court first determines whether the Governmental action being challenged is "neutral and of general applicability," meaning that the object of the Government action is not "to infringe upon or restrict practices *because of* their religious motivation." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 533 (1993) (emphasis added). The court then applies the appropriate judicial review test. If the Government action is neutral and generally applicable, rational basis review applies, "even if the law has the incidental effect of burdening a particular religious practice." *Id.* at 531. If the action infringes upon religious practices *because of* their religious motivation, it is subject to strict scrutiny. *Id.*

The application of that framework to this case is not so straightforward. The primary wrinkle here is that, unlike most Free Exercise claims, Dousa does not challenge a specific government law or regulation. She instead challenges the Government's pattern of surveilling her activities, which she claims was a direct result of her engaging in protected religious activities. In such situations, "when the challenged government action is neither regulatory, proscriptive or compulsory," the question is not necessarily

whether the Government action is neutral and generally applicable, but rather "whether it substantially burdens a religious practice and either is not justified by a substantial state interest or is not narrowly tailored to achieve that interest." *Am. Family Ass'n, Inc. v. City & Cty. Of San Francisco*, 277 F.3d 1114, 1123-24 (9th Cir. 2002).

Dousa has not shown at this stage that the Government has substantially burdened her Free Exercise rights. The harms she alleges—a "canceled trip to Mexico, refrain[ing] from blessing migrant marriages, hav[ing] her pastoral counseling chilled," *see* Reply at 19—are subjective, and the Ninth Circuit is clear that "a subjective chilling effect on free exercise rights is not sufficient to constitute a substantial burden." *Id.* at 1124; *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1394 (9th Cir. 1994) (same). Two cases are instructive.

First, in *Vernon v. City of Los Angeles*, the Ninth Circuit found that a plaintiff had not demonstrated a substantial burden where he alleged that a government investigation had "chilled [him] in the exercise of his religious beliefs, fearing that he can no longer worship as he chooses, consult with his ministers and the elders of his church, participate in Christian fellowship and give public testimony to his faith without severe consequence." *Vernon*, 27 F.3d at 1394. While the investigation did not interfere with his ability to communicate with God, it "interfered with his freedom to worship in the way he wants without repercussions." *Id.* (alterations omitted). The court found that this amounted only to a "subjective chilling effect[ ] with neither 'a claim of specific present objective harm [n]or a threat of specific future harm.'" *Id.* at 1395 (quoting *Laird v. Tatum*, 408 U.S. 1, 14 (1972)). "Such chilling effects are simply not objectively discernable and are therefore not constitutionally cognizable." *Id.*

A more recent case, *Fazaga v. Fed. Bureau of Investigation*, 916 F.3d 1202 (9th Cir. 2019), reached the same result. The plaintiffs there—both Muslims who provided counseling at a local mosque—brought suit against the FBI for surveillance of their mosque. Like Dousa, the Plaintiffs there alleged that they retreated from their normal religious practices as a result of this surveillance:

> Plaintiffs . . . allege that they altered their religious practices as a result of the FBI's surveillance: Malik trimmed his beard, stopped regularly wearing a skull cap, decreased his attendance at the mosque, and became less welcoming to newcomers than he believes his religion requires. AbdelRahim 'significantly decreased his attendance to mosque,' limited his donations to mosque institutions, and became less welcoming to newcomers than he believes his religion requires. Fazaga, who provided counseling at the mosque as an imam and an intern therapist, stopped counseling congregants at the mosque because he feared the conversations would be monitored and thus not confidential.

*Fazaga*, 916 F.3d at 1247. The Ninth Circuit held that even though the plaintiffs had, by all accounts, fundamentally changed the way they practiced their religion in response to the Government surveillance, the Government defendants were entitled to qualified immunity because it was not clearly established that surveillance like this constituted a "substantial burden." *Id.* at 1248.

Dousa's alleged harms are remarkably similar to those alleged in *Fazaga* and *Vernon*. Like the plaintiffs in those cases, Dousa alleges that she has refrained from providing religious counseling and from blessing marriages, fearing that those services might be monitored. The Ninth Circuit is clear, though, that these are "subjective chills" that do not rise to the level of a substantial burden.[4] Importantly, she does not face a "present objective harm [n]or a threat of specific future harm." *Vernon*, 27 F.3d at 1395. She remains free to travel to Mexico, to minister there, and to return to the United States with ease. Indeed, she has used her Global Entry privileges to travel abroad multiple times in the last year. The evidence at this stage suggests that any harms felt are not the

---

[4] There is a certain tension in the Ninth Circuit's precedent on this point. A church or a pastor that alleges a reduction in membership may have suffered a substantial burden, *see, e.g., Presbyterian Church*, 870 F.2d at 521–22, while the individual who was deterred from attending that same church may *not* have suffered a substantial burden because they were "subjectively chilled." *See, e.g., Vernon*, 27 F.3d at 1395. Adding further layers of complexity, the Ninth Circuit recognizes that the same injury that establishes standing in this context may be insufficient to constitute a "substantial burden." *See id.* at 1394.

direct result of government action, but rather a result of her decision to limit her religious practices for her own subjective reasons.

