UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAJI DOUSA, | Case No.:  19-CV-1255 TWR (KSC)) |
| Plaintiff, | |
| v. | **STATEMENT OF FINDINGS OF FACTS AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL** |
| U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS");<br>U.S. IMMIGRATION AND ENFORCEMENT ("ICE");<br>U.S. CUSTOMS AND BORDER PROTECTION ("CBP"); ALEJANDRO MAYORKAS, Secretary of DHS; TAE D. JOHNSON, Acting Director of ICE; CHRIS MAGNUS, Commissioner of CBP; and SIDNEY AKI, Director of Field Operations for CBP, San Diego,[1] | (ECF Nos. 137–39) |
| Defendants. | |

Plaintiff Pastor Kaji Dousa initiated this action by filing her operative Complaint for Declaratory and Injunctive Relief on July 8, 2019, alleging four causes of action for

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary of DHS Alejandro Mayorkas is automatically substituted for Kevin K. McAleenan, Acting Director of ICE Tae D. Johnson for Matthew T. Albence, Acting Commissioner of CBP Troy A. Miller for Mark A. Morgan, and Director of Field Operations for CBP, San Diego ("DFO") Sidney Aki for Peter Flores.

(1) retaliation in violation of the First Amendment; (2) violation of the First Amendment's Free Exercise Clause; (3) hybrid First Amendment rights claim; and (4) violation of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.*, against Defendants U.S. Department of Homeland Security ("DHS"); U.S. Immigration and Enforcement ("ICE"); U.S. Customs and Border Protection ("CBP"); Alejandro Mayorkas, Secretary of DHS; Tae D. Johnson, Acting Director of ICE; Troy A. Miller, Acting Commissioner of CBP; and Sidney Aki, Director of Field Operations for CBP, San Diego ("DFO").  (*See generally* ECF No. 1 ("Compl.").)  After then-Chief Judge Larry Alan Burns dismissed with prejudice Plaintiff's third cause of action, (*see* ECF No. 61), the undersigned presided over a three-day bench trial beginning August 29, 2022, (*see* ECF Nos. 137–39), during which the Court heard testimony from Plaintiff, CBP Branch Chief Saro Oliveri, CBP Intelligence Agent Nathaniel Trueblood, then-Assistant Chief Patrol Agent Roberto Del Villar, then-CBP Acting Special Operations Supervisor Juan Rodriguez, and Supervisory CBP Officer Miguel Haro.  (*See* ECF No. 140.)  The Parties subsequently filed their closing briefs, (*see* ECF Nos. 145 ("Pl.'s Br."), 147 ("Defs.' Br.")); deposition designations for "CBP Agent 1," then-CBP Agent Jeremy Burnett, then-ICE Chief Intelligence Officer Lea DiSenso, and then-ICE Deputy Field Office Director Scott Mechkowski, (*see* ECF No. 146), and then-CBP Intelligence Operations Supervisor Haldo Dominguez, (*see* ECF No. 148); and redacted trial exhibits.  (*See* ECF Nos. 149–54.) Having carefully considered the record, the Parties' arguments, and the relevant law, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1).  *See* Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.").

/ / /

/ / /

/ / /

/ / /

**FINDINGS OF FACT**

**I.    Trusted Traveler Programs**

     ***A.    Overview of Trusted Traveler Programs***

1.    "CBP Trusted Traveler programs ("TTPs") allow travelers [to] cross U.S. international borders in an expedited fashion." (ECF No. 135 ("Stip. Facts") at 23 ¶ 1; *see also* ECF No. 143 ("Day 2 Tr.") at 243:5–8, 249:11–15.) "TTPs are 'risk-based programs to facilitate the entry of pre-approved travelers.  All applicants are vetted to ensure that they meet the qualifications for the program to which they are applying.'" (Stip. Facts at 23 ¶ 2 (quoting https://ttp.dhs.gov/); *see also* Day 2 Tr. at 245:12–25, 337:19–25.)  A TTP participant must remain low risk to continue to be a member of the program.  (*See* Day 2 Tr. at 338:10–12.)

2.    "One TTP is Secure Electronic Network for Travelers Rapid Inspection, or "SENTRI," which provides expedited entry into the United States from Canada and Mexico by land." (Stip. Facts at 23 ¶ 3; *see also* Day 2 Tr. at 249:19–21.) "Another TTP is Global Entry, which provides expedited entry into the United States from other countries by land or by air." (Stip. Facts at 23 ¶ 4; *see also* Day 2 Tr. at 249:16–18.) "Membership in Global Entry includes all of the same expedited border-crossing privileges that come with membership in SENTRI, plus additional privileges as well." (Stip. Facts at 23 ¶ 5; *see also* Day 2 Tr. at 249:22–250:2, 250:18–24.)   Specifically, both programs allow "[e]xpedited travel through a dedicated commuter lane and travel through a special kiosk at . . . airports," (*see* Day 2 Tr. at 336:6–10), although members of TTPs may still be sent to secondary screening while crossing the border.  (*See id.* at 336:1–20.)

3.    "For purposes of crossing the U.S./Mexico border on land, Global Entry and SENTRI are the same." (*See id.* at 250:22–24.)  Indeed, "[t]he CBP officials deposed in this case often use the terms 'SENTRI' and 'Global Entry' interchangeably." (Stip. Facts at 23 ¶ 6; *see also* Day 2 Tr. at 250:25–251:22.)

/ / /

/ / /

### B.    Administration of the Trusted Traveler Programs

4.    The Global Enrollment System ("GES") is the official record for all TTPs. (*See* Day 2 Tr. at 330:2–5.)  An entry in GES cannot subsequently be changed. (*See id.* at 330:6–8.)  A revocation of TTP status in GES must be made manually by a supervisor with annotations as to why he has taken that action. (*See id.* at 330:14–17.)

5.    There are written guidelines (the "Trusted Traveler handbook") that "set[] forth the rules, policies, [and] procedures for applying, determining eligibility, revocation, and the like." (*See id.* at 246:4–11.)  Although officers can recommend revocation of TTP status, a supervisor's concurrence is required. (*See id.* at 246:23–247:8.)  "[R]evocation decisions must be finalized in two days," (*see id.* at 331:14–19), and a revoked member's TTP card must be shredded and GES must be updated to reflect the revocation and destruction of the card. (*See id.* at 334:8–335:2.)

6.    The enrollment center also must enter reasons for the revocation into GES "so that a letter or notification can be generated by the system and sent to the member or posted to his or her GOES account." (*See id.* at 331:20–332:15; *see also id.* at 333:9–20.)  If the revocation is based on a decision that the person is no longer a low risk, the officer should provide information as to why that conclusion was reached. (*See id.* at 335:20–25.)

7.    Since December 2014, Saro Oliveri has been the Branch Chief for CBP responsible for TTPs in San Diego. (*See id.* at 241:24–242:16, 242:24–243:4, 243:9–12.)  "[I]t is very rare that [he] get[s] personally involved in decision making about whether to revoke a person's Trusted Traveler status," (*see id.* at 247:18–25), happening approximately once per year.  (*See id.* at 248:1–249:7.)  Oliveri did, however, have "personal involvement" in Dousa's TTP status.  (*See id* at 257:17–258:4.)

8.    "In [his] job overseeing the[ TTPs], [Olivieri] do[es] not draw a distinction between people having Global Entry or SENTRI." (*See id.* at 251:4–7.)  Although TTP status can only be revoked, (*see id.* at 255:1–4), Oliveri also uses the terms "revocation" and "suspension" interchangeably. (*See id.* at 254:22–25; *see also id.* at 255:5–7.)

/ / /

9.     Between November 2018 and March 2019, Oliveri was on assignment from the TTP office to a liaison unit.  (*See id.* at 258:17–20.)  One of the supervisors who reported to Oliveri, Nicholas Gonzales, acted as Branch Chief of the TTP office during that time.  (*See id.* at 258:25–8.)  Nonetheless, Oliveri continued to receive emails in a TTP Branch Chief capacity during that time.  (*See id.* at 259:9–14.)

### C.     Dousa's Participation in the Trusted Traveler Programs

10.     "Plaintiff applied for and received a membership in Global Entry in 2016." (Stip. Facts at 23 ¶ 7; *see also* ECF No. 142 ("Day 1 Tr.") at 99:10–13; ECF No. 153-10 ("Ex. 340").)  Dousa believed Global Entry "would be useful to [her] in carrying out [her] Christian ministry" because "it would allow [her] to expedite [her] border crossing so that [she] could . . . [cross] more frequently, to offer [her] ministry in Mexico." (*See* Day 1 Tr. at 97:10–18.)

11.     "On November 27 and again on November 28, 2018, Dousa crossed the border into the United States from Mexico at the San Ysidro Port of Entry using her Global Entry membership."  (Stip. Facts at 23 ¶ 12; *see also* Day 1 Tr. at 95:7–18.)

12.     Dousa's Global Entry card expired on August 22, 2022.  (*See* Day 2 Tr. at 213:2–6, 227:20–23.)  As of the date of her testimony, Dousa had applied for renewal.  (*See id.* at 227:24–25.)  Because of a backlog in processing Global Entry renewals, her expiration date was extended by a year.  (*See id.* at 228:4–11.)

## II.   Dousa and Her Ministry

13.     "Dousa is a U.S. Citizen and Senior Pastor at Park Avenue Christian Church in New York City."  (Stip. Facts at 22 ¶ 1; *see also* Day 1 Tr. at 36:3–4, 37:13–23.)  Dousa was ordained by the United Church of Christ, a Protestant denomination, in 2002.  (*See* Day 1 Tr. at 34:20–23, 36:1–11.)

14.     There are two sacraments that are recognized in the Protestant church: (1) baptism, and (2) communion.  (*See id.* at 76:5–6.)  There are also several rituals and ceremonies, including funerals, marriages, ordinations, etc.  (*See id.* at 44:3–13.)

/ / /

15.     Dousa officiates marriage ceremonies "[v]ery often," (*see id.* at 45:6–7), and "consider[s] performing marriages to be one of [her] most sacred pastoral duties." (*See id.* at 50:1–3.)   Dousa is authorized to sign marriage licenses in New York, (*see id.* at 51:9–11), and takes that authorization "very seriously." (*See id.* at 52:12–14.)

16.     Dousa therefore has "very strict rules around how [she] will sign a wedding license." (*See id.* at 52:14–15.)  While she does sign marriage licenses outside of New York, (*see id.* at 52:25–2), she first "contact[s] the city or county clerk's office just to make sure that [she] understand[s] what the requirements are, and that [she is] indeed authorized to do so." (*See id.* at 52:2–6.)

17.     Dousa also has rules for conducting wedding ceremonies:  she has a "standard process that [she] . . . do[es]n't deviate from for any marriage that [she] officiate[s]." (*See id.* at 46:3–8.)  In the "discernment phase," Dousa "tr[ies] to get to know a little bit about" the couple and understand whether there is "consent between the couple," whether "there [is] any coercion," and whether "this [is] a real relationship." (*See id.* at 46:8–17.)

18.     In "many, many cases," Dousa will decline to marry couples following this process.  (*See id.* at 46:17–20.)  Indeed, she has "turn[ed] away more couples than [she] actually agree[s] to marry." (*See id.* at 53:7–13.)  If, however, the couple "do[es] make it through that process, then the next several steps are to help them to understand both theologically and ethically what it means to invite God into [their] relationship." (*See id.* at 46:21–24.)

19.     The immigrant community became a focus of Dousa's ministry beginning in 2009 when "God called [her] to it." (*See id.* at 53:20–23.)  While she was at The Table Church in San Diego in approximately 2013, Dousa would "go to Mexico to minister to people there." (*See id.* at 55:3–18.)