To be clear, if the Government had revoked Dousa's SENTRI card (and Dousa could show that the revocation was the result of her engaging in protected activity), the Court would have no problem finding a substantial burden. That action would effectively amount to a government sanction, and it would undoubtedly make it more difficult for her to travel and to practice her sincerely held beliefs. The problem on this front is that the Government has submitted evidence that it has *not* rescinded her SENTRI card, so she cannot rely on this to demonstrate a likelihood of success on her Free Exercise claim.

In sum, Dousa's alleged Free Exercise harms do not rise above a "subjective chill." The Court is therefore unable to conclude that she is likely to succeed on the merits of this claim.

### ii.     Violation of RFRA

Dousa's next claim is that the Government's actions in this case violate RFRA. For the same reasons she has failed to show a likelihood of success on the merits on her Free Exercise claim, the Court concludes that she has also failed to show a likelihood of success on her RFRA claim.

Congress enacted RFRA in 1993 in response to the Supreme Court's decision in *Smith*, 494 U.S. 872. Prior to *Smith*, courts analyzed Free Exercise claims under a balancing test—similar to the one applied above—that looked to whether the challenged government action imposed a substantial burden on the practice of religion and then applied the appropriate level of scrutiny. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694 (2014) (discussing the development of RFRA). *Smith* changed that landscape, holding that, under the Free Exercise clause, a "neutral, generally applicable law" may substantially burden a religious practice even when it is not supported by a compelling governmental interest. *Id.* Congress, seeking to bring back the traditional "substantially burdens" test, then passed RFRA, which provides that a "rule of general applicability" that "substantially burden[s] a person's exercise of religion" may be upheld

only if it is the least restrictive means of advancing a compelling government interest. *See* 42 U.S.C. §§ 2000bb-1. In other words, any substantial burden is subject to strict scrutiny.

The analysis for Free Exercise claims and RFRA claims is similar, especially where, as here, the government conduct challenged is "neither regulatory, proscriptive or compulsory"—that is, where the government action is something other than a law or regulation. *Am. Family Ass'n*, 277 F.3d at 1123-24. This is because the Ninth Circuit has held that the Supreme Court's decision in *Smith* had no effect on Free Exercise claims premised on government actions other than laws or regulations, leaving in place (for that narrow slice of Free Exercise claims) the same pre-*Smith* framework Congress sought to bring back with RFRA. *See id.* A plaintiff must show two elements to establish a prima facie case under RFRA: "First, the activities the plaintiff claims are burdened by the Government action must be an 'exercise of religion.' Second, the Government action must 'substantially burden' the plaintiff's exercise of religion." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008) (citations omitted). If the plaintiff establishes a prima facie case, the burden shifts to the Government to show a compelling interest that is implemented by the least restrictive means. *Burwell*, 573 U.S. at 705.

The Government concedes that Dousa's activities are an "exercise of religion," satisfying the first prong of the *prima facie* RFRA analysis. The problem here for Dousa is that she is still must show that the Government has "substantially burdened" those activities. See *Navajo Nation*, 535 F.3d at 1076 (9th Cir. 2008) ("Absent a substantial burden, the Government need not establish a compelling interest, much less prove it has adopted the least restrictive means."). The analysis applied to determine a substantial burden under RFRA is identical to the standard applied under the Free Exercise clause. *See id.* Because the Court has already concluded that Dousa is unlikely to show a substantial burden in the Free Exercise context, it likewise concludes that she is unlikely to show a substantial burden in the RFRA context.

/ / /

/ / /

### iii.     First Amendment Retaliation

Dousa next argues that the Government's actions in this case constitute retaliation for her exercise of First Amendment rights.

To succeed on a First Amendment retaliation claim, a plaintiff must show that (1) she engaged in constitutionally protected activity; (2) as a result, she was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action.  *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010).  The Government does not dispute that Dousa's ministry work on the border and her vocal opposition to the Government's immigration policies constitute "constitutionally protected activity," so the Court will focus on the latter two elements.