20.     Eventually, "Dousa [became] the co-chair of the New Sanctuary Coalition ("New Sanctuary"), a faith-based network of congregations, organizations, and individuals devoted to immigrant rights." (Stip. Facts at 22 ¶ 2; *see also* Day 1 Tr. at 54:18–22, 61:7–10, 62:4–5.)  As such, Dousa "advocate[s] for the rights and humane treatment of

6

immigrants," (*see* Day 1 Tr. at 59:4–7), and has "been critical of any family separation policy from the Trump administration and also from the Biden administration." (*See* Day 2 Tr. at 175:5–176:7.) Consequently, "Dousa participates in and is involved in organizing protests, rallies, and prayer vigils, including ones that advocate for immigrants' rights." (Stip. Facts at 22 ¶ 3; *see also* Day 1 Tr. at 59:4–7; Day 2 Tr. at 151:2–152:10.)

21.    Although she finds "it[] scary going on the news," (*see* Day 2 Tr. at 214:13–17), "Dousa makes television and media appearances in which she discusses immigration issues, and meets with local, state, and federal political representatives to discuss public policy and legislative issues related to immigration." (Stip. Facts at 22 ¶ 4; *see also* Day 1 Tr. at 61:1–4; Day 2 Tr. at 171:15–172:12.)

## III.    The Sanctuary Caravan

22.    In late 2018 and early 2019, a large migration of individuals, primarily from Central America, arrived at the U.S.-Mexico border seeking entry into the United States and/or asylum in the United States. (*See* Stip. Facts at 22 ¶¶ 5–6.)

23.    "In late 2018, Pastor Dousa, through New Sanctuary, was involved in organizing a 'Sanctuary Caravan' of faith leaders, congregants, and humanitarian workers to Tijuana to provide pastoral services and support to migrants in the Migrant Caravan." (Stip. Facts at 23 2d ¶ 8; *see also* Day 1 Tr. at 64:2–65:10.) The Sanctuary Caravan was planned to last forty days and forty nights. (*See* Day 1 Tr. at 65:13–18; Day 2 Tr. at 108:13–15.) Dousa "absolutely" "consider[ed her] work with The Sanctuary Caravan to be part of [her] Christian ministry." (*See* Day 1 Tr. at 66:11–14.)

24.    "In addition to providing services, Sanctuary Caravan members coordinated with legal organizations working with migrants applying for asylum." (Stip. Facts at 23 ¶ 9; *see also* Day 2 Tr. at 179:8–14.)

25.    "Before Pastor Dousa departed for Tijuana, Nicole Ramos—an attorney with Al Otro Lado, an organization that provides support for migrants and asylum seekers— asked Pastor Dousa if members of the Sanctuary Caravan could perform religious marriage ceremonies for migrants in the caravan. Pastor Dousa agreed." (Stip. Facts at 23 ¶ 10; *see*

*also* Day 1 Tr. at 68:5–69:10.)  Specifically, Ramos asked Dousa to perform "religious ceremonies only" for couples who were already common-law married but were unable to prove the "fact of their marriage" because "common-law married couples with children are more likely to be separated in family detention."  (*See* Day 1 Tr. at 68:22–70:15; *see also* ECF No. 153-12 ("Ex. 346").)  In other words, Dousa and her cohorts "would not be seeking any state licensure or authorization" for the marriages.  (*See* Day 1 Tr. at 69:25–70:4.)  Dousa did not believe that the marriages she was asked to perform in Tijuana "would or could be used to help the migrants obtain asylum or any other legal status in the United States."  (*See id.* at 70:25–71:4.)

26.    As part of the Sanctuary Caravan, Dousa and seven other clergy traveled to Tijuana on November 27 and 28, 2018.  (*See id.* at 66:15–67:19.)  They were not accompanied by a notary public.  (*See id.* at 146:15–20.)

27.    When Dousa and the other clergy crossed the border, "crowds of people would come to seek to have prayer, laying [on] of hands, . . . hear[ing of] their confession[s,] . . . bless[ing of] their babies."  (*See id.* at 74:3–15.)  Dousa and other clergy also anointed the sick, (*see id.* at 77:23–25); consoled mourners, (*see id.* at 79:20–22); and comforted the distressed.  (*See id.* at 80:8–10).  Finally, "[o]n November 27 and 28, 2018, Pastor Dousa, along with other clergy, performed approximately 17 religious marriage ceremonies for migrants in Tijuana."  (Stip. Facts at 23 ¶ 11; *see also* Day 1 Tr. at 81:9–14.)

28.    Although Dousa is not familiar with the requirements for common law marriage in any Central American country, (*see* Day 2 Tr. at 186:17–187:10), it was Dousa's understanding that the couples whom she and other members of the Sanctuary Caravan married on November 27 and 28, 2018, were couples "who were common-law married back home," (*see* Day 1 Tr. at 81:24–82:3), and "who had not been able to have a church-blessed wedding" previously.  (*See id.* at 82:4–8.)  All but one of the couples either had children or had a child on the way.  (*See id.* at 83:3–6.)

29.    Prior to officiating any marriages, Dousa followed the same process she always does, "just in a very condensed form."  (*See id.* at 83:18–84:1.)  "Based on those

conversations, . . . [Dousa] believe[d] that each of the couples met [her] criteria for agreeing to officiate their Christian marriage." (*See id.* at 84:9–13.) "To the best of [her] knowledge," she did not "perform any marriages in Tijuana for any couples who were not sincerely, genuinely a family, but were getting married solely for U.S. immigration purposes." (*See id.* at 92:10–15.)

30.     Dousa was not "asked to provide any kind of state authorization or recognition for the marriages [she] officiated in Tijuana in November of 2018." (*See id.* at 83:10–14.) Although she does not know what members of Al Otro Lado or other clergy may have said about the marriage certificates, (*see* Day 2 Tr. 199:5–15), she personally "was very clear [with the couples] that there would be no state authorization or recognition for these marriages." (*See* Day 1 Tr. at 84:18–22.)

31.     Dousa did, however, "provide a certificate of marriage to each of the 17 couples whose Christian marriage rituals [she] officiated in Tijuana in November of 2018." (*See id.* at 87:8–12.) The certificates did not "have any seal or any other marking of any government entity," (*see id.* at 88:6–9), and were not "notarized by a notary public." (*See id.* at 88:10–13; *see also id.* at 145:24–5; Day 2 Tr. at 196:13–19; ECF No. 153-2 ("Ex. 327").) She did not provide any "sort of legal document" to accompany the marriage certificates. (*See* Day 2 Tr. at 196:5–12.) Dousa also provided the couples with a copy of her business card. (*See* Day 1 Tr. at 92:24–93:1; Day 2 Tr. at 193:22–194:7.)

32.     Dousa thought that the marriage certificates she provided "might offer the chance for families to stay together once they were taken into immigration and detention." (*See* Day 1 Tr. at 91:10–18; *see also id.* at 92:4–9; Day 2 Tr. at 199:17–200:3.) She did not believe that they would "be used to try to help [the couples] obtain asylum or any other legal status in the United States." (*See* Day 1 Tr. at 92:16–22.)

33.     After returning to the United States, Dousa helped to create a document to help other clergy who were considering pastoral work in Tijuana. (*See id.* at 93:11–24; *see also* ECF No. 154-1 ("Ex. 347"); Day 2 Tr. at 197:2–7.) That document emphasized that the clergy would not be providing state recognition of the marriages, (*see* Day 1 Tr. at

94:23–95:6; *see also* Ex. 347), although it also recommended bringing a notary.  (*See* Day 2 Tr. at 197:17–199:4; *see also* Ex. 347.)

34.    Dousa returned to Tijuana as part of the Sanctuary Caravan on January 2, 2019.  (*See* Day 2 Tr. at 108:23–109:4.)  Although she had intended to stay for "several days," (*see id.* at 109:11–13), she returned to the United States that same evening through the San Ysidro Port of Entry's pedestrian SENTI walkway.  (*See id.* at 110:9–18.)

## IV.    Operation Secure Line

35.    Around the time that Dousa was involved in organizing the Sanctuary Caravan, "[CBP] began gathering information on individuals associated with the migrant caravan."  (Stip. Facts at 22 ¶ 7.)  The migrant caravan consisted of thousands of migrants, primarily from Central America, amassing at the Southern border and seeking to enter the United States.  (*See* ECF No. 144 ("Day 3 Tr.") at 368:12–368:16; *see also id.* at 407:12–15, 431:13–20.)

36.    Around Thanksgiving 2018, there was an attempted mass border crossing in Tijuana.  (*See id.* at 408:12–14.)  There was another such mass border crossing attempted around the New Year in 2019.  (*See id.* at 409:14–17.)

37.    "In response to the Migrant Caravan, CBP implemented an operational plan known as 'Operation Secure Line.'"  (Stip. Facts at 23 1st ¶ 8.)  Operation Secure Line resulted in a reallocation of additional resources to secure the southern border.  (*See, e.g.*, ECF No. 146-2 ("Burnett Depo.") at 34:20–25:14; ECF No. 148-1 ("Dominguez Depo.") at 41:17–42:22.)

### A.    Investigations Concerning Dousa

38.    As an intelligence agent for CBP's Sector Intelligence Unit, Nathaniel Trueblood was tasked with gathering information related to immigration-related crimes and creating reports for field agents and other law enforcement officers.  (*See* Day 3 Tr. at 367:9–368:2, 368:17–23.)  Some of the persons of interest were caravan organizers, including some who were providing humanitarian assistance to migrants.  (*See id.* at 369:15–20.)

39.     One of Trueblood's responsibilities was preparing daily reports of interviews that other agents had conducted of migrants who had crossed the border into the United States. (*See id.* at 368:24–369:6.)  One type of report is a "report of investigation" ("ROI"), which is entered into a system known as IRS.[2]  (*See id.* at 368:3–7.)  IRS is "a database that contains information gathered by border patrol and is accessible to all intelligence agents in border patrol and Customs and Border Protection." (*See id.* at 391:25–392:4; *see also id.* at 434:2–4.)

### 1.     *November 30, 2018 Interview of Migrant 1*

40.     On November 30, 2018, two border patrol agents in Imperial Beach, California—Joshua Morales and Fabian Lopez—conducted an interview of a Honduran national identified in the record as "Migrant 1." (*See* ECF No. 149-6 ("Ex. 30"); *see also* Day 3 Tr. at 373:8:16.)  The resultant report was "published" on December 3, 2018. (*See* Ex. 30 at 1.)

41.     In relevant part, the report provides:

On November 30, 2018[,] Imperial Beath Patrol Station Strike Team Agents Interviewed Honduran national [Migrant 1] . . . .  [Migrant 1] admitted to being a part of the Migrant Caravan that arrived in Mexico from Central America. . . .  [Migrant 1] later admitted to being a volunteer worker for the Park Avenue Christian Church.

[Migrant 1] stated that while in Tijuana, she was sitting with other members of the caravan at their camp site when an organizer began addressing the crowd.  [Migrant 1] states that the person is a Reverend by the name Kaji S. Dousa.  [Migrant 1] stated that Kaji S. Dousa told her and others that were present at the camp site that they should all get married to each other. According to [Migrant 1] Dousa told everyone that if they get married, they w[ould] get papers to live in the United States.  [Migrant 1] stated that she is currently married to a man in Honduras and . . . that despite being married in Honduras, they forced her to get married.  [Migrant 1] stated . . . that marriage certificates are being provided to facilitate their political asylum claim once in the United States.

---

[2] IRS appears to stand for "Intelligence Records System."

19-CV-1255 TWR (KSC)

[Migrant 1] stated than an organizer from Park Avenue Christian Church provided her with a phone since [Migrant 1] volunteered to help the group. . . .