For at least some of the Government's conduct, Dousa has not shown that there was a "substantial causal relationship" between her protected activity and Government's adverse action.  This causation element is generally "understood to be but-for causation." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 917 (9th Cir. 2012) (citing *Hartman v. Moore*, 547 U.S. 250, 260 (2006)).  She alleges, for example, that the Government surveilled two of her immigration-related rallies in New York.  *See* Compl. at ¶¶ 69-70.  Although Dousa has provided the Court with little evidence regarding this specific aspect of the surveillance, the limited information she has provided suggests the Government monitored the events not *because of* Dousa's protected activities, but because of ICE's statutory mandate to enforce the nation's immigration laws and the fact that Dousa's events were attended by undocumented aliens.  In other words, Dousa has not shown— at least not with the level of particularity needed to secure injunctive relief—that the Government's surveillance was a result of her protected activity rather than a byproduct of the fact that her work (religious or not) intersects with two areas of interest to the Government: the border and undocumented aliens.

Other aspects of the Government's surveillance seem more directly related to Dousa's First Amendment activities. The Government's decision to place her on a list of "Suspected Organizers, Coordinators, Instigators, and Media," for example, seems to be quite clearly linked to her work on the border. *See* Perdue Decl. at CBP-00035. The name of the document alone conveys a message that the Government understood her to be an "organizer, coordinator, or instigator," all descriptors that carry speech-related implications. Another field report describes the "Migrant Caravan" as "a common cause for numerous open border, humanitarian, and other groups with the goal to challenge. U.S. immigration laws." *Id.* at CBP-00022. That report identifies Pastor Dousa, among others, as having traveled to the Southern Border as part of that project. Again, the fact that Dousa is listed on a document of individuals whose goal is to "challenge U.S. immigration laws" strongly suggests the Government's decision to monitor her activities was motivated at least in part by Dousa's protected speech.

But it's not enough to show that the retaliation was a direct result of her protected activity. She must also show that the retaliation was an adverse action that "would chill a person of ordinary firmness from continuing to engage in the protected activity." *Blair*, 608 F.3d at 543. Dousa has not made that showing here. "The most familiar adverse actions are 'exercise[s] of governmental power' that are 'regulatory, proscriptive, or compulsory in nature.'" *Blair*, 608 F.3d at 544 (9th Cir. 2010) (quoting *Laird,* 408 U.S. at 11). As the Ninth Circuit explained in *Blair*:

> The prototypical plaintiff in these cases is a government worker who loses his job as a result of some public communication critical of the Government entity for whom he works, *e.g., Pickering v. Bd. Of Educ. Of Township High Sch. Dist.,* 391 U.S. 563, 564 (1968) (teacher dismissed by the Board of Education after sending a letter critical of the Board to a local newspaper), or a regulated entity that is stripped of its business license after engaging in speech that displeases the regulator, *e.g., CarePartners, LLC v. Lashway,* 545 F.3d 867, 871 (9th Cir. 2008) (boarding home operators engaged in lobbying and other speech and petition activities which they alleged led to retaliation by the regulators), or a prisoner who

is retaliated against by prison officials for filing grievances or initiating actions in court, *e.g., Bruce v. Ylst,* 351 F.3d 1283, 1286 (9th Cir. 2003) (prison officials allegedly retaliated against prisoner on the basis of his jailhouse lawyering activities), or citizens who are allegedly targeted by law enforcement because of their political speech activities, *e.g., Mendocino Envtl. Ctr. [v. Mendocino Cty.],* 192 F.3d [1283,] 1288–89 (9th Cir. 1999) (police officers sued for engaging in conspiracy to falsely accuse political activists of a crime in an effort to inhibit their political activities).

*Blair*, 608 F.3d at 544.

Dousa bears little similarity to these "prototypical" retaliation plaintiffs. The Government has not taken "regulatory, proscriptive, or compulsory" steps to restrict her First Amendment activities, as would be the case if it had revoked her SENTRI card and made it objectively more difficult for her to travel abroad. Nor has she shown a pattern of government detention at the border[5] or any other affirmative government action that would limit her exercise of constitutionally protected activities. At this stage, Dousa's alleged harm amounts to a single, isolated incident of questioning at the border and a generalized practice of monitoring her border-related activities. The Court acknowledges that this pattern of surveillance may have caused Dousa subjective harm; she feels as though she is being watched and feels compelled to warn potential penitents that they might be watched too. The Court also acknowledges that, in some circumstances, surveillance might become so pervasive that it becomes tantamount to "regulatory, proscriptive, or compulsory" government action. But at this stage, the Court cannot find that Dousa is likely to show that she suffered adverse government action that would chill a person of ordinary firmness from engaging in protected activity. It therefore cannot find that she is likely to succeed on her First Amendment retaliation claim.