A photo of Rev. Kaji S. Dousa was taken from the internet and shown to [Migrant 1 who] was unable to identify Rev. Kaji S. Dousa. [Migrant 1] stated that a woman fitting the description of Rev. Kaji S. Dousa provided her with a red business card, with Dousa's name on it above the title "Senior Minister, Park Avenue Christian Church". . . .

[Migrant 1] gave verbal and written consent for Agents to search her cell phone. [Migrant 1] stated the app [redacted] was loaded on the phone when she received it, and there were multiple group chats already created as well. . . .

One of the messages in the "[redacted]" conversation . . . stated that a group named [redacted] is organizing a protest at the San Ysidro Port of Entry to be held on Saturday[,] December 1, 2018. The message states that the intent of the protest is to shut down the San Ysidro Port of Entry. . . . The group chat also contains a recorded voice message that states that [redacted] intends to initiate a violent confrontation with caravan members in order to gather media attention on the date of the protest.

(Ex. 30 at 3–4.) The report included an image of Dousa's business card. (*See* Ex. 30 at 5.)

42. On November 30, 2018, an email was circulated under the subject "Caravan INTEL from ASID."[3] (*See* ECF No. 152-4 ("Ex. 305").) The email noted "IMB ASID is developing some INTEL to include a possible NY nexus and a church/religious group that is assisting in coordinating at least some of the movement from the caravan." (*See id.*)

43. A draft of the report was circulated on December 2, 2018, to a group of recipients including Supervisory CBP Officer Miguel Haro.[4] (*See* ECF No. 154-2 ("Ex. 348").) Miguel Haro responded, copying Morales and Lopez, "I may have found Kaji Dousa and I was wondering if you still had the image you showed to [Migrant 1]

---

[3] ASID appears to refer to the Alien Smuggler Identification and Deterrence unit.

[4] Because Miguel Haro's brother, Jose Haro, was also employed by CBP during the relevant period, (*see* Day 3 Tr. at 446:12–16), the Court will distinguish between them by also using their first names.

[redacted]?  I would also like to confirm that [Migrant 1] positively identified her in the photograph you showed."[5]  (*See id.*; *see also* Day 3 Tr. at 495:5–13.)

44.     Morales responded, "[Migrant 1] was NOT able to identify Dousa, but she did describe a woman fitting the description of Dousa.  We showed various pictures of Kaji S. Dousa from the internet, as well as the website of the Park Avenue Christian Church."  (*See* Ex. 348.)

45.     After it was published on December 3, 2018, a copy of the report was circulated via the November 30, 2018 email chain.  (*See* Ex. 305.)  The email indicated that "IMB ASID is looking into a church/religious group from NY called Park Avenue Christian Church that may have assisted in coordinating movement of [the] caravan group.  Possible association to [redacted].  Rev. Kaji S. Dousa was pushing for subjects at the camp site to marry each o[ther] to facilitate their political asylum case once in the U.S.  Subject [Migrant 1,] mentioned below, is currently married to a man in Honduras but stated they forced her to get married at the camp."  (*See id.*)

46.     The email was forwarded up the chain of command.  (*See id.*)  Then-CBP Division Chief Patrol Agent for Law Enforcement Operations Kathleen Scudder, (*see* Day 3 Tr. at 404:17–20), who reported to then-CBP Chief Patrol Agent for the San Diego Sector Rodney Scott, (*see id.* at 404:21–23), forwarded the email to then-CBP Assistant Chief Patrol Agent overseeing the Foreign Operations Branch in the San Diego Sector of the U.S. Border Patrol, Roberto Del Villar, (*see id.* at 403:5–10), asking, "What the?"  (*See* Ex. 305.)

47.     Del Villar then forwarded the email to Juan Rodriguez, then-CBP Acting Special Operations Supervisor, (*see* Day 3 Tr. at 404:10–16, 429:24–430:2), writing "We need to start with some serious targeting efforts.  Canceling visas, SENTRIs, Psy[cological] Op[eration]s, etc."  (*See* Ex. 305; *see also* Day 3 Tr. at 418:3–8, 419:15–17.)

---

[5] When Miguel Haro said that he had "found" Dousa, he meant that he had searched for her name in an internal CBP databased and had found a record for her.  (*See* Day 3 Tr. at 495:13–19.)

19-CV-1255 TWR (KSC)

48.     Trueblood was "concern[ed]" about Dousa's purported claim that those who got married would get papers to live in the United States because single adults had "more of a chance of being detained," whereas those who were married or had children had a greater chance of being released together.  (*See* Day 3 Tr. at 396:24–397:14.)  Trueblood was also "concern[ed]" by the information on Migrant 1's phone regarding a possible confrontation at the border "[b]ecause previously there was a physical, violent confrontation with several hundred migrants that had actually closed down the San Ysidro Port of Entry for . . . a period of like 10, 12 hours."  (*See id.* at 397:16–24.)  Although Trueblood believed that the report merited follow up, it was not his job to do so.  (*See id.* at 398:15–22.)

49.     On December 3, 2018, Trueblood emailed a "Migrant Interview Analysis" of the November 30, 2018 interview of Migrant 1.  (*See* ECF No. 153-1 ("Ex. 325"); *see also* Day 3 Tr. at 369:23–370:17.)  Trueblood wrote:

> On November 30, 2018, Imperial Beach Border Patrol Station Strike Team Agents interviewed Honduran national [Migrant 1] who was part of the Migrant Caravan.  [Migrant 1] identified several individuals who are organizing the caravan and attempting to defraud the U.S. government. [Migrant 1] stated that Reverend named Kaji S. DOUSA from the Park Avenue Christian Church told members of the caravan [they] should get married to each other.  [Migrant 1] stated . . . that marriage certificates are being provided to facilitate their political asylum claim once in the United States.  An organizer from the Park Avenue Christian Church provided her with a phone, which had social media application called [redacted] used by organizers and advisors to the caravan to communicate to each other.  The following subjects are the ones designated as Group Chap administrators on the [redacted].  Several of these numbers are linked to individuals already identified by the Department of Homeland Security (DHS) as organizers.
>
> . . .
>
> According to [Migrant 1], DOUSA told members of the caravan that if they get married, they will get papers to live in the United States.  [Migrant 1] stated that an organizer from the Park Avenue Christian Church provided her with a phone since [Migrant 1] volunteered to help the group.

(Ex. 325 at 2–4; *see also* Day 3 Tr. at 371:19–373:6.)

50.   Trueblood was not present for the interview and never spoke with Migrant 1. (*See* Day 3 Tr. at 370:19–371:3.)   In preparing his email, Trueblood relied on and summarized the interview report prepared by the interviewing border patrol agents.  (*See id.* at 371:10–18.)

51.   Dousa credibly testified at trial that she had never "address[ed] a crowd of migrants in Tijuana and t[old] them that if they got married, they would get papers to live in the United States."  (*See* Day 2 Tr. at 139:4–9.)  She also denied that she "ever t[old] anyone in Tijuana in any setting that if they got married, they would get papers to live in the United States," (*see id.* at 139:17–22); they "would get marriage certificates to facilitate their political asylum claims," (*see id.* at 142:6–15); or she ever "forced anyone to get married."  (*See id.* at 140:14–141:16.)  Dousa also denied "giv[ing] anyone in Tijuana any cell phone."  (*See id.* at 145:2–4.)

### 2.   *December 17, 2018 Recovery of a Marriage Certificate*

52.   On December 20, 2018, Trueblood prepared a ROI entitled "Possible Marriage Fraud Migrant Caravan ROI," (*see* ECF No. 153-5 ("Ex. 330"); *see also* Day 3 Tr. at 380:1–4), which provides, in relevant part:

**Executive Summary:**
Imperial Beach Border Patrol Intelligence Group (IBM Intel Group) was able to identify several subjects involved in performing marriages in Tijuana, MX as a tactic to assist members of the migrant caravan with their asylum claims. On December 17, 2018, IMB Strike Team discovered a marriage certificate linking a Virginia notary and reverend with performing a marriage for two Guatemalan Nationals.  Further analysis linked the revered to another open border activist/attorney named Nicole Ramos who works with the migrant caravan, and initiates active protests at the Otay Mesa Port of Entry (OTM POE).  RAMOS is linked to another pastor involved in marrying migrant caravan members that was previously identified by the IMB Intelligence Group.

**Narrative:**
On December 17, 2018, IMB Border Patrol Agents apprehended a Guatemala National family . . . for illegally entering the United States (U.S.). . . .

> During the search of their personal belong[ing]s by IMB Strike Team, a marriage certificate was found showing [redacted] were recently married on December 03, 2018[,] in Tijuana, MX.  The certificate had a simple generic overlay with no distinct markings other than an official notary stamp from the Commonwealth of Virginia.  The registered notary public is a subject named Alicia Rose HORST . . . .  The reverend who performed the ceremony is a subject named Brittany CAINE-Conley from the United Church of Christ located in Charlottesville, VA.

(Ex. 330 at 1 (emphasis in original).)

53.     The ROI continues with "a more extensive analysis on the subjects connected to the marriage certificate."  (*See id.*)  Several pages later, in a discussion of Ramos, the report notes that, "[o]n November 27, 2018, RAMOS posted about how Al Otro Lado was partnering with New Sanctuary Coalition.  She linked Kaji DOUSA and DOUSA was in the photograph.  DOUSA was previously identified by IMB Strike Team as another pastor performing marriage ceremonies in Tijuana, MX . . . ."  (*See id.* at 7.)

54.     There is then a separate entry for Dousa, identifying her "Association" as "Pastor for Park Avenue Christian Church/Coordinator for the Migrant Caravan."  (*See id.*) The ROI notes:

> On November 30, 2018, an illegal alien named [Migrant 1] was interviewed regarding her role in the migrant caravan.  [Migrant 1] stated that while in Tijuana, she was sitting with other members of the caravan at their campsite when an organizer began addressing the crowd.  [Migrant 1] states [it] was Reverend Kaji S. DOUSA.  [Migrant 1] stated that DOUSA told her and others that were present at the migrant campsite that they should all get married to each other.  According to [Migrant 1] DOUSA told everyone that if they got married, they would get papers to live in the United States.

(*See id.* at 8.)

55.     The ROI concludes:

> The Migrant Caravan is a common cause for numerous open border, humanitarian, and other groups with the goal to challenge U.S. Immigration laws.    RAMOS works for one of these groups named Al Otro Lado.  According to their website, this organization assists deportees, migrants, and refugees in Tijuana, MX.  They attempt to use mechanisms such as the U Visa,

19-CV-1255 TWR (KSC)

the Credible Fear screening process for refugees, and Humanitarian Parole to allow aliens to gain legal status in the U.S.  RAMOS has documented travel to Guatemala and the southern Mexico Border in order to assist migrants with their goal of entering the U.S.  RAMOS is a common connection between both DOUSA and CAINE who have married an unknown number of migrants with a promise it will help their asylum claims.

Further investigation into the regulations pertaining to the violations of notary law of the Commonwealth of Virginia shows possible violations and/or criminal activity.  HORST possibly violated the prohibition of a notary public to offer legal advice on immigration or other legal matters, unless she is authorized or licensed to practice law within the Commonwealth or accredited pursuant to 8 C.F.R. 292.2 to practice immigration law . . . .

(*Id.*)

56.     As of December 20, 2018, Trueblood had no information that Caine-Conley had told migrants that getting married would help with their asylum claims, (*see* Day 3 Tr. at 386:5–8), and no evidence aside from Migrant 1's statement that Dousa was performing marriages to help with asylum claims.  (*See id.* at 386:19–23.)