---

[5] Especially if viewed in the light most favorable to Dousa, a pattern of detention could be seen as analogous to false arrest that might give rise to a cognizable retaliation claim. *Cf. Mendocino Envtl. Ctr.*, 192 F.3d at 1288 (finding a triable retaliation claim where the defendants obtained a search warrant based on false information and then arrested the plaintiffs in retaliation for their political speech).

### iv. Hybrid First Amendment Rights

Dousa's final substantive claim is a "hybrid" First Amendment rights claim.  She argues that where a "Free Exercise claim is brought in conjunction with a claim alleging a separate constitutional violation for the same communicative activity, strict scrutiny is triggered and the Government policy, custom or practice in question must be justified by a compelling governmental interest and narrowly tailored to advance that interest."  Mot. at 19 (citing *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir. 2004)).  The "hybrid rights" doctrine, however, has been effectively repudiated, at least in the Ninth Circuit.  *See Jacobs v. Clark Cty. Sch. Dist.*, 526 F.3d 419, 440 n.45 (9th Cir. 2008) (noting that the hybrid rights doctrine has been "widely criticized" and declining to "be the first court . . . [to] allow[ ] a plaintiff to bootstrap a free exercise clause in this manner"); *Ass'n of Christian Sch. Int'l v. Stearns*, 362 F. App'x 640, 646 (9th Cir. 2010) (re-affirming the decision in *Jacobs*); *Church of the Lukumi*, 508 U.S. at 566–67 (Souter, J., dissenting) (explaining why the hybrid rights doctrine is "ultimately untenable").  As such, the Court cannot conclude that Dousa is likely to succeed on the merits of this claim.

### b. Remaining Injunction Factors and Conclusion

**"**Likelihood of success on the merits 'is the most important' *Winter* factor; if a movant fails to meet this 'threshold inquiry,' the court need not consider the other [three] factors in the absence of 'serious questions going to the merits.'"  *Disney Enters., Inc.*, 869 F.3d at 856 (quoting *Garcia*, 786 F.3d at 740 (citations omitted)).  Because Dousa has failed to make the threshold showing that she is likely to succeed on the merits of her claims, the Court does not address the remaining three injunction factors: irreparable harm, balance of equities, and public interest.

It bears repeating that a preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to relief."  *Winter*, 555 U.S. at 22.  The conclusion here that Dousa is not entitled to an injunction is simply a finding that she has not made that "clear showing" at this stage; it is not a finding that she *cannot* make that showing down the line, perhaps with the advantage of additional

discovery. For now, though, Dousa's Motion for a Preliminary Injunction is **DENIED**. Dkt. 25.

### 3. Government's Motion to Dismiss

The final motion before the Court is the Government's motion to dismiss Dousa's complaint under Rule 12(b)(6). In its view, none of Dousa's four causes of action state a plausible claim for relief. The Court (mostly) disagrees. Although she has not made a "clear showing" that she is entitled to an injunction, each of Dousa's three substantive claims are plausible. With additional evidence, for example, it is plausible that the Government's pattern of continued surveillance might rise to the level of a "substantial burden" that would support a Free Exercise or RFRA claim. It is likewise possible that she might uncover additional evidence showing that the surveillance was so pervasive that it is actionable as a First Amendment retaliation claim.

The Court agrees with the Government on one point. For reasons already discussed, the Court finds that Dousa cannot state a Hybrid First Amendment Rights claim as a matter of law. Accordingly, the Defendants' Motion to Dismiss under Rule 12(b)(6) is **GRANTED** as to Dousa's Hybrid First Amendment Rights claim, and that claim is **DISMISSED WITH PREJUDICE**. The remainder of the Defendants' Motion to Dismiss is **DENIED**. Dkt. 36.

### CONCLUSION

For the reasons above:

1. Dousa's Motion for Preliminary Injunction is **DENIED** [Dkt. 25];

2. Defendants' Motion to Dismiss under Rule 12(b)(1) is **DENIED** [Dkt. 36];

3. Defendants' Motion to Dismiss under Rule 12(b)(6) is **GRANTED** as to Dousa's Third Cause of Action (Hybrid First Amendment Rights Claim), and that Claim is **DISMISSED WITH PREJUDICE** [Dkt. 36];

4. Defendants' Motion to Dismiss under Rule 12(b)(6) is otherwise **DENIED**; and

5. The Motions by Interested Parties Mijente, The General Synod of the United Church of Christ, and the National Council of Churches for Leave to File Amicus

Briefs are **GRANTED** [Dkt. 52, 56].  The Court thanks these and other amici for the time they have spent on this matter.

**IT IS SO ORDERED.**

Dated: January 27, 2020

_Larry A. Burns_
**HONORABLE LARRY ALAN BURNS**
Chief United States District Judge