57.     On December 20, 2018, Ricardo Gilbert, a special agent assigned to the HIS Document and Benefit Fraud Task Force,[6] reached out to Trueblood and another agent regarding "the recent reporting regarding Hondurans being found with Marriage Certificates and/or with VA Notarized documents."  (*See* ECF No. 153-3 ("Ex. 328"); *see also* Day 3 Tr. at 387:1–10.)  He also requested clarification as to several questions.  (*See* Ex. 328.)

58.     Trueblood responded the following day, attaching the ROI and a copy of the marriage certificate.  (*See* Ex. 328; *see also* Day 3 Tr. at 387:21–23.)  In response to Gilbert's questions, Trueblood noted that the marriage certificate recovered on December 17, 2018, was a "generic[,] illegitimate marriage certificate."  (*See* Ex. 328; *see also* Day 3 Tr. at 387:24–388:1.)  At his deposition, Trueblood testified that he believed the marriage certificate looked illegitimate because the notary and officiant were from

---

[6] HIS appears to refer to ICE's Homeland Security Investigations Service.

Virginia, while the marriage happened in Tijuana.  (*See* Day 3 Tr. at 389:8–25.)  Trueblood also noted that "[i]t appears a Reverend named Kaji Rosa DOUSA is telling the migrants if they get married, they w[ill] get papers to live in the United States."  (*See* Ex. 328; *see also* Day 3 Tr. at 391:5–9.)

59.     On December 28, 2018, Miguel Haro received an email with the subject line "SM/OS and financials on fraud marriage certificate group."[7]  (*See* ECF No. 151-1 ("Ex. 79); *see also* Day 3 Tr. at 535:1–15.)  The email contains bullet points related to the Facebook and LinkedIn profiles and certain financial information for four "targets": Alicia Rose Horst, Brittany Caine-Conley, Nicole Elizabeth Ramos, and Kaji Rosa Dousa Spellman.  (*See* Ex. 79; *see also* Day 3 Tr. at 535:16–539:15.)

60.     The email indicates that Dousa's "Facebook is blank and private" and that a report from a financial tracking service used by the United States government in 2012 turned up a $12,876 withdrawal from a PNC bank in Pittsburgh.  (*See* Ex. 79; *see also* Day 3 Tr. at 542:14–19.)  An additional search in another financial tracking service yielded no results.  (*See* Day 3 Tr. at 542:20–543:1.)

61.     On January 14, 2019, Trueblood published a Field Information Report entitled "Migrant Caravan—Possible Marriage Fraud," (*see* ECF No. 150-4 ("Ex. 73"); *see also* Day 3 Tr. at 391:18–21), which contains "basically the same . . . information [as] in the marriage fraud report of information."  (*See* Day 3 Tr. at 392:5–15.)

### B.     Actions Regarding Dousa's TTP Status

62.     On December 2, 2018, Miguel Haro emailed Gonzales, cc'ing Oliveri, identifying Dousa as a SENTRI holder who was possibly a caravan organizer.  (*See* ECF No. 149-5 ("Ex. 29"); *see also* Day 2 Tr. at 259:18–260:23, 261:5–10.)  Miguel Haro noted that he had "placed a lookout on the subject," (*see* Ex. 29; *see also* Day 2 Tr. at 261:12–18; Day 3 Tr. at 497:8–14, 499:7–10, 574:25–575:2), meaning she could be referred to secondary screening or tracked when she crossed the border.  (*See* Day 2 Tr. at

---

[7] Based on the content of the email, SM/OS appears to stand for "Social Media/Online Selectors."

262:17–22; *see also* Day 3 Tr. at 497:15–19.)   A lookout is placed in the Treasury Enforcement Communications System ("TECS"), (*see id.* at 269:18–19, 280:8–9; *see also id.* at 317:25–318:3), and can affect the subject's TTP status.  (*See id.* at 262:23–263:1, 269:10–270:1.)

63.   Miguel Haro added that he "would like to have her interviewed to see if she is helping coordinate the caravan in Tijuana," (*see* Ex. 29; *see also* Day 2 Tr. at 263:2–9), but that "her continued enrollment [in Global Entry] I'll leave up to your discretion." (*See* Ex. 29; *see also* Day 2 Tr. at 263:4–264:7; Day 3 Tr. at 498:20–499:6.)  The email also transmitted the Field Information Report ("FIR") discussing Morales and Lopez's interview of Migrant 1.  (*See* Ex. 29; *see also* Day 2 Tr. at 260:24–261:1.)

64.   On December 3, 2018, at 7:03 a.m., Gonzales responded, asking Miguel Haro to "[p]lease, let us know once you confirm this information." (*See* Ex. 29; *see also* Day 2 Tr. at 264:13–19; Day 3 Tr. at 500:9–13.)

65.   Miguel Haro responded that evening at 8:19 p.m. that "Border Patrol showed various pictures of Kaji S. Dousa from the internet, as well as the website of the Park Avenue Christian Church[. Migrant 1] was not able to identify Dousa, but she did describe a woman fitting the description of Dousa.  Attached is a picture of the business card [Migrant 1] was provided with and had in her possession." (*See* Ex. 29; *see also* Day 2 Tr. at 264:20–265:7; Day 3 Tr. at 500:22–501:2.)

66.   On December 3, 2018, Miguel Haro also disseminated an "organizers line up" containing photographs and names of purported "instigators." (*See* ECF Nos. 149-9 ("Ex. 39"), 150-3 ("Ex. 64"); *see also* Day 2 Tr. at 286:6–287:20; Day 3 Tr. at 503:15–508:3; ECF No. 149-3 ("Ex. 14").)  Beginning on December 5, 2018, and various dates thereafter, Miguel Haro disseminated "target profiles" for twenty-four "caravan organizers/ instigators" to a wide variety of individuals within CBP.  (*See* ECF Nos. 149-10 ("Ex. 40"), 151-3 ("Ex. 109"), 151-4 ("Ex. 110"), 151-5 ("Ex. 111"), 152-2 ("Ex. 302"); *see also* Day 2 Tr. at 287:21–288:24, 289:16–290:1; Day 3 Tr. at 508:17–518:9, 531:1–534:4; ECF No. 152-1 ("Ex. 301").)  One of the attached profiles was for Dousa and included her name,

photograph, and other identifying information.  (*See* Exs. 40, 109, 301, 302; *see also* Day 2 Tr. at 289:3–9, Day 3 Tr. at 508:17–509:18.)   In the process of updating the target profiles, Miguel Haro emailed Gonzales on December 5, 2018, to ask whether "any decision [had] been made about her membership in the TTP" or whether they were "in a holding pattern until she is interviewed by TTRT."  (*See* ECF No. 152-5 ("Ex. 309"); *see also* Day 3 Tr. at 525:11–19.)

67.    On December 5, 2018, Gonzales placed an "interdiction" on Dousa in GES. (*See* ECF No. 150-2 ("Ex. 51-2") at 48–49; ECF No. 154-7 ("Ex 580"); *see also* Day 2 Tr. at 268:6–10, 348:13–349:5.)  An interdiction is distinct from a lookout and triggers an alert when the subject tries to go through a TTP lane at the border, (*see* Day 2 Tr. at 268:11–269:9; *see also* Day 3 Tr. at 526:18–527:3), and, as with a lookout, can affect the subject's continued eligibility for TTPs.  (*See* Day 2 Tr. at 269:10–270:1.)

68.    On December 6, 2018, Gonzales emailed Miguel Haro, cc'ing others, "Today I suspended [Dousa's] Global access as well," (*see* Ex. 309; *see also* Day 2 Tr. at 270:2–6; Day 3 Tr. at 526:11–13), meaning Dousa's Global Entry had been revoked.  (*See* Day 2 Tr. at 270:7–272:2, 274:23–275:4.)  He added, "I am going to wait until you guys interview her so I can add more information in her account."  (*See* Ex. 309; *see also* Day 3 Tr. at 526:13–15.)  Miguel Haro responded, confirming receipt.  (*See* Ex. 309; *see also* Day 3 Tr. at 527:4–13.)

69.    On December 13, 2018, at 10:15 p.m., Miguel Haro forwarded to Oliveri an email with the subject line "DOUSA KANJI []INFO/MARRIAGE FRAUD CERTIFICATE," in which he asked Oliveri to forward the email to Gonzales to "see what you and him think of this for this TTP participant."  (*See* ECF No. 149-14 ("Ex. 44"); Day 2 Tr. at 304:25–305:25; Day 3 Tr. at 529:3–7.)  Oliveri understood this to mean that Miguel Haro wanted his and Gonzales's thoughts about possibly revoking Dousa's TTP privileges. (*See* Day 2 Tr. at 306:1–5, 306:12–19.)

/ / /

/ / /

70.     Oliveri responded the following day, December 14, 2018, "We revoked her." (*See* ECF Nos. 149-8 ("Ex. 33"), 152-7 ("Ex. 314"); *see also* Day 2 Tr. at 306:20–307:1; Day 3 Tr. at 529:8–16.)

71.     Ultimately, despite these email communications, Dousa's GES contains "no indication of revocation." (*See* Day 2 Tr. at 333:21–334:4.)

### C.      *December 10, 2018 Email to the Mexican Government*

72.     On December 10, 2018, Oliveri emailed an official with the Mexican immigration authorities, requesting in Spanish that the Mexican government detain and return to the United States a list of twenty-four people corresponding to the twenty-four "caravan organizers/instigators" for whom target profiles had been prepared on December 5, 2018.   (*See* ECF Nos. 149-11 ("Ex. 41"); *see also* Day 2 Tr. at 290:1–293:13.) Translated into English, the email reads:

> Greetings [redacted],
>
> CBP has identified the following individuals as part of the organizers/instigators of the migrant caravan that is currently located in Tijuana.  The majority of these persons are United States citizens and there exists a great possibility that they do not have adequate documentation to be in Mexico.  CBP wishes to interview them all and respectfully requests of the INM that they deny their entry to Mexico.  If they are found, please send them back to the United States so that CBP may proceed with the interview.  Your attention and assistance is very appreciated.

(Ex. 41; *see also* Day 2 Tr. at 294:16–296:5, Day 3 Tr. at 519:10–520:14.)

73.     On December 11, 2018, Oliveri forwarded the email to Miguel Haro, (*see* ECF No. 149-12 ("Ex. 42"); *see also* Day 2 Tr. at 304:14–23, Day 3 Tr. at 518:17–20), who, in turn, forwarded the "list" to the Director of Field Intelligence for the Office of Intel.  (*See* ECF No. 149-13 ("Ex. 43"); *see also* Day 3 Tr. at 522:20–523:8.)

74.     The list in the email contained fourteen U.S. citizens, including Dousa.  (*See* Exs. 41, 42, 43; *see also* Day 2 Tr. at 290:12–291:2, 293:14–18, Day 3 Tr. at 521:5–11.) Oliveri was not involved in creating the list of people the email contained.  (*See* Day 2 Tr. at 294:1–4, 301:21–302:9.)

75.     This was the first and only time that Oliveri has ever sent such a communication, (*see id.* at 297:6–298:1, 298:25–299:12), and he is not aware of anyone else at CBP sending such a communication to a foreign government.  (*See id.* at 299:13–300:18; *see also id.* at 344:17–22.)  Although he was involved in writing the email, (*see id.* at 293:19–25), Oliveri does not recall who asked him to send the email, (*see id.* at 291:3–5, 302:10–14), or why he told the Mexican government that there was a large possibility that the people on that list did not have adequate documentation to be in Mexico.  (*See id.* at 298:12–16.)

76.     In fact, "[n]o one told [Oliveri]" that there was a great possibility that the people on the list did not have adequate documentation to be in Mexico.  (*See id.* at 302:14–18.)  At trial, he characterized the addition of that statement as "[l]iterally, creative writing . . . [w]ithout any basis."  (*See id.* at 302:19–303:4.)

77.     Oliveri never received a response to the December 10, 2018 email, (*see id.* at 326:5–10), and is not aware of any action taken pursuant to it.[8]  (*See id.* at 326:11–13.)  Although he testified that he did not "have any expectation . . . the recipients in Mexico would take the action [he had] requested," (*see id.* at 327:10–13), no other explanation was offered for why he would have sent it.  Oliveri has not followed up on, retracted, or corrected the email in any way and does not know whether anybody else has.  (*See id.* at 303:17–25, 304:6–12.)

/ / /

---

[8] Although not introduced into the record—and therefore not considered as part of the instant Statement of Decision—the Court notes that the DHS Office of Inspector General ("OIG") reported that, "[a]pproximately a month after [Oliveri]'s email, Mexico notified the FOB that it was denying entry to [an] American [listed in the email]."  *See* OIG, DHS, *CBP Targeted Americans Associated with the 2018–2019 Migrant Caravan* 19, OIG-21-62 (Sept. 20, 2021), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2021-09/OIG-21-62-Sep21.pdf (the "DHS OIG Report").  Because the Court "may take judicial notice of the fact that such a report was published by the OIG, but not of the facts included within the report," *see Dasenbrock v. Enenmoh*, No. 1:11-CV-01884-DADGSAPC, 2018 WL 10322174, at *2 (E.D. Cal. Jan. 8, 2018); *see also, e.g.*, *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("[A] court cannot take judicial notice of disputed facts contained in such public records." (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001))), the Court reiterates that it does not consider this fact as part of the record or its analysis.

### D.     Dousa's Detention and Interrogation

78.     "On January 2, 2019, after having returned to Tijuana, Pastor Dousa crossed the border into the United States from Mexico at the San Ysidro Port of Entry, but was not able to use her Global Entry membership to cross in an expedited fashion, and instead was referred to secondary inspection."   (Stip. Facts at 23 ¶ 13; *see also* Day 2 Tr. at 110:19–111:12.)   An email alert was sent to Miguel Haro pursuant to the TECS alert he had placed on Dousa. (*See* ECF No. 154-3 ("Ex. 349"); *see also* Day 3 Tr. at 544:7–19.)

79.     Dousa was not informed why she had been placed into secondary. (*See* Day 2 Tr. at 112:1–3; *see also id.* at 115:15–18.)   After she was referred to secondary, the Tactical Terrorism Response Team was contacted for an interview.   (*See, e.g.*, Burnett Depo. at 38:14–19.)   Then-CBP Agent Jeremy Burnett and an officer identified in the record as "CBP Agent 1" were selected to perform the interview. (*See id.* at 44:14–45:6; *see also* CBP Agent 1 Depo. at 40:12–17.)

80.     Burnett and CBP Agent 1 had approximately 30 to 40 minutes to prepare before the interview. (*See* Burnett Depo. at 38:20–39:6.)   During that time, they queried databases to determine the subject's crossing and interview history and called the Emergency Operations Center ("EOC") to determine whether there were any instructions or questions to be asked.   (*See id.* at 39:7–42:3; *see also id.* at 33:6–34:15; CBP Agent 1 Depo. at 26:17–27:5, 28:9–29:13.)   Although Burnett could not recall whether he had conferred with CBP Agent 1 prior to interviewing Dousa, it was generally their practice to do so. (*See* Burnett Depo. at 46:17–22.)

81.     CBP Agent 1 was "confident" that prior to the interview he knew that Dousa "was . . . possibly involved in marriage fraud." (*See* CBP Agent 1 Depo. at 43:24–44:20.) He also believed that he may have called Miguel Haro after querying Dousa's TECS record and before the interview. (*See id.* at 49:12–50:5.)   He was unsure whether he learned of Dousa's alleged involvement in marriage fraud from TECS or from Miguel Haro. (*See id.* at 50:13–18.)

/ / /

82.     Burnett, on the other hand, did not recall knowing in advance of the interview that there was an allegation that Dousa was committing marriage fraud. (*See* Burnett Depo. at 51:7–13.)  He believes he may have seen "a chart of pictures of certain individuals . . . they believed were involved in the caravan," which was likely a targeting package, (*see id.* at 58:22–59:4), and that Dousa's picture was on it. (*See id.* at 51:1–6.)

83.     Dousa was detained and interviewed by Burnett and CBP Agent 1 regarding her ministry to members of the migrant caravan.  (Stip. Facts at 23 ¶ 14; *see also* Day 2 Tr. at 111:19–114:16.)  Burnett asked questions, while CBP Agent 1 took notes. (*See* Burnett Depo. at 47:25–48:7; CBP Agent 1 Depo. at 40:18–41:9, 43:8–11.)  According to Burnett's recollection, the TTRT agents were generally instructed to ask questions regarding why the subject was in Mexico, their involvement in the caravan, and whether they were aiding with illegal crossings, (*see* Burnett Depo. at 62:20–63:12; *see also* CBP Agent 1 Depo. at 30:6–20), and Dousa was asked these questions.  (*See* Burnett Depo. at 63:13–15; *see also id.* at 74:7–75:2; CBP Agent 1 Depo. at 45:3–9.)

84.     Burnett testified at his deposition that the interview was "a usual interview." (*See* Burnett Depo. at 35:23–36:17.)  CBP Agent 1 believed that Dousa was being "open" with them.  (*See* CBP Agent 1 Depo. at 44:21–45:2.)

85.     In what Miguel Haro later characterized as a possible "lack of communication," (*see* Day 3 Tr. at 577:11–25), "[t]he CBP agents who interviewed Pastor Dousa in secondary inspection did not ask any questions about any marriage ceremonies Pastor Dousa performed" in Tijuana in November 2018, (*see* Stip. Facts at 23 ¶ 15; *see also* Day 2 Tr. at 113:12–21, 138:4–6; Day 3 Tr. at 548:24–549:12), and—understandably—she did not volunteer any such information.  (*See* Day 2 Tr. at 114:6–14, 210:24–211:13.)  According to CBP Agent 1, "[i]t didn't seem necessary" to ask Dousa about marriage fraud.  (*See* CBP Agent 1 Depo. at 45:10–15.)

86.     The interviewing agents also did not ask Dousa any questions regarding the Virginia notary, (*see id.* at 147:10–24), or the report based on Migrant 1's interview that Dousa had addressed a crowd in Tijuana and told them that if they got married, they would

get papers to live in the United States, (*see id.* at 140:4–10); forced people to get married, (*see id.* at 141:17–21); and had provided anybody with a cell phone. (*See id.* at 145:5–9.)

87.    After forty-three minutes, the agents told Dousa she was free to go. (*See id.* at 114:15–21; *see also id.* at 209:7–14.)  They gave her back her Global Entry card. (*See id.* at 212:3–5.)  A subsequent query of a CBP database reported that Dousa had "PRESENTED HER VALID GLOBAL ENTRY CARD . . . FOR ENTRY INTO THE UNITED STATES." (*See* ECF No. 154-12 ("Ex. 586") (emphasis in original); *see also* Day 2 Tr. at 327:21–328:16.)

88.    Although Dousa had intended to, she did not return to Tijuana the following day or for the rest of the week because she "was afraid" and "wasn't sure what was happening." (*See id.* at 115:1–14; *see also id.* at 134:3–8.)

89.    On January 3, 2019, Miguel Haro received an email notification reporting "NEGATIVE INSPECTION RESULTS," (*see* ECF No. 154-4 ("Ex. 350") (emphasis in original); *see also* Day 3 Tr. at 544:22–545:15), meaning "nothing was seized from Pastor Dousa and no derogatory information was found" during her interview with the TTRT the previous day. (*See* Day 3 Tr. at 545:16–19.)

90.    On January 4, 2019, a "Field Encounter" was published entitled "MIGRANT CARAVAN 2019/KAJI DOUSA." (*See* ECF No. 151-9 ("Ex. 125"); *see also* Day 3 Tr. at 546:19–21.)  In relevant part, the Field Encounter provided:

EXECUTIVE SUMMARY

On January 2, 2019[,] at approximately 1847 hours, Kaji DOUSA (DOB: [redacted]) applied for entry into the US from Mexico via the San Ysidro Port of Entry Pedestrian West area.  DOUSA presented her valid Global Entry card bearing #[redacted], her name, and picture for entry into the United States.  Primary Customs and Border Protection Officer Salazar received two negative customs declarations from DOUSA and she stated she was going to San Diego.  Primary CBPO [redacted] Queried DOUSA'S name in CBP systems and received a computer generated alert.  DOUSA was referred and escorted to the Pedestrian West secondary area for further inspection.  CBPO [redacted] and CBPO Burnett were notified of the alert and responded.

/ / /

An interview of DOUSA was conducted by CBPO Burnett and CBPO [redacted].  DOUSA made the following statements:

**NARRATIVE**

DOUSA arrived in San Diego on Sunday[,] December 30, 2018[,] and spent New Year's in Los Angeles.  She traveled to Tijuana on this date, January 2, 2019[,] and spent the day with immigrants as part of her "Aid Organization." She is a Pastor for Park Avenue Christian Church . . . .  She is now going to San Diego and tomorrow, Thursday, January 3, 2019[,] she will return to Tijuana.  She will be returning to New York on Saturday, January 5, 2019.

DOUSA stated she speaks to migrants who want to cross over to the US "the right way" by "preparing them" to share their credible fear story truthfully. She has been helping the migrants who[se] numbers are coming up at the shelters in Tijuana, Mexico.  When she talks to people at the shelter, she sees them frustrated and "at a breaking point."  Some of them want to cross through the desert.  DOUSA does not encourage them to go through the desert because it is dangerous.

DOUSA has been a pastor since 2006 and has been working on this project since 2009, when she was with "New Sanctuary" in New York. . . .  In the past, she has worked with Immigration and Customs Enforcement in New York as well as CBP New York but was not too clear as to what her dealings were/are with them.

. . . No derogatory information was found during interview[.]

DOUSA was released at approximately 1930 hours.

(Ex. 125 at 4; *see also* Day 3 Tr. at 546:24–548:22.)

91.    By writing "[n]o derogatory information was found," CBP Agent 1 meant "[n]o information that was gathered . . . sa[id] that she was involved in . . . marriage fraud or anything that had to do with the caravan."  (*See* CBP Agent 1 Depo. at 58:21–59:7.)  In CBP Agent 1's opinion, none of the information in the Field Encounter "support[ed] taking any adverse action against Pastor Dousa."  (*See id.* at 76:7–11.)

92.    Although he considered the information in the Field Report to be "potentially relevant to Pastor Dousa's continued enrollment in CBP's Trusted Traveler program," (*see*

Day 3 Tr. at 549:22–25), Miguel Haro did not send it to Oliveri or Gonzales, (*see id.* at 550:1–3), with whom he had previously corresponded regarding Dousa's continued TTP enrollment.  (*See id.*at 549:13–21.)

93.    That same day, Miguel Haro emailed the TTRT: "If Kaji Dousa crosses again please see attached ROI and image.  She may be part of furthering fraudulent marriage certificates with a valid VA notary stamp.  If encountered[,] direct questions to association to women from ROI and how she's assisting with marriage certificates."  (*See* ECF Nos. 150-5 ("Ex. 78"), 154-8 ("Ex. 582"); *see also* Day 3 Tr. at 552:6–10, 578:1–579:10; Burnett Depo. at 80:1–19.)

94.    On January 7, 2019, the Emergency Operations Center provided a briefing.  (*See* ECF No. 154-5 ("Ex. 351"); *see also* Day 3 Tr. at 556:25–557:4.)  Among other things, the briefing included slides concerning "CBP Encounter[s]/Interview[s]" with "Caravan Coordinator[s]," including Dousa.  (*See* Ex. 351 at 22–23.)  The slide contained bullet points from the Field Encounter from her TTRT interview, (*see id.* at 23; *see also* Day 3 Tr. at 557:9–22), but nothing about marriage ceremonies in Tijuana.  (*See* Ex. 351 at 23; *see also* Day 3 Tr. at 557:23–558:3.)

### E.    *The Migrant Caravan PowerPoint*

95.    In the beginning of 2019, following a mass attempt by migrants to cross the Southern border into the United States, then-CBP Chief Patrol Agent for the San Diego Sector Scott asked for a briefing on efforts being taken regarding the migrant caravan.  (*See* Day 3 Tr. at 409:18–410:3.)   In response, Del Villar assigned Rodriguez to create a document to brief Scott about individuals associated with the caravan.  (*See id.* at 410:12–411:1, 431:21–432:3.)

96.    Rodriguez "directly obtained" "all of the information contained within the PowerPoint."  (*See id.* at 433:12–15.)  Rodriguez first performed keyword searches for terms such as "caravan," "migrant caravan," "caravan 2019," and "migrant caravan 2019" in the IRS database.  (*See id.* at 433:21–434:12.)

/ / /

97.     Rodriguez then skimmed the search results and relevant reports.  (*See id.* at 434:13–14, 435:17–24.)  Individuals who were identified in the reports were added to the PowerPoint.  (*See id.* at 436:5–437:12.)  Rodriguez included uniform information for each individual, including their photograph, name, date of birth, county of citizenship, role, whether a TECS alert had been placed, and a "disposition."  (*See id.* at 437:13–439:8.)  Rodriguez completed these steps in approximately four to five hours on January 7, 2019.  (*See id.* at 443:20–444:5.)

98.     Ninety-nine percent of the information included in the PowerPoint came from the IRS keyword search results, (*see id.* at 439:9–13), with the rest coming from other CBP databases.  (*See id.* at 439:14–440:6.)  Aside from role and disposition, Rodriguez considered the information to be accurate.  (*See id.* at 442:17–443:2.)  Verifying the information, however, was beyond the scope of the task he had been assigned.  (*See id.* at 440:18–441:12.)

99.     After compiling this information, Rodriguez sent it two other supervisors whose role was limited to the aesthetic presentation of that material in PowerPoint format.  (*See id.* at 433:2–8, 433:16–20, 444:2–9.)  One of those supervisors sent the completed PowerPoint to Rodriguez the following morning at 7:26 a.m.  (*See* ECF No. 152-10 ("Ex. 317"); *see also* Day 3 Tr. at 444:14–445:10.)

100.    At 7:39 a.m. on January 8, 2019, Rodriguez circulated the PowerPoint presentation, entitled "SDC-FOB: Migrant Caravan FY-2019: Suspected Organizers, Coordinators, Instigators, and Media" (the "Migrant Caravan PowerPoint"),[9] to Jose and Miguel Haro, among others.  (*See* ECF Nos. 149-15 ("Ex. 48"), 152-8 ("Ex. 315"); *see also* Day 2 Tr. at 307:15–308:1, 308:14–22; Day 3 Tr. at 446:4–11, 559:1–12.)  The cover email said, "this is what we have so far, see attached."  (*See* Exs. 48, 315.)  It added, "I know Saro [Oliveri] mentioned . . . a few SENTRIs that were pulled, do you know which

/ / /

---

[9] SDC-FOB stands for "San Diego Sector Foreign Operations Branch."

ones?  Are the subjects on here?" ((*See* Ex. 315; *see also* Day 2 Tr. at 308:2–13, Day 3 Tr. at 450:16–24.)

101.   The Migrant Caravan PowerPoint included a photograph of Dousa *without* an "X" over her face, indicating her "Role" and "Disposition" as "N/A" and that there had been "No" "Alert Placed."  (*See* Ex. 315; *see also* Day 2 Tr. at 308:25–309:13; Day 3 Tr. at 448:16–449:14, 559:16–560:3; Stip. Facts at 23 ¶ 17.)

102.   Later that morning, Miguel Haro responded to Rodriguez, copying Dousa's photograph and information from the Migrant Caravan PowerPoint into the email.  (*See* ECF Nos. 149-15 ("Ex. 48"), 152-9 ("Ex. 316"); *see also* Day 2 Tr. at 309:20–25, Day 3 Tr. 452:17–24, 560:9–12.)  He noted:

> She has Global Entry[.]
>
> It was put on hold pending interview.
>
> She was interviewed by TTRT and she has a [TECS hit].  She was marrying the migrants and she is associated [with] possible marriage fraud with a VA notary that is down in Mex too.  I believe Agent Trueblood did an FE on the marriage fraud.  I'll look for it and forward.

(*See* Exs. 48, 316; *see also* Day 2 Tr. at 310:17–311:9, Day 3 Tr. at 452:5–453:6, 560:13–561:16.)

103.   After further email exchanges, Rodriguez asked, "So she still has her Global Card?" (*See* ECF No. 152-6 ("Ex. 311").)  At 11:11 a.m. on January 8, 2019, Miguel Haro responded, "Yeah, the enrollment center wasn't 100% convinced.  So they were waiting on the interview.  I'll check GES (Global Enrollment System) and see what they did with her.  I'll let you know." (*See id.*)

104.   Despite receiving this information and understanding that Dousa still had her Global Entry card, Rodriguez "made a mistake and . . . never went back and adjusted or adjudicated that information on the PowerPoint."  (*See* Day 3 Tr. at 477:3–478:6.)  He presented the Migrant Caravan PowerPoint to Scott on the morning of January 9, 2019. / / /

(*See id.* at 455:25–456:7.)  The briefing lasted approximately 90 seconds.  (*See id.* at 475:17–21.)

105.   On January 9, 2019, and again on January 10, 2019, Rodriguez circulated a revised version of the Migrant Caravan PowerPoint "containing 67 identified Caravan Organizers."  (*See* ECF Nos. 149-1 ("Ex. 5"), 151-6 ("Ex. 119"), 152-3 ("Ex. 303"); *see also* Day 2 Tr. at 311:11–312:5, Day 3 Tr. at 456:8–457:10, 563:11–24; Stip. Facts at 23 ¶ 16.)  Rodriguez invited the recipients to "[f]eel free to send out to whomever you like." (*See* Exs. 5, 119, 303; *see also* Day 2 Tr. at 312:6–8, Day 3 Tr. at 457:2–10, 474:13–19.) Miguel Haro forwarded the email containing the revised Migrant Caravan PowerPoint to a number of recipients without comment.  (*See* Ex. 119; *see also* Day 3 Tr. at 564:3–20.)

106.   The revised Migrant Caravan PowerPoint added a yellow "X" over Dousa's photo indicating revocation of her TTP status, changed her "Role" to "Associate," indicated that an "Alert" had been "Placed," and changed "Disposition" to "SENTRI Revoked."  (*See* ECF Nos. 149-4 ("Ex. 27"), 151-10 ("Ex. 126"); *see also* Day 2 Tr. at 312:20–315:19, Day 3 Tr. at 459:15–460:22, 562:17–563:3; Stip. Facts at 23 ¶ 18.)  Oliveri cannot explain why these changes were made after the TTRT found no derogatory information about Dousa after interviewing her on January 2, 2019.  (*See* Day 2 Tr. at 317:8–15.)

107.   On February 27, 2019, NBC sent several agencies a "request for comment" on the Migrant Caravan PowerPoint, (*see* ECF No. 149-2 ("Ex. 9")), which had been leaked.  (*See* Stip. Facts at 23 ¶ 19; *see also* Day 3 Tr. at 413:6–7.)  The email was circulated within CBP, (*see* Ex. 9), with Del Villar eventually writing that "Chief [Scott] is asking [the Sector Intelligence Unit] and [Foreign Operations Branch] to help him articulate why we are targeting these individuals."  (*See id.*; *see also* Day 3 Tr. at 414:6–19.)

108.   On March 8, 2019, an entry was added to Dousa's TECS record: "Migrant caravan FY 2019.  Information Only [¶] TTRT exam.  Do not revoke SENTRI based on this lookout."  (*See* ECF Nos. 150-1 ("Ex 51") at 3, 151-8 ("Ex. 122"); *see also* Day 2 Tr.

/ / /

at 318:14–319:3, 345:10–15.)  Oliveri had no explanation for the entry other than the leak of the Migrant Caravan PowerPoint two days earlier.  (*See* Day 2 Tr. at 320:9–16.)

109.  On July 25, 2019—the same day that Dousa moved for a preliminary injunction in this case, (*see generally* ECF No. 25; *see also* Day 2 Tr. at 324:3–13)—Oliveri entered a notation in Dousa's GES record: "Interdiction cancelled.  TECS record was a one-day lookout based on limited information received.  No other derogatory information found.  Oliveri."  (*See* Ex. 51-2 at 48; Ex 580; *see also* Day 2 Tr. at 322:24–323:13, 345:16–22.)  Other than Dousa moving for a preliminary injunction that day, Oliveri could recall no other reason for cancelling the interdiction on that day.  (*See* Day 2 Tr. at 325:14–325:18.)

**V.    Dousa's Discovery of the Investigation and Its Impact on Her**

110.  "On March 6, 2019, NBC 7 in San Diego published an article [containing] a copy of the PowerPoint presentation that had been leaked by a whistleblower."  (Stip. Facts at 23 ¶ 19; *see also* ECF No. 153-11 ("Ex. 343"); Day 3 Tr. at 413:6–7.)  When Dousa saw the article, she understood why she had been pulled into secondary screening in January of that year.  (*See* Day 2 Tr. at 115:19–117:5.)

111.  Because Dousa suspected that one of the blurred-out photos appearing in the article might be hers, she contacted Tom Jones, the reporter who broke the story, who emailed her a copy of the unredacted, unblurred photo of Dousa with a yellow "X" across her face.  (*See id.* at 117:6–25; *see also* ECF No. 151-10 ("Ex. 126").)  When she saw it, Dousa "collapsed to the floor and just hid under [her] table and cried."  (*See* Day 2 Tr. at 122:13–15.)

112.  The combination of the yellow "X" and text led Dousa to believe that her Global Entry had been "canceled," (*see* Day 2 Tr. at 127:10–19), or "revoked," (*see id.* at 128:20–129:8), and she has been unsure of her Trusted Traveler program status ever since.  (*See id.* at 130:4–11.)

113.  Dousa has travelled to Mexico five times and internationally two times since March 2019.  (*See* ECF No. 154-9 ("Ex. 583"); *see also* Day 2 Tr. at 339:9–25.)  Although

Dousa was "unable to use [her] Global Entry card at the kiosk" and "had to go back into the general passport lane" when she returned from a ministry trip to Ethiopia in approximately 2021, (*see id.* at 130:12–24; *see also id.* at 229:15–230:5), she was not pulled into secondary inspection or otherwise questioned during that or any subsequent reentry into the United States. (*See id.* at 131:3–6 (Ethiopia), 229:7–12 (Bahamas), 230:10–17 (Mexico); *see also* Ex. 583.)

114.   When Dousa returned to Mexico as part of her ministry after March 2019, she only felt comfortable doing so accompanied by counsel. (*See* Day 2 Tr. at 128:21–129:16; *see also id.* at 134:9–12, 228:21–3.) Dousa also has been "careful to carry a letter from [her] lawyer explaining that [she is], indeed, a U.S. citizen" when travelling internationally. (*See id.* at 129:17–130:3.)

115.   In September 2021, Dousa learned of the email that Oliveri had sent to the Mexican government when she read the DHS OIG Report. (*See id.* at 131:21–132:6.) To Dousa, "this was worse" than the leak of the PowerPoint "because it's just so much more physically dangerous" and she "was, again, terrified." (*See id.* at 132:12–20.) Because she does not feel safe doing so, she has not returned to Mexico since that time. (*See id.* at 132:21–133:4, 134:13–16, 155:3–6.)

116.   According to Dousa, these events have "changed [her] life" and "the way that [she] do[es her] ministry." (*See id.* at 133:12–15.) She no longer travels to Mexico, meaning she can no longer offer a "ministry of presence." (*See id.* at 134:17–135:1; *see also id.* at 226:23–227:19.) As for her ministry in the United States, Dousa no longer feels comfortable officiating marriages for non-U.S. citizens. (*See id.* at 135:2–17.) Finally, regarding her ministry to U.S. citizens, after these events took place, Dousa's congregants worried that they might become "targets of the U.S. government." (*See id.* at 136:3–15.)

117.   Dousa continues to "speak publicly about immigration issues and [her] criticisms of them," (*see id.* at 215:5–7), although she has "plenty of fear of retaliation from CBP." (*See id.* at 215:22–25.) "It's a calculation [she] always ha[s] to make." (*See id.* at 216:1–3.)

**CONCLUSIONS OF LAW**

## I.   Article III Standing

1.     "To establish Article III standing, a plaintiff must demonstrate that: (1) she suffered an 'actual or imminent' injury as a result of the alleged illegal conduct; (2) there is a 'causal connection between the injury and the conduct complained of'; and (3) the injury will 'likely' be 'redressed by a favorable decision' of the court." *Wright v. Serv. Emps. Int'l Union Loc. 503*, 48 F.4th 1112, 1118 (9th Cir. 2022) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)), *cert. denied sub nom. Wright v. SEIU Loc. 503*, No. 22-577, 2023 WL 350030 (U.S. Jan. 23, 2023).

2.     "Because [Dousa]'s First Amendment claim for declaratory and injunctive relief [i]s based on the threat of future injury, she has standing to sue only if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *See id.* (internal quotation marks omitted) (quoting *In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014))). "[Dousa] cannot rely 'on mere conjecture' about Defendants' possible actions; she must present 'concrete evidence to substantiate [her] fears.'" *See id.* (quoting *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 825 (9th Cir. 2020) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 420 (2013))). "Past wrongs are 'insufficient by themselves to grant standing,' but are 'evidence bearing on whether there is a real and immediate threat of repeated injury.'" *Id.* at 1118–19 (quoting *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983))). "When a plaintiff's standing is grounded entirely on the threat of repeated injury, a plaintiff must show 'a sufficient likelihood that [s]he will again be wronged in a similar way.'" *Id.* at 1119 (alteration in original) (quoting *Davidson*, 889 F.3d at 967 (quoting *Lyons*, 461 U.S. at 111)).

3.     "First Amendment challenges 'present unique standing considerations' because of the 'chilling effect of sweeping restrictions' on speech." *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1171 (9th Cir. 2018) (quoting *Ariz. Right to Life Political Action*

*Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003)).  "A chilling of First Amendment rights can constitute a cognizable injury, so long as the chilling effect is not 'based on a fear of future injury that itself [is] too speculative to confer standing.'"  *Index Newspapers*, 977 F.3d at 826 (alteration in original) (quoting *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015) (citing Clapper, 568 U.S. at 417–18); *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) ("[A]s the Supreme Court has recognized, a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury.").

4.      "The existence of standing turns on the facts as they existed at the time the plaintiff filed the complaint."  *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007) (citing *Lujan*, 504 U.S. at 569 n.4).  Judge Burns previously concluded that "Dousa has demonstrated that she has standing to pursue her claims against the Government based on its pattern of surveillance and the chilling effect this surveillance has had on her exercise of protected activity," *see Dousa v. DHS*, No. 19CV1255-LAB (KSC), 2020 WL 434314, at *6 (S.D. Cal. Jan. 28, 2020), and, in the absence of any challenge from Defendants, (*see generally* Defs.' Br.), the Court is disinclined to reevaluate Dousa's standing at this time.

## II.      First Cause of Action: Retaliation in Violation of the First Amendment

5.      The Parties agree that, to establish a *prima facie* case for retaliation, Dousa must establish that (1) she engaged in a constitutionally protected activity, (2) Defendants' actions would chill a person of ordinary firmness from continuing to engage in that protected activity, and (3) the protected activity was a substantial or motivating factor in Defendants' conduct.  (*Compare* Pl.'s Br. at 39–40 (quoting *Sampson v. County of Los Angeles*, 974 F.3d 1012, 1019 (9th Cir. 2020)), *with* Defs.' Br. at 17 (citing *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010)).)  "To ultimately prevail on such a claim, a plaintiff must establish a causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury."  *Capp v. County of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019) (internal quotation marks omitted) (quoting *Nieves v. Bartlett*, 587 U.S. ___, 139 S. Ct. 1715, 1722 (2019)).  "Specifically, a plaintiff must show that the

defendant's retaliatory animus was a but-for cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* (quoting *Nieves*, 139 S. Ct. at 1722).

6.    "Once a plaintiff has made such a showing, the burden shifts to the government to show that it 'would have taken the same action even in the absence of the protected conduct.'" (Pl.'s Br. at 40 (quoting *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016)).)   "The Government must show more than that they *could* have punished the plaintiffs[] in the absence of the protected speech; instead, the burden is on the defendants to show through evidence that they *would* have punished the plaintiff[] under those circumstances." *Bello-Reyes v. Gaynor*, 985 F.3d 696, 702 (9th Cir. 2021) (emphasis in original) (quoting *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006)).

7.    The Court finds that Dousa has established a *prima facie* case for First Amendment Retaliation.   First, the law is clear, and Defendants do not dispute, (*see* Defs.' Br. at 17–18), that both Dousa's ministry to migrants and speech concerning U.S. immigration law and policy constitute "constitutionally protected activity."   *See, e.g.*, *Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105, 109 (1943) (noting that distribution of religious pamphlets, like "worship in the churches and preaching from the pulpits," "occupies . . . high estate under the First Amendment"); *Capp*, 940 F.3d at 1054 ("[V]oicing criticism of [a government a]gency's conduct[ ]is constitutionally protected." (citing *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *Ford v. City of Yakima*, 706 F.3d 1188, 1192–93 (9th Cir. 2013) (per curiam), *abrogated on other grounds by Nieves*, 139 S. Ct. 1715)); *see also Adlerstein v. U.S. Customs & Border Prot.*, No. CIV 19-500-TUC-CKJ, 2020 WL 5846600, at *12 (D. Ariz. Oct. 1, 2020) (concluding that "associating with migrants and advocates and . . . engaging in political speech" were protected activity (first citing *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984); then citing *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 186–87 (1999))).

8.    Second, Oliveri's email to the Mexican government would chill a person of ordinary firmness from continuing to engage in Dousa's protected activities.   In that email,

Oliveri, on behalf of CBP, requested that Dousa be "den[ied] entry to Mexico" and "sen[t] . . . back to the United States."  As Dousa testified at trial:

> It would be reckless, even, to go to a country that my country has asked to apprehend, arrest me and place me in custody until I'm returned to the custody of the United States. . . .  You don't go to a country where you know that you might be arrested for just walking there and offering ministry.  It doesn't make sense.

(*See* Day 2 Tr. at 227:13–19.)  There is no evidence that Defendants have corrected or retracted this request and, although Dousa traveled to Mexico five times following her detention on January 2, 2019, she has not returned to Mexico since she learned of the email in September 2021.

9.    Finally, the Court concludes that Dousa's constitutionally protected activity was a substantial or motivating factor in—at the very least—Defendants' decision to email the Mexican authorities.

10.    With the benefit of hindsight, there are numerous ways in which Defendants' investigation of Dousa could have been improved.  Based on Migrant 1's statements on November 30, 2018, the Court finds that Defendants had a legitimate interest in searching for information concerning Dousa in government databases and/or placing a TECS "lookout" on Dousa to conduct an interview of her regarding the information provided by Migrant 1.  The legitimacy of the Defendants' investigative efforts, however, particularly the detention and interview of Dousa on January 2, 2019, is undermined by the fact that during the January 2, 2019 interview Dousa was never questioned about Migrant 1's information or her activities related to officiating marriage ceremonies in Mexico.  Further, although several CBP employees sought to revoke Dousa's Global Entry, the record makes clear that no CBP employee ever took the steps necessary to do so.  Indeed, had the Migrant Caravan PowerPoint never been leaked to the press, Dousa would have been none-the-wiser as to any of Defendants' investigative actions, including the "targeting" work product, with the notable exception of Dousa's January 2, 2019 detention and interview.

/ / /

11.    In contrast to the Court's determination that Defendants had a legitimate interest in conducting a follow-up investigation regarding Migrant 1's statements, the Court concludes that no credible claim of legitimacy can be made for Oliveri's December 10, 2018 email to the Mexican government.  Not only does it appear that the decision to send such an email was unprecedented, but even Oliveri acknowledged that the email was "[l]iterally, creative writing . . . [w]ithout any basis."  Despite Oliveri's testimony that he never "inten[ded] to punish or retaliate against Pastor Dousa because of her religious beliefs," (*see* Day 2. Tr. at 340:20–23), the absence of any proper basis for writing and sending the email is incontrovertible evidence of Oliveri's retaliatory motive. *See, e.g.*, *White*, 227 F.3d at 1237–38 (affirming grant of summary adjudication in favor of plaintiffs' on the First Amendment retaliation claim where "the investigation far exceeded what was reasonable for the purpose of ascertaining the plaintiffs' motives for filing the state-court suit and thus intruded unnecessarily on their First Amendment rights").

12.    Because Dousa has established a *prima facie* case for retaliation stemming from the email to the Mexican government, the burden shifts to the government to show that it would have taken the same action even in the absence of Dousa's protected conduct. Defendants have failed to do so.  (*See generally* Defs.' Br. at 17–18.)

13.    The Court therefore concludes that Dousa has established that the CBP retaliated against her in violation of her First Amendment rights.

**III.    Second Cause of Action: Violation of the First Amendment's Free Exercise Clause**

14.    The Parties agree that, to prevail on her Free Exercise claim, Dousa must establish that Defendants' actions impaired the free exercise of her genuinely held religious beliefs.  (*Compare* Pl.'s Br. at 38 (citing *Jones v. Slade*, 23 F.4th 1124, 1144 (9th Cir. 2022)), *with* Defs.' Br. at 18 (citing *United States v. Lee*, 455 U.S. 252, 256–57 (1982)).) As Judge Burns previously recognized, when—as here—"'the challenged government action is neither regulatory, proscriptive or compulsory,' the question is not necessarily whether the Government action is neutral and generally applicable, but rather 'whether it

19-CV-1255 TWR (KSC)

substantially burdens a religious practice and either is not justified by a substantial state interest or is not narrowly tailored to achieve that interest.'" *Dousa*, 2020 WL 434314, at *7 (quoting *Am. Fam. Ass'n, Inc. v. City & County of San Francisco*, 277 F.3d 1114, 1123–24 (9th Cir. 2002)).

15.   "[A] substantial burden 'must place more than inconvenience on religious exercise.'" *Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1067 (9th Cir. 2011) (quoting *Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 456 F.3d 978, 988 (9th Cir. 2006)).  Instead, "a 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert[ v. Verner*, 374 U.S. 398 (1963)]) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*[Wisconsin v.] Yoder*[, 406 U.S. 205 (1972)])." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069–70 (9th Cir. 2008).  "Any burden imposed on the exercise of religion short of that described by *Sherbert* and *Yoder* is not a 'substantial burden.'" *Id.* at 1070.  Consequently, "a subjective chilling effect on free exercise rights is not sufficient to constitute a substantial burden." *Dousa*, 2020 WL 434314, at *7 (quoting *Am. Family Ass'n*, 277 F.3d at 1124) (citing *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1394 (9th Cir. 1994)).

16.   Dousa contends that Defendants have substantially burdened her religious practice by (1) "coercively prevent[ing] her from traveling to Mexico to carry out her ministry of presence there[,]" (2) "coercively prevent[ing] her from officiating Christian marriage ceremonies for non-U.S. citizens in the United States[,]" and (3) "imped[ing] [her] ability to provide essential pastoral care to her congregants with the necessary guarantees of secrecy and confidentiality."  (*See* Pl.'s Br. at 37 (citing *Mockaitis v. Harcleroad*, 104 F.3d 1522, 1533 (9th Cir. 1997), *overruled on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997)).)  Although Defendants concede that Dousa's ministry in Mexico, officiating Christian marriage ceremonies, and provision of pastoral care are religious practices, they argue that the harms Dousa identifies remain "subjective / / /

and constitute, at best, only an incidental burden on her religious practice." (*See* Defs.' Br. at 19.)

17.     To the extent Dousa contends that Defendants have violated her Free Exercise rights because she has declined to "officiate marriages for non-U.S. citizens, because [she] worr[ies] about what that might do to their immigration status for having been associated with [her] in some way," (*see* Day 2 Tr. at 135:2–17), Dousa has not established more than a subjective chilling effect.  Although Dousa's reluctance to officiate marriages for non-U.S. citizens is understandable, the record establishes that Defendants' investigation was limited to whether Dousa was committing marriage fraud to facilitate asylum claims for members of the 2018 to 2019 migrant caravan.  There is no evidence in the record that (1) the investigation ever focused on marriages Dousa officiated anywhere other than Tijuana; (2) any further investigative measures were taken against Dousa after July 25, 2019, when Oliveri cancelled the interdiction on her in the TECS database; or (3) any adverse immigration-related action has ever been taken against any non-U.S. citizen Dousa has married, including those she married in Tijuana on November 27 and 28, 2018.  Ultimately, there is an insufficient nexus between the activity from which Dousa is refraining and the government's investigative actions.  The Court is therefore unable to conclude that Defendants' investigation coercively has prevented Dousa from officiating marriages for non-U.S. citizens in the United States.

18.     The same is true of Dousa's claim that Defendants' investigation has impeded her from providing essential pastoral care to her congregants.  Dousa testified that learning of the investigation against her has made "things so much harder for [her congregants]" because "they worried that [the United States' investigation] could also make them targets of the U.S. government." (*See* Day 2 Tr. at 136:3–15.)  Dousa, however, stops short of offering evidence that "members have withdrawn from active participation" or "congregants have become reluctant to seek pastoral counseling and are less open in prayers and confessions." *Cf. Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 522 (9th Cir. 1989) (concluding that church had standing on First Amendment claim

where U.S. Immigration and Naturalization Service agents surreptitiously recorded church services because "when congregants are chilled from participating in worship activities, when they refuse to attend church services because they fear the government is spying on them and taping their every utterance, all as alleged in the complaint, . . . a church suffers organizational injury because its ability to carry out its ministries has been impaired"); *cf. also Mockaitis*, 104 F.3d at 1530 (concluding that audiotaping of Catholic sacrament of confession between prisoner and Catholic priest for purposes of murder investigation "invade[d prisoners'] free exercise of religion and . . . ma[de] it impossible for [the priest] to minister the sacrament to those who seek it in jail").  There also is no evidence, as there was in *Presbyterian Church* or *Mockaitis*, that Dousa's interactions with her congregants were ever recorded, much less monitored, as part of the government's investigation into marriage fraud allegedly occurring in Mexico.  Although Dousa's claimed harms are important, the current record fails to establish that Defendants' investigation into Dousa's alleged participation in marriage fraud has prevented Dousa from providing essential pastoral care to her congregants in the United States.

19.    Further, the United States has a compelling interest in protecting the border, *see Presbyterian Church (U.S.A.) v. United States*, 752 F. Supp. 1505, 1513 (D. Ariz. 1990) ("[T]he government's interest in controlling immigration outweighs appellants' purported religious interest." (quoting *United States v. Aguilar*, 883 F.2d 662, 696 (9th Cir.1989), *superseded by statute on other grounds as recognized in United States v. Gonzalez-Torres*, 309 F.3d 594 (9th Cir. 2002))); (*see also* Defs.' Br. at 22–26), and the investigation was narrowly tailored to achieve that result.  The record reveals that the investigation—although at times misguided and unprofessional—was limited to Defendants pulling information about Dousa from the internet and government-accessible databases and interviewing her at secondary inspection.  The Court therefore concludes that Dousa has failed to establish that Defendants violated her Free Exercise rights by investigating Migrant 1's report that Dousa may have been involved in marriage fraud.

/ / /

20.     The Court reaches a different conclusion as to Dousa's Free Exercise claim to the extent she contends that Oliveri's December 10, 2018 email to the Mexican government has substantially burdened her ministry in Mexico.  At the preliminary injunction stage, Judge Burns concluded that Dousa had failed to demonstrate a likelihood of success on the merits because "[s]he remains free to travel to Mexico, to minister there, and to return to the United States with ease."  *See Dousa*, 2020 WL 434314, at *8.  Judge Burns noted, however, that, "if the Government had revoked Dousa's SENTRI card (and Dousa could show that the revocation was the result of her engaging in protected activity), the Court would have no problem finding a substantial burden" because "[t]hat action would effectively amount to a government sanction, and it would undoubtedly make it more difficult for her to travel and to practice her sincerely held beliefs."  *See id.*

21.     Although the Court has concluded that the government did not revoke Dousa's Global Entry privileges, the December 10, 2018 email has accomplished the same end result:  Defendants contend that "Plaintiff has traveled to Mexico on multiple occasions since the time she was sent to secondary," (*see* Defs.' Br. at 19), but the record conclusively establishes that Dousa has not travelled to Mexico since learning of the December 10, 2018 email in September 2021.  For the reasons discussed above, *see supra* Section II, the email "threatens to 'coerce' [Dousa], via [potential forced repatriation,] into abandoning conduct that is an exercise of religion."  *See United States v. Hoffman*, 436 F. Supp. 3d 1272, 1285 (D. Ariz. 2020) (concluding that volunteers from a faith-based, humanitarian aid organization demonstrated that enforcement of permit requirement for entering wildlife refuge substantially burdened their exercise of their religious beliefs); *see also, e.g.*, *Dousa*, 2020 WL 434314, at *8 (noting that revocation of Dousa's TTP status "would effectively amount to a government sanction, and it would undoubtedly make it more difficult for her to travel and to practice her sincerely held beliefs").

22.     Further, this burden is not justified by a substantial state interest or narrowly tailored to achieve that interest.  While the United States undoubtedly has a compelling state interest in protecting the border, Oliveri's admission that the email was "[l]iterally,

creative writing . . . [w]ithout any basis" indicates that there exists no substantial state interest in requesting that Mexican authorities deny entry to Dousa.  And, as evidenced by the United States' other investigative efforts, there exist more "narrowly tailored" approaches to achieve border security.  Dousa therefore has established that the CBP violated her Free Exercise rights by restricting her ability to minister to migrants in Mexico.

**IV.     Third Cause of Action: Violation of the Religious Freedom Restoration Act**

23.     Finally, the Parties agree that, to succeed on her RFRA claim, Dousa must prove (1) the activities she claims are burdened by Defendants' action are an exercise of religion, and (2) Defendants' action substantially burdened her exercise of religion. (*Compare* Pl.'s Br. at 36 (quoting *Oklevueha Native Am. Church of Haw., Inc. v. Lynch*, 828 F.2d 1012, 1014 (9th Cir. 2016)), *with* Defs.' Br. at 20 (quoting *Navajo Nation*, 535 F.3d at 1068).)  Once Dousa has met her burden, Defendants must prove that the challenged government action furthers a compelling governmental interest and is implemented by the least restrictive means.  (*Compare* Pl.'s Br. at 36 (quoting *Navajo Nation*, 535 F.3d at 1068), *with* Defs.' Br. at 20 (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 705 (2014)).)

24.     As Judge Burns noted, *see Dousa*, 2020 WL 434314, at *8–9, and the Parties acknowledge, (*see* Pl.'s Br. at 38–39), this analysis is similar to that of Plaintiff's Free Exercise claim, with the exception that the government interest must be "compelling" instead of "substantial" and "implemented by the least restrictive means" rather than "narrowly tailored."  For the same reasons as discussed above, *see supra* Section III, the Court concludes that Plaintiff has established that the CBP violated the RFRA when Oliveri emailed the Mexican government on December 10, 2018, but not by conducting its investigation into her alleged marriage fraud.

**V.     Prevailing Party**

25.     Dousa requests that she be awarded her reasonable costs and attorneys' fees as the prevailing party pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412.  "The EAJA provides for the award of attorney's fees to a party that prevails against

the United States in a proceeding for review of an agency action, unless the court finds 'that the position of the United States was substantially justified or that special circumstances make an award unjust.'"  *Costa v. Comm'r of Soc. Sec. Admin.*, 690 F.3d 1132, 1135 (9th Cir. 2012) (quoting 28 U.S.C. § 2412(d)(1)(A)).

26.    Here, the Court finds that the CBP violated Dousa's First Amendment rights when Oliveri emailed the Mexican government on December 10, 2018. *See supra* Sections II–IV.  Dousa is therefore entitled to at least some of her reasonable costs and attorneys' fees.  What proportion of her costs and attorneys' fees Dousa is entitled to recover depends on the resolution of two questions:  "First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded?  Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?"  *See Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).  The Court therefore defers ruling on the amount of Dousa's award of reasonable costs and attorneys' fees pending the receipt of additional briefing from the Parties, as discussed below.

## CONCLUSION AND RULING

27.    Ultimately, the Court concludes that Dousa has established that the CBP unlawfully retaliated against her for her protected First Amendment activity, violated her Free Exercise right to minister to migrants in Mexico, and violated the RFRA when Oliveri emailed Mexican authorities on December 10, 2018, that "there exist[ed] a great possibility that [she] d[id] not have adequate documentation to be in Mexico" and that she should be "den[ied] . . . entry to Mexico" and "sen[t] . . . back to the United States."

28.    Accordingly, within fourteen (14) days of the date on which this Order is electronically docketed, Defendants **SHALL COMMUNICATE** in writing to appropriate Mexican immigration authorities that their request in Oliveri's December 10, 2018 email is fully and immediately rescinded and revoked as to Dousa.  Defendants **SHALL SUBMIT** a copy of such communication to the Court.

29.    Pursuant to the EAJA, the Court **AWARDS** Dousa her reasonable costs and attorneys' fees as the prevailing party in this case.  Dousa **MAY FILE** a properly supported

19-CV-1255 TWR (KSC)

motion regarding her reasonable costs and attorneys' fees, including whether the fee award should be reduced given Dousa's partial success, on or before April 24, 2023.  Should Dousa file a motion under the EAJA, Defendants **SHALL FILE** their opposition on or before May 15, 2023, and Dousa **MAY FILE** an optional reply, if any, on or before May 29, 2023.  Upon completion of the briefing, the Court will take the matter under submission without oral argument pursuant to Civil Local Rule 7.1(d)(1).  If the Court later determines that oral argument is necessary, it will set a hearing date.

  **IT IS SO ORDERED.**

Dated:  March 21, 2023

Honorable Todd W. Robinson
United States District Judge

19-CV-1255 TWR (KSC)